**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**BLOOMBERG L.P., Defendant.**

**Jill Patricot, Tanys Lancaster, Janet Loures, Monica Prestia, Marina Kushnir and Maria Mandalakis, Plaintiffs–Intervenors,**

v.

**Bloomberg L.P., Defendant.**

**No. 07 Civ. 8383(LAP).**

United States District Court, S.D. New York.

Sept. 9, 2013.

---

See, also, 967 F.Supp.2d 802, 2013 WL 4799150.

Elizabeth Anne Grossman, Raechel Lee Adams, Robert David Rose, Ana Consuelo Martinez, Christine Jiyeun Back, Konrad Batog, U.S. Equal Employment Opportunity Commission, New York, NY, Justin Mulaire, Kam Sau Wong, U.S. Equal Employment Opportunity Commission, Chicago, IL, for Plaintiff.

Milo Silberstein, William J. Dealy, Dealy Silberstein & Braverman, LLP, Richard Alan Roth, The Roth Law Firm, PLLC, New York, NY, for Plaintiffs–Intervenors.

Eric S. Dreiband, Hannah M. Breshin, Sherron Thomas McClain, M. Carter DeLorme, Stephanie Holmes, Tonya M. Osborne, Jones Day, Washington, DC, Thomas H. Golden, Willkie Farr & Gallagher LLP, Vicki Renee Walcott–Edim, Jones Day, New York, NY, for Defendant.

## OPINION & ORDER

LORETTA A. PRESKA, Chief Judge:

Plaintiff, the Equal Employment Opportunity Commission ("EEOC"), filed this action against Defendant Bloomberg L.P. ("Bloomberg") after several current and former employees had filed charges with the EEOC alleging sex/pregnancy discrimination and retaliation[1] in violation of Title

---

**1.** Claimants Jill Patricot, Tanys Lancaster, and Janet Loures filed charges with the EEOC alleging sex/pregnancy discrimination by Bloomberg. (Second Amended Compl. [dkt. no. 49] ¶ 6.) Later, claimants Jill Patricot, Janet Loures, Maria Mandalakis, and Marina Kushnir filed charges with the EEOC alleging

VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e(k), 2000e–2. (Second Amended Compl. ¶¶ 1, 6.) Generally, the complaint alleged that Bloomberg had discriminated and/or retaliated against the claimants and other similarly situated employees after they had announced their pregnancies and had returned to work following maternity leave. (Id. ¶¶ 7, 9.) Subsequently, Plaintiffs Jill Patricot, Tanys Lancaster, Janet Loures, Monica Prestia, Marina Kushnir, and Maria Mandalakis (collectively, the "Plaintiff–Intervenors") intervened in this action on their own behalf.

Before the Court is a motion brought by Bloomberg seeking summary judgment on claims asserted by the Plaintiff–Intervenors [dkt. no. 322]. As set forth below, Defendant's motion with respect to the Plaintiff–Intervenors is GRANTED in part and DENIED in part.[2]

## I. BACKGROUND

The basic allegations and procedural history of this case as it pertains to the claims brought by the EEOC on behalf of the Non–Intervenor Plaintiffs are stated adequately in the Court's prior opinions, with which the Court assumes the parties' familiarity. *EEOC v. Bloomberg L.P.* (*Bloomberg IV*), [dkt. no. 557], 967 F.Supp.2d 802, 2013 WL 4799150 (S.D.N.Y. Sept. 5, 2013); *EEOC v. Bloomberg L.P.* (*Bloomberg III*), 778 F.Supp.2d 458 (S.D.N.Y.2011); *EEOC v. Bloomberg L.P.* (*Bloomberg II*), 751 F.Supp.2d 628 (S.D.N.Y.2010); *EEOC v. Bloomberg L.P.* (*Bloomberg I*), No. 07 Civ. 8383, 2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010). Plaintiff EEOC brought a case on behalf of a class of similarly situated women who were pregnant and took maternity leave ("Class Members"), asserting that Defendant Bloomberg engaged in a pattern or practice of discrimination on the basis of the Class Members' sex and/or pregnancy. The EEOC alleges that Bloomberg reduced pregnant women's or mothers' pay, demoted them in title or in number of directly reporting employees (also called "direct reports"), reduced their responsibilities, excluded them from management meetings, and subjected them to stereotypes about female caregivers, any and all of which violated the law because these adverse employment consequences were based on class members' pregnancy or the fact that they took leave for pregnancy-related reasons. The Court has dismissed all claims brought by the EEOC. (*See Bloomberg IV.*) The only remaining claims are those brought by the Plaintiff–Intervenors.

Consistent with their rights, the Court permitted Jill Patricot, Tanys Lancaster, Janet Loures, Monica Prestia, Marina Kushnir, and Maria Mandalakis to intervene in this action as plaintiffs to pursue claims on their own behalf. (*See* [dkt. nos. 6, 9, & 50].) In addition to claims brought under Title VII, the Plaintiff–Intervenors assert claims under Section 296(1) of the New York Executive Law (the "New York State Human Rights Law" or "NYSHRL") and Section 8–107 of the New York City Administrative Code (the "New York City Human Rights Law" or "NYCHRL").

The Opinion that follows proceeds in two principal parts. First, the Court sets forth the legal standards relevant to Defendant's motion for summary judgment on the

---

retaliation and sex/pregnancy discrimination by Bloomberg. (*Id.*)

**2.** In a related Opinion and Order, also filed today, the Court addresses Defendant's mo-

tion for summary judgment with respect to claims brought by the EEOC on behalf of the Non–Intervening Plaintiffs. (*See* [dkt. no. 557].)

Plaintiff–Intervenors' claims. Then, the Court analyzes the instant motion as it relates to each of the Plaintiff–Intervenors, one-by-one. In so doing, the Court defers setting forth additional background specific to each individual Plaintiff–Intervenor's claims until the portion of this opinion discussing that person's claims.[3]

## II. LEGAL STANDARDS

### A. *Summary Judgment Standard*

In considering a motion for summary judgment, the Court resolves all ambiguities and draws all reasonable inferences against the moving party. *Lindsay v. Ass'n of Prof'l Flight Attendants,* 581 F.3d 47, 50 (2d Cir.2009). "Summary judgment is appropriate only 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Kwan v. Schlein,* 634 F.3d 224, 228 (2d Cir.2011) (quoting Fed.R.Civ.P. 56(a)); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *Lindsay,* 581 F.3d at 50. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial-whether, in other words, there are any genuine factual issues that proper-

ly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. 2505.

Rule 56 mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted). In the face of insufficient evidence, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

"[E]ven in the fact-intensive context of discrimination cases," "[i]t is now beyond cavil that summary judgment may be appropriate." *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.2001), *cert. denied,* 534 U.S. 993, 122 S.Ct. 460, 151 L.Ed.2d 378 (2001); *see also Weinstock v. Columbia Univ.,* 224 F.3d 33, 40 (2d Cir.2000) (instructing that "trial courts should not 'treat discrimination differently from other ultimate questions of

---

**3.** Throughout this opinion, the Court looks to the Declaration of Thomas H. Golden Concerning the Plaintiff–Intervenors, dated January 18, 2012 ("Golden Decl.") [dkt. no. 325]; the Declaration of Milo Silberstein, dated May 7, 2012 ("Silberstein Decl.") [dkt. no. 329]; the Declaration of Richard A. Roth, dated May 4, 2012 ("Roth Decl.") [dkt. no. 346]; and the Declaration of Eric Dreiband, dated June 28, 2012 ("Dreiband Decl.") [dkt. no.

541]. In addition, the Court considers the parties' Rule 56.1 Statements: Rule 56.1 Statement in Support of Defendant Bloomberg's Motion for Summary Judgment as to Claims of the Plaintiff–Intervenors ("Bloomberg 56.1") [dkt. no. 324], the Plaintiff–Intervenors' Statement of Material Disputed Facts in Opposition ("Pl.-Intv'rs 56.1") [dkt. no. 326], and Bloomberg's Reply 56.1 Statement ("Reply 56.1").

fact'" (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000))). Accordingly, a plaintiff alleging discrimination claims "cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts ... or defeat the motion through mere speculation or conjecture." *Jones v. Hirschfeld*, 348 F.Supp.2d 50, 59 (S.D.N.Y.2004).

Finally, in accordance with Local Rule 56.1, Bloomberg submitted a statement of material facts as to which it contends there is no genuine issue to be tried. (*See generally* Bloomberg 56.1.) Plaintiff–Intervenors, collectively, submitted a statement in opposition, (*see generally* Pl.-Intv'rs 56.1), and Bloomberg then submitted a reply thereto, (*see generally* Reply 56.1). To the extent any of these filings is not in total compliance with the local rules,[4] the Court retains "broad discretion to accept [it], even if it does not comply strictly with the Rule's requirements." *Primmer v. CBS Studios, Inc.*, 667 F.Supp.2d 248, 254 (S.D.N.Y.2009) (citing *Photopaint Techs., LLC v. Smartlens Corp.*, 335 F.3d 152, 155 n. 2 (2d Cir.2003); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir.2001)).

### B. *Statutes of Limitations*

■ Title VII provides a limitations period of 300 days for a claimant to file an administrative charge with the EEOC. *See* 42 U.S.C. § 2000e–5(e)(1). Although Title VII sets forth an individual filing rule, a "single-filing" or "piggybacking" exception to the rule might apply. Under such an exception, claims by all individuals arising out of similar discriminatory treatment in the same time frame are deemed timely as of the date of the first-filed complaint with the EEOC. *Snell v. Suffolk Cnty.*, 782 F.2d 1094, 1100 (2d Cir.1986). An individual who has previously filed her own EEOC charge, however, cannot invoke the exception. *See Holowecki v. Fed. Express Corp.*, 440 F.3d 558, 564 (2d Cir.2006).

■ In rare cases, a "continuing violation" exception may be observed under which, "if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 220 (2d Cir.2004). The doctrine, however, clearly does not apply to "[d]iscrete acts such as termination, failure to promote, [or] denial of transfer." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

■ Under the NYSHRL and NYCHRL, the statute of limitations is three years from the date that the claim accrued. *See* N.Y. C.P.L.R. 214; N.Y.C. Admin. Code § 8–502(d); *see also Greene v. Trs. of Columbia Univ. in N.Y.*, 234 F.Supp.2d 368, 377 (S.D.N.Y.2002). The limitations period tolls, though, during the period in which a complaint is filed with the EEOC and the issuance by the EEOC of a right-to-sue letter. *See Cuttler v. Fried, Frank, Harris, Shriver and Jacob-*

---

4. Counsel for Plaintiff–Intervenors would be well served to re-familiarize themselves with the specific requirements of Local Rule 56.1. For starters, it is inexplicable why nearly half of its statement fails to correspond numerically with much of Bloomberg's Rule 56.1 Statement. Additionally, rather than specifically controverting, Plaintiff–Intervenor's submission often relies on implication to controvert a statement by Bloomberg, and it is replete with statements lacking citation to admissible evidence. Finally, should counsel ever appear in front of a jury, the Court offers a friendly reminder that the substance of an attorney's question is not admissible evidence in support of a material fact.

*son, LLP,* No. 10 Civ. 296(DAB), 2012 WL 1003511, at *4 (S.D.N.Y. Mar. 23, 2012); *Siddiqi v. N.Y.C. Health & Hosps. Corp.,* 572 F.Supp.2d 353, 373 (S.D.N.Y.2008).

### C. *Title VII & NYSHRL*

■ As the parties are aware, claims asserted under Title VII and the NYSHRL are analyzed pursuant to the same standard; therefore, analysis of identical claims brought by an individual under both of these laws can be performed in tandem. *See Pucino v. Verizon Wireless Commc'ns, Inc.,* 618 F.3d 112, 117 n. 2 (2d Cir.2010). Plaintiff–Intervenors assert claims under Title VII and the NYSHRL arising in: (1) discrimination; (2) retaliation; (3) hostile work environment; and (4) constructive discharge.

### 1. *Discrimination*

"Title VII of the Civil Rights Act of 1964, § 703(a), 42 U.S.C. § 2000e et seq., prohibits various forms of employment discrimination on the basis of race, color, religion, sex, or national origin." *United States v. City of N.Y.,* 713 F.Supp.2d 300, 316 (S.D.N.Y.2010). As amended by the Pregnancy Discrimination Act of 1978 ("PDA"), Title VII prohibits "discrimination based on a woman's pregnancy [because it] is, on its face, discrimination because of her sex." *Newport News Shipbuilding & Dry Dock Co. v. EEOC,* 462 U.S. 669, 684, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983). Specifically, the PDA adds this definition to Title VII:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work.

42 U.S.C. § 2000e(k); *see id.* § 2000e–1(a)–(b).

An action for violation of Title VII may be brought by the person affected or by the EEOC. Here, the EEOC has brought an enforcement action under 42 U.S.C. § 2000e–5(f) on behalf of the twenty-nine Non–Intervenor Plaintiffs. Individuals may also intervene to assert their own claims, as has been done here by the Plaintiff–Intervenors.

Similarly, the NYSHRL makes it "an unlawful discriminatory practice . . . [f]or an employer . . . because of an individual's . . . sex . . . to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1).

■ To make out a pregnancy discrimination claim, the plaintiff must show that she was treated differently from others who took leave or were otherwise unable or unwilling to perform their duties for reasons unrelated to pregnancy or that she simply was treated differently because of her pregnancy. *Velez v. Novartis Pharm. Corp.,* 244 F.R.D. 243, 264 (S.D.N.Y.2007) ("It has been repeatedly affirmed that the PDA does not require the creation of special programs for pregnant women; nor does it mandate any special treatment. To the contrary, the statute specifically requires that pregnant women be treated the same as all other employees with similar disabilities." (quoting *Dimino v. N.Y.C. Transit Auth.,* 64 F.Supp.2d 136, 157 (E.D.N.Y.1999) (internal quotation marks omitted))); *see Fisher v. Vassar Coll.,* 70 F.3d 1420, 1448 (2d Cir.1995), *reheard en banc on other grounds,* 114 F.3d 1332 (2d Cir.1997), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods.,*

*Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

At the summary judgment stage, such "claims are ordinarily analyzed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny." [5] *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir.2008); *see also Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir.) (applying *McDonnell Douglas* in pregnancy discrimination case). Under the *McDonnell Douglas* framework, the plaintiff has the initial burden of establishing a prima facie case. *Id.* The plaintiff's burden of proof at this first stage "is not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ A plaintiff fulfills the burden of establishing a prima facie case of discriminatory treatment by showing that: (1) she belonged to a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *Mathirampuzha*, 548 F.3d at 78.

■ Once the plaintiff has established a prima facie case, the burden shifts to the defendant to offer a non-discriminatory justification for its actions. As the Court of Appeals has noted, "[a]ny legitimate, non-discriminatory reason will rebut the presumption triggered by the prima facie case." *Fisher*, 114 F.3d at 1335–36. The

defendant's burden is one of production, meaning that to rebut the presumption the defendant must "clearly set forth, through the introduction of admissible evidence, the reasons" for the adverse employment action. *Burdine*, 450 U.S. at 254–55, 101 S.Ct. 1089.

■ At that point, the presumption of discrimination disappears, and the plaintiff must prove "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir.2001) (quoting *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097 (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089)). If the plaintiff cannot prove the presence of such a pretext by a preponderance of the evidence, then summary judgment is appropriate. *See Abdu–Brisson*, 239 F.3d at 470.

■ In rare cases, discrimination claims are subject to a mixed-motive standard of analysis under *Price Waterhouse*. This dual-motive framework is available where the plaintiff demonstrates the availability of direct evidence of discrimination. "Evidence potentially warranting a *Price Waterhouse* burden shift includes, *inter alia*, policy documents and evidence of statements or actions by decisionmakers that may be viewed as *directly reflecting* the alleged discriminatory attitude. [T]o warrant a mixed-motive burden shift, the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support [her] allegations of discriminatory treatment. Where ... the plaintiff

5. Cases alleging discrimination under Title VII fall into two distinct categories, "single-issue motivation" and "dual-issue motivation" or "mixed-motive" cases. In a mixed-motive case, which is analyzed under the standard put forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), the dual issues are (1) whether the plaintiff has proved that an im-

permissible reason motivated the adverse action and (2) whether the defendant has proved that it would have taken the same action for a permissible reason. *See Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 119–20 (2d Cir.1997). This standard is further elaborated on below.

fails to produce any such evidence, the plaintiff cannot withstand a motion for summary judgment by arguing that a jury might reasonably find in [her] favor under the mixed-motives framework." *Price v. Cushman & Wakefield, Inc.*, 808 F.Supp.2d 670, 687 (S.D.N.Y.2011) (internal quotation marks and citations omitted).

The Court of Appeals has noted, however, that "[a]n employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to a discriminatory intent." *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir.1991). "A victim of discrimination is therefore seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." *Id.* Thus the existence of direct evidence in a case has been termed "a rare exception." *Bateman v. Project Hospitality, Inc.*, No. 07–CV–2085 (RRM)(RML), 2009 WL 3232856, at *8 (E.D.N.Y. Sept. 30, 2009); *see also Sulehria v. City of N.Y.*, 670 F.Supp.2d 288, 305 (S.D.N.Y. 2009) ("Direct evidence that the adverse employment action was motivated by discrimination, 'a smoking gun,' is typically unavailable, however.").

### 2. *Retaliation*

Title VII also prohibits an employer from retaliating against an employee because she has engaged in a protected activity, that is, "has opposed any practice made an unlawful practice by [Title VII], or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 2000e–3(a). Similarly, the NYSHRL safeguards employees against retaliation for engaging in protected activities. N.Y. Exec. Law § 296(7).

Like discrimination claims, retaliation claims are usually governed by the *McDonnell Douglas* standard. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 79–81 (2d Cir.2001). To establish a prima facie retaliation claim, the plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir.2010). While the framework for analyzing retaliation claims mirrors that for discrimination claims, a plaintiff need not succeed on one in order to succeed on the other. *See Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir.2002).

### 3. *Hostile Work Environment*

Title VII and the NYSHRL prohibit "discriminatorily hostile or abusive [work] environment[s]." *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). To prevail on such a claim, the plaintiff must establish two elements: "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and (2) that there is a specific basis for imputing the conduct creating the hostile work environment to the employer." *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir.2009) (internal quotation marks and citations omitted).

Unlike claims of discrimination based on disparate treatment or retaliation, this kind of claim is "based on the cumulative effect of individual acts." *Morgan*, 536 U.S. at 115, 122 S.Ct. 2061. Such acts "must be intimidating, hostile, or offensive, with discriminatory intimidation, ridicule, and insult permeating the workplace." *Kalp v. Kalmon Dolgin Affiliates*

*of Long Island Inc.,* No. 11–CV–4000 (JG), 2013 WL 1232308 (E.D.N.Y. Mar. 27, 2013) (citing *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir.1995)).

 The first element is both subjective and objective. This means that the victim must "subjectively perceive [the] environment to be abusive" and that the conduct complained of also must be "severe or pervasive enough to create an objectively hostile or abusive work environment." *Petrosino v. Bell Atl.,* 385 F.3d 210, 221 (2d Cir.2004) (citation omitted). When evaluating this element, the Court must look at the entirety of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *See Harris,* 510 U.S. at 23, 114 S.Ct. 367.

#### 4. *Constructive Discharge*

 Constructive discharge "occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Serricchio v. Wachovia Secs. LLC,* 658 F.3d 169, 185 (2d Cir.2011). However, an employee's mere dissatisfaction with job assignments or criticism from a supervisor do not, alone, give rise to such a claim. *See, e.g.,*

*Spence v. Maryland Cas. Co.,* 995 F.2d 1147, 1156 (2d Cir.1993).

#### D. *NYCHRL*

Given the slow development of case law regarding the appropriate standard by which to evaluate NYCHRL claims at the summary judgment stage, it is unsurprising that the parties do not agree on just how much more liberally the NYCHRL requires this Court to examine the Plaintiff–Intervenors' claims than is demanded under Title VII and the NYSHRL.[6] Such continues to be a contentious legal issue in almost every case in which such claims are asserted alongside Title VII and NYSHRL claims. Nonetheless, while Plaintiffs' brief proved helpful in distinguishing some of the differences between how Title VII and NYSHRL claims and NYCHRL claims should be examined, the Court of Appeals has more recently provided additional guidance to district courts based on decisions of the Appellate Division of the New York State Supreme Court, First Department.

 In *Mihalik v. Credit Agricole Cheuvreux North America, Inc.,* 715 F.3d 102 (2d Cir.2013), the Court of Appeals notes that district courts "must analyze NYCHRL claims separately and independently from any federal and state law claims" and "constru[e] the NYCHRL's provisions broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Id.* at 109 (internal quotation marks omitted).

**6.** Quite surprising, though, is the degree to which Defendant's counsel dismisses the importance of recent leading state court decisions that should inform this Court's analysis of NYCHRL claims. While the Court acknowledges that the case law on how to evaluate NYCHRL claims continues to evolve, Defendant—who elsewhere is more than willing to cite persuasive authority—inexplicably fails to discuss significant cases bearing on the appropriate standard of review here even though some were cited by Plaintiff–Intervenors in their opposition brief and another was filed by the First Department a full month before Defendant submitted its reply and offered additional clarification regarding the standard.

Such is true "even if the challenged conduct is not actionable under federal and state law." *Id.* Specifically, the Court of Appeals provided district courts with the following guidelines when reviewing NYCHRL claims:

(1) NYCHRL claims must be analyzed separately and independently from federal and state discrimination claims;

(2) the totality of the circumstances must be considered because "the overall context in which [the challenged conduct occurs] cannot be ignored";

(3) the federal severe or pervasive standard of liability no longer applies to NYCHRL claims, and the severity or pervasiveness of conduct is relevant only to the scope of damages;

(4) the NYCHRL is not a general civility code, and a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives or if the defendant proves the conduct was nothing more than "petty slights or trivial inconveniences";

(5) while courts may still dismiss "truly insubstantial cases," even a single comment may be actionable in the proper context; and

(6) summary judgment is still appropriate in NYCHRL cases[ ] but only if the record establishes as a matter of law that a reasonable jury could not find the employer liable under any theory.

*Id.* at 113 (citations omitted).

■ At this point, additional observations of the Court of Appeals bearing on how burdens shift under the NYCHRL should be noted. Although it is clear a court must analyze NYCHRL claims independently of Title VII and NYSHRL claims and must consider both the *McDonnell Douglas* and mixed-motive frameworks, the *Mihalik* court noted that it remains "unclear whether, and to what extent the *McDonnell Douglas* burden-shifting analysis has been modified for NYCHRL claims." *Mihalik*, 715 F.3d at 110 n. 8. The court made this observation after comparing the opinions filed by the First Department in *Bennett v. Health Management Systems, Inc.*, 92 A.D.3d 29, 936 N.Y.S.2d 112 (1st Dep't 2011), and *Melman v. Montefiore Medical Center*, 98 A.D.3d 107, 946 N.Y.S.2d 27 (1st Dep't 2012). *Id.* ("Although *Bennett* seemed to suggest the analysis has changed, the First Department later narrowly construed *Bennett* [in *Melman*] as only requiring trial courts to consider whether plaintiff's claim could survive under either the *McDonnell Douglas* analysis or a mixed-motive theory of liability. It is unclear how this differs from the federal standard." (citation omitted)). In the end, though, what remains clear is that the NYCHRL has "simplified the discrimination inquiry: the plaintiff need only show that her employer treated her less well [than other similarly situated employees], at least in part for discriminatory reasons. The employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record established as a matter of law that discrimination played *no* role in its actions." *Id.* (internal quotation marks omitted). This Court further observes that the *Melman* court seemed to consider the possibility that a plaintiff could sustain a showing under a mixed-motive standard by relying principally on circumstantial evidence.[7]

---

**7.** As noted *supra,* to trigger the mixed-motive analysis under federal law, the plaintiff must

*See Melman*, 98 A.D.3d at 128, 946 N.Y.S.2d 27. Given the liberal framework of the NYCHRL, this Court will consider circumstantial evidence when conducting its mixed-motive analysis of NYCHRL claims.

Using these principles as a guide, the Court now reviews the legal standards for discrimination and retaliation claims under the NYCHRL.

### 1. *Discrimination* [8]

Section 8–107(1)(a) of the NYCHRL makes it "an unlawful discriminatory practice ... [f]or an employer or an employee or agent thereof, because of the actual or perceived ... gender ... of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8–107(1)(a).

■ "To establish a [pregnancy] discrimination claim under the NYCHRL, the plaintiff need only demonstrate 'by a preponderance of the evidence that she has been treated less well than other employees because of her gender.'" *Mihalik*, 715 F.3d at 110 (quoting *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 78, 872 N.Y.S.2d 27 (1st Dep't 2009)). "At the summary judgment stage, judgment should normally be denied to a defendant if there exist triable issues of fact as to whether such conduct occurred."

*Williams*, 61 A.D.3d at 78, 872 N.Y.S.2d 27. Moreover, the challenged conduct need not even amount to something tangible, like hiring or firing. *Id.* at 79, 872 N.Y.S.2d at 40.

■ However, this Court remains "mindful that the NYCHRL is not a 'general civility code.'" *See Mihalik*, 715 F.3d at 110 (quoting *Williams*, 61 A.D.3d at 79, 872 N.Y.S.2d 27). "The plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive. It is not enough that a plaintiff has an overbearing or obnoxious boss. She must show that she has been treated less well at least in part *because of* her gender." *Id.* (internal quotation marks omitted).

■ Even upon such a showing, though, "defendants may assert an affirmative defense whereby [they] can still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences." *Id.* (citations omitted) (internal quotation marks omitted). The burden at this stage is on the defendant to prove the conduct's triviality. *Id.* Nevertheless, the defendant may prevail at summary judgment upon showing that a reasonable jury could conclude only that the challenged conduct was nothing more than petty. *Id.*

demonstrate the existence of a "smoking gun."

**8.** In *Mihalik*, the plaintiff asserted discrimination claims under the NYCHRL based on sexual harassment. There, the district court first evaluated her claims under the federal *quid pro quo* standard and then conducted an analysis based on the federal hostile work environment standard. *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, No. 09 Civ. 1251(DAB), 2011 WL 3586060, at *5–10 (S.D.N.Y. July 29, 2011). As this Court has

already noted, the Court of Appeals held that the federal severe or pervasive standard is only relevant to the scope of damages. *Mihalik*, 715 F.3d at 110. Thus, whereas hostile work environment allegations are evaluated as separate claims herein under Title VII and the NYSHRL, such allegations do not present separate and distinct claims under the NYCHRL. Instead, NYCHRL "liability is normally determined simply by the existence of differential treatment." *Id.*

■ "In evaluating both the plaintiff's claims and the defendant's affirmative defense, courts must consider the totality of the circumstances." *Id.* Even a single incident signaling discrimination on account of a plaintiff's pregnancy may be actionable. *See id.; Williams,* 61 A.D.3d at 80 n. 30, 872 N.Y.S.2d 27.

■ Finally, it is clear that a preference exists under the NYCHRL for a jury to make determinations regarding what are often borderline situations. *Williams,* 61 A.D.3d at 80, 872 N.Y.S.2d 27. Nevertheless, summary judgment remains "an appropriate mechanism for resolving [such] claims" where "there is no genuine dispute as to any material fact regarding plaintiff's claim and the employer's affirmative defense." *Mihalik,* 715 F.3d at 111–12.

### 2. *Retaliation*

Section 8–107(7) of the NYCHRL makes it unlawful for an employer to "retaliate or discriminate in any manner against any person because such person has ... opposed any practice forbidden under" the NYCHRL. *See* N.Y.C. Admin. Code § 8–107(7). The provision further provides that the "retaliation or discrimination complained of under this subdivision need not result in an ultimate action with respect to employment ... or in a materially adverse change in the terms and conditions of employment ... provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity." *Id.*

■ This means that to prevail on a retaliation claim under the NYCHRL, a plaintiff must show (1) "that she took an action opposing her employer's discrimination" and (2) "that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik,* 715 F.3d at 112.

■ Like discrimination claims under the NYCHRL, retaliation claims shall be interpreted broadly. *Id.* The phrase " 'oppos[ing] any practice' can include situations where a person, before the retaliatory conduct occurred, merely 'made clear her disapproval of the [defendant's] discrimination by communicating to [the defendant], in substance, that she thought [its] treatment of [her] was wrong." *Id.* (quoting *Albunio v. City of N.Y.,* 16 N.Y.3d 472, 479, 922 N.Y.S.2d 244, 947 N.E.2d 135 (2011)).

■ Additionally, summary judgment is only appropriate where no reasonable jury could conclude from the evidence that the challenged conduct was reasonably likely to deter a person from engaging in protected activity. *Id.* Such an "assessment [should] be made with a keen sense of workplace realities, of the fact that the 'chilling effect' of particular conduct is context-dependent, and of the fact that a jury is generally best suited to evaluate the impact of retaliatory conduct." *Id.* (internal quotation marks omitted).

### III. DISCUSSION

#### A. *Jill Patricot*

Jill Patricot ("Patricot") alleges discrimination and retaliation claims against Bloomberg under Title VII, the NYSHRL, and the NYCHRL. As to Title VII, Patricot filed her EEOC discrimination charge on March 24, 2006, and her EEOC retaliation charge on June 13, 2008.

##### 1. *Background*

Bloomberg hired Plaintiff–Intervenor Patricot to work in its London office in 1998. (Bloomberg 56.1 ¶ 1) In November 2004, approximately three months into her pregnancy and a month and a half after Patricot announced her first pregnancy,

she was offered a position as Global Data Manager of New York, which she accepted. (*Id.*) At the time she accepted the offer, Patricot understood that she was leaving Sales for the Global Data division, and both she and her supervisors considered the move to be a promotion. (Golden Decl. Ex. 2, at 18–20 (Patricot Dep.).) During her deposition, Patricot recalled: "I wanted the promotion, I needed the money, and I needed the stature, it was going to be good for me." (*Id.* at 20.) Patricot now believes that she was offered the job in Global Data for the purposes of hiding her pregnancy from "powerful hedge fund managers." (Bloomberg 56.1 ¶ 3.)

As head of Global Data in New York, Patricot was placed in charge of more than seventy employees, including seven managers (her sales position had only required that she supervise a handful of direct reports). (Bloomberg 56.1 ¶ 8.) Approximately six months before her first maternity leave, Patricot was told that she and her group would be temporarily moved to a satellite office for about one week. (Silberstein Decl. Ex. 1, at 30–34, 456–57 (Patricot Dep.).) However, after moving to the new office, Patricot's group remained there for the remainder of the six months until she went on leave. (*Id.* at 30–34, 455–57.) Patricot concedes that the move "[did not] prevent [her] obviously from getting in touch with people." (*Id.* at 30.)

Prior to going on maternity leave, Patricot's supervisor Beth Mazzeo ("Mazzeo")

told her she was doing a "fabulous" and "great" job.. (*Id.* ¶ 4.) Patricot went on leave in late April 2005, and in May 2005, Patricot received her compensation award, increasing her total intended compensation from \$216,953 to \$270,522. (*Id.* ¶ 5–6.) This occurred despite a decrease in her Equity Equivalent Certificates ("EECs") from 210 in May 2004 to 185 in May 2005. (Pl.-Interv'rs 56.1 ¶ 6; Reply 56.1 ¶ 6.) [9]

Patricot returned from maternity leave on September 22, 2005. (Bloomberg 56.1 ¶ 11.) Patricot alleges that during her maternity leave and after her return, she was ignored by Mazzeo and excluded from calls, meetings, and normal decision-making processes. (*Id.* ¶¶ 11, 13; Pl.-Interv'rs 56.1 ¶¶ 6, 11, 13.) Prior to taking leave, Patricot often worked from 8:00 A.M. to 6:00 P.M. or 7:00 P.M., but upon her return from leave, she left the office every day at approximately 4:45 P.M. (Bloomberg 56.1 ¶ 15; Pl.-Interv'rs 56.1 ¶ 15; Reply 56.1 ¶ 15.) According to Bloomberg, Patricot's predecessor complained to Mazzeo that Patricot's subordinates were coming to her with issues that Patricot should have handled. (Bloomberg 56.1 ¶ 15.) Bloomberg states that such complaints prompted Mazzeo to schedule a meeting with Patricot about Patricot's hours. (*Id.* ¶ 18.)

On or about December 22, 2005, Mazzeo, a mother of three, met with Patricot. (Bloomberg 56.1 ¶ 15.) At this meeting, Patricot recalls that Mazzeo told her that "sometimes when you have a baby your

---

**9.** In 2005, there was an across-the-board reduction of twenty-three percent in the number of EECs awarded. (Reply 56.1 ¶ 6; Dreiband Decl. Ex. 115, at BLP–0092591–93.) Additionally, Patricot's increase in total intended compensation was greater, by percentage, than those received by a number of the male managers also reporting to Mazzeo, including Comparator 1 (19.85%), Comparator 2 (13.38%), Comparator 3 (8.70%), and Compa-

rator 4 (14.38%), all but one of whom had higher performance ratings than Patricot. (Golden Decl. Ex. 6 ("Patricot Comparator Chart").) Although Patricot disputes Bloomberg's choice of comparators and asserts that she should instead be compared to managers in the Sales Department where she had previously been a Team Leader," she does not offer any actual comparators for the Court to consider. (Pl.-Interv'rs 56.1 ¶ 7.)

career is paused" and that Mazzeo's own career "was [paused] too for a little," which Patricot understood as Mazzeo's "trying to relate." (Golden Decl. Ex. 2, at 62–63 (Patricot Dep.).) Also during this meeting, Mazzeo told Patricot that other Global Data managers worked until 5:30 or 6:00 P.M. each day and that Patricot needed to do the same. (*Id.* at 68–70.)[10]

In or about early February 2006, Mazzeo again approached Patricot about her hours. (Golden Decl. Ex. 2, at 86 (Patricot Dep.).) This time, Mazzeo insisted that Patricot stay until 5:30 P.M., and told her that she was setting a bad example on the floor. (*Id.* at 99.) Mazzeo asked if Patricot could stay late two days a week, but Patricot refused to stay until 5:30 or 6:00 P.M. and insisted on leaving at no later than 4:45 P.M. every day. (*Id.* at 101–103, 105, 618–19, 655–56, 658, 764; Ex. 17, at 50–51 (Keogh Dep.); Golden Decl. Ex. 15, at 203–04 (Sack Dep.).)

On or about February 3, 2006, Patricot met with Jennifer Sack ("Sack") from Bloomberg Human Resources ("HR"), who told Patricot that Mazzeo had a problem with her hours. (Golden Decl. Ex. 2, at 94 (Patricot Dep.).) Sack asked Patricot if her husband could relieve the nanny, which Patricot found inappropriate. (*Id.* at 105.) Patricot offered to come in an hour earlier, but she could not name any Global Data manager who did so. (*Id.* at 102, 155, 279, 472; Golden Decl. Ex. 1 ¶ 77 (Am. Compl.).) Patricot's supervisees in the New York office generally started at 8:00 A.M., and the Company wanted to limit supervisory coverage to when it was necessary. (Golden Decl. Ex. 2, at 588 (Patricot Dep.); Golden Decl. Ex. 15, at 209 (Sack Dep.).)

Patricot alleges that on or about February 10, 2006, Mazzeo called her at her desk and said that if she did not change her hours, Mazzeo would demote her to the position of Data Analyst. (Bloomberg 56.1 ¶ 21.) Patricot further states that she was never informed during any of the aforementioned conversations that her subordinates were looking for her after she left for the day and that such prompted the concern over her hours. (Pl.-Interv'rs 56.1 ¶¶ 17–18.) On February 14, 2006, Mazzeo demoted Patricot to Data Analyst. (Bloomberg 56.1 ¶ 22.)

Shortly after Patricot's demotion, allegedly in an attempt to intimidate her, Mazzeo appeared unannounced in the New York office and sat at a desk next to Patricot for the entire day without acknowledging her. (Pl.-Interv'rs 56.1 ¶ 26; Silberstein Decl. Ex. 1, at 144–45, 147–48 (Patricot Dep.).)[11] On March 24, 2006, Patricot filed her charge of discrimination with the EEOC. (Bloomberg 56.1 ¶ 28) In her April 2006 self-evaluation she noted that she had "reached out to the Federal Government to hold an unbiased investigation," particularly regarding Mazzeo. (*Id.*)

Following her demotion, Patricot told Max Linnington ("Linnington"), the Head of Sales for the North and South Americas, that she wanted to return to Sales, and asked if any Team Leader positions were open; he told her that none was.

---

10. At least two Bloomberg managers testified in depositions that it was important for the Head of Global Data in New York to be available past 5:00 P.M., and possibly even until 6:00 P.M., to take care of certain situations that arise after the closing of the markets at 4:00 P.M. (*See* Golden Decl. Ex. 11, at 183 (Mazzeo Dep.); Ex. 12, at 228–29 (Secunda Dep.).)

11. The record reveals that Patricot is not the only employee who had problems with Mazzeo's management style; certain male managers who reported to Mazzeo also considered her to be "abrasive" and "hostile." (*See* Golden Decl. Ex. 9, at 152–55 (Iraca Dep.); Ex. 10, at 32–35, 38–39 (Ursitti Dep.).)

(*Id.* ¶ 26.) [12] Within a few months after Patricot joined Sales, however, two individuals were promoted to Team Leader positions, as were approximately 37 others between March 2006 and January 2009—none of whom was Patricot. (Reply 56.1 ¶ 26.)

In May 2006, Patricot's EEC award decreased from 185 to 140, and her total intended compensation decreased from $270,522 to $233,727. (Bloomberg 56.1 ¶ 29.) Patricot went on maternity leave for the second time at the end of August 2006. (Golden Decl. Ex. 4.) Patricot states that upon her return from maternity leave in or around March 2007, she no longer had a desk or direct telephone line. (Pl.-Interv'rs 56.1 ¶ 34.B.)

On October 3, 2007, Patricot filed a motion to intervene in the EEOC's suit against Bloomberg. (First Mot. to Intervene [dkt. no. 2].) In her proposed complaint, Patricot referred to Michael Bloomberg at least ten times, alleging that he was responsible for the "culture of discrimination" at Bloomberg. (*Id.* Attach. 2 ¶ 17.) Around that time, Patricot also attended a press conference with fellow Plaintiff–Intervenor Tanys Lancaster concerning the complaint. (Bloomberg 56.1 ¶ 30.) According to press reports, Bloomberg spokesperson Judith Czelusniak accused these two Plaintiff–Intervenors of participating in a "publicity stunt" and "dragging the mayors [sic] name into their battle in their lawsuit against the company to settle." (Bloomberg 56.1 ¶ 31.) Subsequently, the Court granted Patricot's motion to intervene, and Patricot filed her complaint on October 25, 2007. (Compl. of Pls.-Interveners [dkt. no. 7].)

Patricot now further alleges that on or about May 6, 2008, following a status conference during which the EEOC disclosed that there were 58 claimants in the case, Linnington yelled at her on the sales floor and treated her in an "abusive and unprofessional manner." (Bloomberg 56.1 ¶ 33; Pl.-Interv'rs 56.1 ¶ 31.) Patricot admits that she is unaware of whether Linnington knew about the conference, that she herself did not attend the conference, and that she cannot speak to the question of how Linnington spoke to other employees. (Golden Decl. Ex. 2, at 492–94 (Patricot Dep.).) However, Patricot notes that news regarding the conference was reported on Bloomberg's terminal scrolling system, which is on every employee's desk. (Pl.-Interv'rs 56.1 ¶ 31.) Patricot filed a retaliation charge with the EEOC in June 2008. (*Id.* ¶ 34.)

Patricot attended Mazzeo's deposition, in December 2008. (*Id.* at 566.) Patricot alleges that Mazzeo was not truthful during her deposition, and this led her to speculate that the "culture [of Bloomberg] had not changed." (Bloomberg 56.1 ¶ 34.) At this time, Mazzeo was still in charge of Global Data, while Patricot had been in Sales since 2006. (*Id.*) Patricot resigned from Bloomberg on January 2, 2009. (*Id.*)

### 2. Analysis of Claims under Title VII & NYSHRL

#### a. Discrimination Claims

The parties are in agreement that Patricot is a member of a protected class. As such, in order to make out a prima facie case of discriminatory treatment, Patricot must show that she was qualified for the position, she suffered an adverse employment action, and the adverse action occurred under circumstances giving rise to an inference of discriminatory intent. Patricot alleges a series of events that she

---

12. Patricot claims that a month prior to this conversation, Patricot met with Sack and Mazzeo and was told that she could go back to Sales but not as a Team Leader. (Pl.-Interv'rs 56.1 ¶ 26.)

claims to be adverse and motivated by her becoming pregnant.

■ At the outset, the Court holds that Patricot cannot establish a prima facie case with respect to the initial events involving her November 2004 change in position from one in the Sales division to one leading the New York Global Data division.[13] Buyer's remorse is insufficient to term such a move a demotion where the undisputed facts demonstrate that she voluntarily accepted the position because she "wanted the promotion, [ ] needed the money, and [ ] needed the stature." (*See* Reply 56.1 ¶¶ 2, 6–7, 8, 10.) The law does not bestow upon employees within a protected class a guarantee that new positions will not entail a change in certain job-specific duties and the potential for less job satisfaction than a prior job. Simply stating that she harbored "fears that this was not really a promotion, which she was warned about by colleagues," (*see* Silberstein Decl. Ex. 1, at 17–18 (Patricot Dep.)), and pointing out that her group eventually was moved to a satellite office during part of her pregnancy, (*see id.* at 30–34, 455–57), does not translate into a triable issue of fact when the job change resulted in increasing her responsibilities from managing a handful of employees to managing more than seventy, (Bloomberg 56.1 ¶ 8), led to an approximately $50,000 raise, (*id.* ¶ 6), and is contradicted by the earlier-noted statement reflecting that the change was voluntary and one that Patricot ultimately thought at the time "was going to be good for [her]," (*id.* ¶ 10). Because Patricot cannot establish that this change was adverse, she cannot establish a prima facie case with respect to her November 2004 position change.

■ Similarly, the Court finds that what Patricot describes as a compensation decrease in 2005 was not an adverse action. As this Court has found previously

> [c]ompensation at Bloomberg, as in most for-profit enterprises, signals to some degree an employee's performance. At least during the times at issue here, compensation at Bloomberg included both a base salary and variable, additional compensation known as [EECs] that were redeemable one year after they were granted. EEC grants had an "intended value" based on projected company (not individual) performance, and the intended value of EEC grants plus base salary comprised an employee's total intended compensation for a given year. The actual value of an EEC grant could differ from its intended value based on actual company (not individual) financial performance; actual value was determined upon redemption. The change in the raw number of EEC grants from year to year did not indicate better or worse performance because an EEC grant did not have a constant intended or actual value year to year. Therefore, an employee's intended compensation for a given year, rather than actual compensation, is the relevant comparative metric for employee compensation.

*Bloomberg III,* 778 F.Supp.2d at 463 (citations omitted).

It follows that, although the number of Patricot's EECs decreased from 210 to 185, her total intended compensation increased by $54,000 from $216,952 in May 2004 to $270,522 in May 2005. (Bloomberg 56.1 ¶ 6) And even if such a change in

---

**13.** To the extent that Patricot claims that this incident by itself is sufficient to constitute discrimination, the Court notes that it is time-barred under Title VII. The Court continues its analysis of this event, however, because it is not time-barred under the NYSHRL or NYCHRL.

EECs equated to adverse action, such does not give rise to an inference of discrimination where Bloomberg has noted that there was an across-the-board reduction of twenty-three percent in the number of EECs awarded in 2005, (see Reply 56.1 ¶ 6), and Patricot (whose reduction was less than that) has not put forth any evidence that her decrease was greater than that of similarly situated employees in the Sales Department. See, e.g., Martinez–Santiago v. Zurich N. Am. Ins. Co., No. 07 Civ. 8676(RJH), 2010 WL 184450, at *10 (S.D.N.Y. Jan. 20, 2010) ("[W]hen an individual's salary falls within the middle of a range, the mere existence of other higher paid employees does not necessarily give rise to an inference of discrimination.").

The Court next considers whether Patricot's discrimination claims survive with respect to the events subsequent to her return from maternity leave. With respect to these events, the Court notes again that there appears to be no dispute as to whether Patricot is a member of a protected class and whether she was qualified for the relevant positions.

Insofar as establishing the adverse action element, the Court notes the following guidance from Sanders v. N.Y.C. Human Resources Administration, 361 F.3d 749 (2d Cir.2004):

> An adverse employment action is a "materially adverse change in the terms and conditions of employment. To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation."

Id. at 755 (internal citations and quotation marks omitted). Bloomberg does not dispute that Patricot's demotion represents an adverse employment action. Bloomberg, however, does dispute that other individual actions were also adverse. Plaintiff argues that the events she alleges as adverse are properly viewed in the aggregate and, as such, the Court should refrain from weighing whether isolated events taken together constitute an adverse action. (See Pl.-Intv'rs Mem. of Law in Opp'n to Def. Bloomberg's Mot. for Summ. J. [dkt. no. 328] ("Pl.-Intv'rs Br."), at 27 ("Weighing the evidence to determine whether all of these actions can be considered adverse employment actions, independently or in the aggregate, is not the job of the Court at the summary judgment stage.")) While the Court rejects the insinuation that alleging numerous isolated events in-and-of itself creates a triable issue of fact, it interprets Patricot's point as her assertion that she was subjected to a pattern of discriminatory actions that could be interpreted by a jury as evidence of or part of more significant adverse acts. Moreover, in the Plaintiff–Intervenors' brief, Patricot identifies four distinct adverse actions when arguing that Bloomberg acted under the guise of pretext: (1) "Patricot's 'Promotion' to Head of Global Data"; (2) "Patricot's Demotion to Data Analyst"; (3) "Defendant's Failure to Promote Patricot to Team Leader in Sales"; and (4) "Compensation Decreases." Because the Court has already held that Patricot cannot establish a prima facie case regarding the first of these allegedly adverse actions and her 2005 change in compensation, the Court determines whether she can show that the remaining events constitute adverse actions giving rise to an inference of discriminatory intent and, if so, whether she can survive the subse-

quent burden-shifting analysis.[14]

### i. Demotion to Data Analyst and 2006 Compensation Decrease [15]

Bloomberg does not dispute that Patricot has made out a prima facie case with respect to this adverse employment action. Rather, Bloomberg asserts that demoting Patricot was lawful. The Court finds that an issue of fact remains with respect to this claim.

■ Having made out a prima facie case, the burden shifts under *McDonnell Douglas* to Bloomberg to offer non-discriminatory justifications for its actions. Bloomberg states that Patricot's demotion was a product of her "refusal to work the hours required of her Global Data role." (*See* Mem. of Law in Support of Bloomberg's Mot. for Summ. J. as to Claims of the Pl.-Interv'rs [dkt. no. 323] ("Bloomberg Br."), at 26.) According to Bloomberg, the nature of her position required that she stay at work after 4:45 P.M. at least a few days of the week because Patricot had responsibilities to fulfill between 5:00 and 5:30 P.M., namely the supervision of her subordinates who, according to deposition testimony, were forced to approach Patricot's predecessor in the position for guidance after Patricot left each day. (*See id.* at 27; Bloomberg 56.1 ¶ 17–20.) Instead, following her return from maternity leave, Patricot (who prior to taking leave often worked until between 6:00 and 7:00 P.M.) insisted on leaving work every day at 4:45 P.M. (Bloomberg 56.1 ¶ 19.) As this Court has noted, "[t]he law does not mandate 'work-life balance,'" *Bloomberg III*, 778 F.Supp.2d at 485, and accordingly, Bloomberg has stated a nondiscriminatory justification for its actions.

■ Patricot now must show by a preponderance of the evidence that said justification is merely pretext for discrimination. According to Patricot, Bloomberg's explanation amounts to pretext for the following reasons. First, to counter Bloomberg's statement that her failure to work sufficient hours justified her demotion, Patricot asserts that her first successor only visited the New York office once during the seven months he held the position and left the Princeton office before 5:30 P.M. approximately forty-six times during that span and her second successor visited the New York office only twenty-eight times in the twenty-two months he held the position and often left work before 5:30 P.M. (*See* Pl.-Inter'vr Br., at 28–29.) Second, Patricot challenges the legitimacy of Bloomberg's claims that she had to be present to fulfill her duties by contending that she was always available even after she physically had left the office and that she was never informed that her subordinates were looking for her as the reason why she needed to stay later than 4:45 P.M. (*Id.* at 29–30.)

---

14. To the extent that Patricot alleges for the purposes of establishing a prima facie case that she was subjected to one large adverse action made up of these individual events, the Court, upon shifting the burdens, should assess the probative value, materiality, and motive of each alleged action separately. *See Sanders*, 361 F.3d at 756–58. Thus, the analysis that follows can apply equally as to whether Patricot's claims survive under such a theory.

15. Considering that Bloomberg justifies Patricot's May 2006 reduction in total intended compensation as naturally flowing from her no longer being Head of Global Data or a Team Leader, (*see* Bloomberg Br., at 28 & n. 2), the Court considers this compensation decrease as inextricably linked to her demotion from Head of Global Data and, thus, a single claim; the following analysis applies equally to both events. The parties concede as much in their papers. (*See* Pl.-Interv'rs Br., at 32; Reply Br., at 13.)

To support her claims, Patricot relies upon "badge data" produced by Bloomberg reflecting these claims. Bloomberg attempts to explain this data in its reply by offering more detailed badge data demonstrating that the badge data upon which Patricot relies fails to reflect occasions when employees "badged in to the Princeton office, took the Bloomberg shuttle to New York, worked in New York, and then returned to Princeton and badged out there." (*See* Reply Mem. in Support of Bloomberg's Mot. for Summ. J. on Interv'rs' Claims [dkt. no. 539] ("Reply Br."), at 10 n. 2.) According to Bloomberg, this latter set of badge data shows that Patricot's first successor "was in New York about twice a week immediately after he took over from Patricot, and less frequently later," at which point he "felt he was letting his team down and asked" that those duties be reassigned to someone else. (*See id.;* Reply 56.1 ¶ 17.)

But while a review of this latter badge data refutes Patricot's observation from the former data that her successor only visited the New York office once, it does not overcome the overarching issue. Bloomberg makes much ado about Patricot's unavailability within the office after the markets closed at 4:00 P.M. and 5:30 P.M. and her successor's working a schedule such that he stayed late in the New York office approximately twice a week. (*See id.; see also* Bloomberg 56.1 ¶ 22.) The new badge data, however, reflects that Patricot's immediate successor in 2006 was in the New York office nine times in March, seven times in April, six times in May, five times in June, twice in July, twice in August, and zero times in September.

ber. (*See* Dreiband Decl. Ex. 118.) As such, on average, the only month he was in the New York office twice a week was March. Not only is this contrary to Bloomberg's contention in its opening brief that he "came up to New York two to three times per week," it is contrary to Bloomberg's reliance on the assertion that his presence was completely consistent with the arrangement offered to Patricot. (*See* Bloomberg Br., at 27.) Moreover, while Patricot's predecessor often stayed past 5:00 P.M. during the bulk of the times he did go to New York, the data shows that as the frequency of his appearances in the New York office dwindled, so did his record of staying late in the New York office past 4:45 P.M.: only three out of five times in June, one of two times in July, and zero times in August.[16] (*See* Dreiband Decl. Ex. 118.)

Finally, Bloomberg points out that Patricot's successor asked that his duties be reassigned in September 2006 due to his inability to spend more time in New York. (*See id.*) This, though, does not counter Patricot's assertion that there was a double standard. Indeed, it only speaks to that individual's subjective belief about whether he could adequately fulfill his duties. Bloomberg's subsequent acquiescence in his request does not equate to there being no question of fact as to whether Bloomberg shared his sentiment.[17] Nothing in the record indicates that Patricot's first or second successor was confronted by Bloomberg about the time he did not spend in the New York office.

---

**16.** While the Court notes that Patricot's successor often continued to work upon his return to Princeton on days that he left the New York office early, such does not cure Bloomberg's statement that he stayed late in the *New York* office.

**17.** In its reply, Bloomberg only attempts to rebut the badge data with respect to Patricot's first successor. (*See* Reply Br., at 10.)

This information, along with Patricot's testimony that Mazzeo told her that "sometimes when you have a baby your career is paused," (*see* Bloomberg 56.1 ¶ 15),[18] and Patricot's statement that she was never informed that her subordinates were forced to approach others for guidance, (*see* Pl.-Intv'rs Br., at 29), demonstrate that a genuine issue of fact exists as to whether Bloomberg's justifications for demoting Patricot amount to pretext.[19]

### ii. *Failure to Promote*

■ Patricot alleges that, upon moving back to Sales, Bloomberg further discriminated against her by failing to promote her to Team Leader. To establish a prima facie case for discriminatory failure to promote, the plaintiff must demonstrate that "(1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *See Brown v. Coach Stores, Inc.*, 163 F.3d 706, 709 (2d Cir.1998). The Court holds that Patricot cannot make out such case.

■ It is undisputed that Patricot did not formally apply for any Team Leader positions. Normally, a specific application is required to satisfy the second element of such a claim. *See Petrosino*, 385 F.3d at 227. A narrow exception to this requirement, exists, however, where a plaintiff can "demonstrate that (1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer." *Id.* Patricot does not meet this exception.

■ Patricot relies on her one statement to Bloomberg's Head of Sales of the Americas in March 2006 asking whether any Team Leader positions were available as constituting her application to be considered for all future openings. (*See* Pl.-Interv'rs Br., at 30–31.) But Patricot does not demonstrate that a single inquiry constitutes an informal procedure endorsed by the employer to apply for all future openings. Moreover, the fact that persons were promoted to Team Leader in May 2006 does not show that management knew in March 2006 that positions would open. Finally, Patricot does not even allege that she had no knowledge of the availability of any of the positions for which she was allegedly passed over, but merely states that Bloomberg never apprised her of any vacancies. (*See id.* at 31.) As such, Patricot cannot make out a discriminatory failure to promote claim under Title VII or the NYSHRL.

### b. *Retaliation Claims*

Patricot alleges a series of individual events that allegedly constitute retaliation against her for filing a discrimination

**18.** The Court does not interpret this statement as a smoking gun and acknowledges Patricot's own admission during her deposition that Patricot understood this statement at the time to have been made in the context of a mother of three trying to relate. Nevertheless, a jury could consider it as circumstantial evidence in light of the other alleged events.

**19.** The Court does not dispute Bloomberg's general right to demand flexibility from a senior manager or that it "was entitled to conclude that working in *an* office with full access to Bloomberg's systems was more desirable than being available by blackberry and cell phone while commuting home." (*See* Reply Br., at 10–11.) Rather, the Court notes that on summary judgment, Bloomberg's opening brief emphasizes its contention that Patricot's successors worked under the same arrangement that Patricot refused before falling back on this latter justification once it became apparent that Patricot's successors did not work under the same arrangement.

charge with the EEOC in March 24, 2006. She went on her second maternity leave from September 2006 through March 2007. Because the filing of a discrimination charge constitutes a protected activity, Patricot can make out a prima facie case by showing that (1) her employer knew of the protected activity, (2) she suffered an adverse employment action, and (3) a causal connection exists between the protected activity and the adverse employment action. The Court addresses each of the alleged retaliatory acts in turn.

### i. *Failure to Provide Desk or Telephone*

■ First, Patricot claims that she was retaliated against upon her return from her second maternity leave by being denied her own desk or telephone.[20] Bloomberg does not dispute that, with respect to this event, it was aware that Patricot had engaged in protected activity. Rather, Bloomberg asserts that standing alone, the denial of one's own desk and telephone line has never been held to be a retaliatory adverse action. (*See* Reply Br., at 14 (citing *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir.1997)).) Under these circumstances, the Court agrees.

Although Patricot's brief characterizes the period of time as five months, this mischaracterizes Patricot's own recollection as stated in her deposition. In fact, Patricot's recollection is that her time without a direct phone line was anywhere between "a good couple of months" to five months. (*See* Silberstein Decl. Ex. 1, at 184, 491.) Considering that Patricot has not put forth any evidence on the matter other than the uncertain range as stated in her deposition, that she had just returned from a long leave of absence, and that her own deposition testimony indicates that a person who was hired either while she was on leave or around the time she returned did not have a direct phone line, (*see id.* at 185), the Court holds that Patricot cannot demonstrate that Bloomberg's failure to give her a desk and phone immediately upon her return constituted an adverse employment action or that such gives rise to an inference of retaliation under Title VII and the NYSHRL.

### ii. *Mistreatment by Senior Management*

■ Patricot asserts that "she was completely ostracized by senior management" between the time she filed her discrimination charge in March 2006 and quit in January 2009. (Pl.-Interv'rs Br., at 33.) First, she claims that "[o]n several occasions, senior managers, who were friendly and responsive to Patricot during her pre-pregnancy years, passed Patricot in the hallways of Defendant's offices only to avoid eye contact with [her] altogether and studiously ignore her." But the Court cannot imagine how such behavior amounts to anything more than "petty slights, minor annoyances, and simple lack of good manners." *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (internal quotation marks and citation omitted). And viewing such behavior as anything but would turn Title VII and the NYSHRL into a general civility code.

Similarly, Patricot asserts that one week after she filed her complaint to Bloomberg HR, "Mazzeo showed up unannounced at Defendant's [New York] office, only to turn her head and ignore Patricot when

---

**20.** Patricot asserts that Bloomberg did not address this allegation in its motion and, therefore, summary judgment is inappropriate in favor of Bloomberg with respect to these claims. The Court rejects this contention because Bloomberg moved for summary judgment on all of Patricot's retaliation claims, and it is far from clear from the face of her rambling Amended Complaint [dkt. no. 47] that these events constituted a basis for a retaliation claim.

they passed in the hallway" and then sit right next to Patricot the entire next day in "a clear attempt to intimidate and harass Patricot." (*See* Pl.-Interv'rs Br., at 34.) While such behavior, if true, is childish and reflects poor leadership skills, it is yet another example of behavior best dealt with by a general civility code within the workplace. Patricot does not cite any legal authority holding that analogous conduct constitutes adverse employment action. Moreover, Patricot does not even assert that she was adversely affected by Mazzeo's conduct or that such conduct might dissuade Patricot or other employees from engaging in future protected activity. As such, the Court finds that Patricot cannot establish a prima facie case with respect to these perceived slights.

### iii. *Public Verbal Reprimand*

■■■ Patricot asserts that approximately five days after this case's May 1, 2008, status conference, Linnington publicly yelled at her on the sales floor. But Patricot does not offer any examples of cases in which yelling at an employee publicly has been held to constitute an adverse employment action. This is understandable, though, because yelling, without more, does not constitute an adverse employment action. *See, e.g., Ragin v. E. Ramapo Cent. Sch. Dist.,* No. 05 Civ. 6496(PGG), 2010 WL 1326779, *17–21 (S.D.N.Y. Mar. 31, 2010); *Martin v. MTA Bridges & Tunnels,* 610 F.Supp.2d 238, 256 (S.D.N.Y. 2009); *Martinez v. N.Y.C. Dep't of Educ.,* No. 04 Civ. 2728(LTS), 2008 WL 2220638, at *12 (S.D.N.Y. May 27, 2008). And Patricot does not offer any compelling reason why this case is any different or why the manner in which Linnington allegedly once yelled at her about matters unrelated to the instant lawsuit would dissuade someone from engaging in a protected activity.

### iv. *Statements to the Media*

■■■ Patricot alleges that after Patricot sought to intervene in the instant lawsuit and participated in a press conference about the lawsuit a Bloomberg spokesperson's use of the phrase "publicity stunt" amounts to unlawful retaliation. In support, Patricot cites *Lore v. City of Syracuse,* 670 F.3d 127 (2d Cir.2012), and *Kercado–Clymer v. City of Amsterdam,* 370 Fed.Appx. 238, 242 (2d Cir.2010), for the proposition that statements to the media are actionable adverse actions and preclude summary judgment. But the statements in the cases cited by Patricot are a far cry from the phrase complained of here. In *Lore,* the plaintiff was accused of being a thief, resulting in negative treatment from his peers and the community. 670 F.3d at 154, 164. *Kercado–Clymer* also dealt with statements amounting to defamation, including accusations that the plaintiff was "a chronic complainer," "[a] professional victim," and "one of [the] worst employees," and who, in addition to "never [being] qualified to be hired," "can't be trusted" and "blatantly lied." 370 Fed. Appx. at 317. Additionally, Plaintiff has not shown that the statement complained of, which clearly was made in the context of the complainants' reference to New York City Mayor Michael Bloomberg and not the case itself, had any adverse effect on her beyond some speculative effect or is of such a nature that it would dissuade others from engaging in protected activity. Thus, the Court holds that this statement is more representative of a "petty slight" and that a reasonable jury could not find that it amounted to an adverse action.[21]

---

21. While the Court has analyzed each of Patricot's retaliation claims individually, it notes that her claim would fail even if viewed as a pattern of retaliatory harassment. Where isolated, individual incidents of alleged retaliation are supported solely by conclusory alle-

#### c. *Hostile Work Environment*

██ Rather than direct the Court to evidence tending to show that an issue of fact exists as to whether the alleged harassment against Patricot was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment and that there is a specific basis for imputing the conduct creating such an environment to Bloomberg, Patricot responds to Bloomberg's motion by offering the vague, conclusory statements that "[a]s a result of Defendant's discriminatory and retaliatory actions toward Patricot, [she] has suffered significant psychological harm." (Pl.-Interv'rs Br., at 35.) While the latter portion of the statement indicates that Patricot subjectively perceived her workplace to be abusive, it does not demonstrate that the few isolated events alleged in her complaint are "severe or pervasive enough to create an objectively hostile or abusive work environment." *See Petrosino*, 385 F.3d at 221. Merely following the previous sentence with the statement that "a reasonable factfinder could find that a hostile work environment existed" does not make it so.

Because Patricot has not offered any law or evidence tending to show that she can meet the objective prong of the first element of a hostile work environment claim, summary judgment is granted on this claim in favor of Bloomberg.

#### d. *Constructive Discharge*

██ Patricot purports to make out a constructive discharge claim based on conclusory allegations stemming from Mazzeo's deposition on December 8, 2008, which Patricot attended. (*See* Pl.-Interv'rs Br., at 36.) Patricot essentially argues that because Mazzeo testified untruthfully at her deposition, Bloomberg was forcing Patricot out of the company deliberately. (*See id.*) Such a statement, however, does not explain how the working conditions at Bloomberg, where Patricot no longer worked with Mazzeo, were so intolerable as to compel a reasonable person to resign. Moreover, Patricot does not offer any evidence as to how or why Mazzeo's testimony represents a deliberate intent by Bloomberg to create such conditions. In the absence of such showings, summary judgment is appropriate in favor of Bloomberg. *See Kader v. Paper Software*, 111 F.3d 337, 339–40 (2d Cir.1997).

#### 3. *Analysis of Claims under NYCHRL*

##### a. *Discrimination Claims*

The Court interprets Patricot as alleging two sets of discrimination claims under the NYCHRL: (1) pre-maternity leave discrimination and (2) post-maternity leave discrimination.

██ The former claims involve Patricot's promotion to Head of Global Data and her subsequent increase in total intended compensation. With respect to these events, simply stating that she harbored "fears that this was not really a promotion, which she was warned about by colleagues," (*see* Silberstein Decl. Ex. 1, at 17–18 (Patricot Dep.)), and pointing out that her group eventually was moved to a satellite office during part of her pregnancy, (*see id.* at 30–34, 455–57), do not amount to a showing that Patricot was treated less well than other employees on account of her pregnancy. As noted above, the undisputed facts show that she voluntarily accepted the position because she "wanted the promotion, [ ] needed the

gations of retaliatory motives, such as here, summary judgment is appropriate in favor of the defendant. *See Spector v. Bd. of Trs. of*

*Cmty. Tech Colls.*, 316 Fed.Appx. 18, 21 (2d Cir.2009).

money, and [ ] needed the stature." (*See* Reply 56.1 ¶¶ 2, 6–7, 8, 10.) Even under the more liberal standard of the NYCHRL, a ·reasonably jury could not conclude that· an increase in her responsibilities from managing a handful of employees to managing more than seventy, (Bloomberg 56.1 ¶ 8), and an approximately $50,000 raise, (*id.* ¶ 6), constitutes discrimination, especially when the facts demonstrate the change in position was voluntary and one that Patricot ultimately thought "was going to be good for [her]," (*id.* ¶ 10).[22]

Similarly, the Court finds that Patricot cannot show that her 2005 change in compensation was discriminatory. Plaintiff–Intervenors have not offered any reason that the NYCHRL should utilize a different comparator than an employee's total intended compensation for a given year as the relevant metric for considering whether she was treated less well because of her gender.[23] Thus, considering that Patricot's total intended compensation increased by $54,000 from May 2004 to May 2005, that her decrease in EECs was smaller than the average across-the-board decrease during this year, and that Patri-

cot has not put forth any evidence that her increase in total intended compensation was less than or decrease in EECs was greater than that of similarly situated employees, Patriot cannot prevail on her pre-leave compensation claims.

██ With respect to Patricot's claim regarding the events after she returned from maternity leave, the Court denies Bloomberg's request for summary judgment. The Court must consider the totality of the circumstances in evaluating Patricot's claims under the NYCHRL. Because the Court found that summary judgment was not appropriate under the stricter federal and state standard on Patricot's claims related to her demotion and because under the NYCHRL it views her other claims after her return from leave as stemming from this claim, Patricot's discrimination claims related to her return from maternity leave and arising under the NYCHRL survive.[24]

#### b. *Retaliation Claims*

██ In analyzing retaliation claims under the NYCHRL, this Court will not categorically reject challenged conduct as non-actionable but looks to whether a jury

---

**22.** While the Court believes it is justified in finding that her pre-leave and post-leave claims are independent, it finds that even if all the events were evaluated as part of one large claim, Patricot cannot rely on her move to Global Data to show discrimination because she took the job nearly an entire year before she returned from maternity leave, she did so voluntarily, and the way she performed the job before taking leave is distinguishable from the way she performed the job after returning from leave, at least in respect to her willingness to work past 4:45 P.M. (*See* Bloomberg 56.1 ¶ 15.)

**23.** Despite the NYCHRL's broader standard with respect to whether a claimant has sustained her evidentiary burden on each requisite element, this Court previously held as a matter of law that the relevant metric in pur-

suing a discriminatory compensation claim is total intended compensation as opposed to an individual's change in EECs. *Bloomberg III*, 778 F.Supp.2d at 463.

**24.** Additionally, to the extent that Patricot's claim that she was not promoted for discriminatory reasons constitutes a separate claim under the NYCHRL, the Court finds that summary judgment is not appropriate here, either. The Court considers the totality of the circumstances of these events, and in doing so, it finds that Bloomberg's continued promotion of other individuals ahead of Patricot for the three years she worked in Sales as a non-managerial employee subsequent to demoting her for allegedly discriminatory reasons suffices under the NYCHRL to create an issue of fact as to whether she was treated less well for discriminatory reasons.

could "reasonably conclude from the evidence that the complained-of conduct by the employer was, in the words of the [NYCHRL], reasonably likely to deter a person from engaging in protected activity." *See Williams,* 61 A.D.3d at 71, 872 N.Y.S.2d 27. Thus, the inquiry does not center on whether the retaliatory conduct constituted a materially adverse change in the terms and conditions of employment.

 Under this broader standard, the Court finds that Patricot can maintain a retaliation claim under the NYCHRL based on some of the events that transpired. Although the NYCHRL does not prescribe a general civility code for the workplace, the nature of some of the specific actions and the cumulative nature of the incidents alleged could lead a jury to conclude that a person may be dissuaded from engaging in protected activity.

For example, under the NYCHRL, public reprimands can constitute adverse action. *See Mihalik,* 715 F.3d at 115–16. With respect to Patricot's allegations involving Mazzeo's conduct towards her, Patricot alleges that she complained in both February and March 2006 of Mazzeo's hostility towards her and that she believed it stemmed from her recent pregnancy and complaints to Bloomberg HR. Approximately a week after the March 2006 complaint, Mazzeo appeared in the New York office and took a seat next to Patricot for the entire day without saying a word to her in an alleged effort to intimidate Patricot. Considering that Patricot who had just been demoted had repeatedly requested prior to her demotion that Mazzeo come to the New York office, a jury could find that such an unannounced appearance was

prompted by Patricot's complaint and amounted to an effort to deter Patricot from pursuing her claim further. Insofar as Patricot had just suffered one adverse employment action, a person in Patricot's position may be deterred from pursuing her complaint out of fear that a supervisor such as Mazzeo would continue to try to affect her career negatively.

Similarly, under the NYCHRL, a jury could conclude that Linnington's outburst was at least partially motivated by the ongoing lawsuit against Bloomberg in which Patricot was involved. Although the subject of Linnington's tirade at Patricot was unrelated to the lawsuit, considering the fact that it occurred less than a week after a status conference reported on Bloomberg's own terminals and that such an outburst may have been out-of-character for Linnington or at least had never been directed at Patricot, a jury could find that his response was motivated at least in part by his dissatisfaction with Patricot's continued pursuit of the instant action. *See Williams,* 61 A.D.3d at 78 n. 27, 872 N.Y.S.2d 27 ("In the mixed-motive context ... the question on summary judgment is whether there exist triable issues of fact that discrimination was one of the motivating factors for the defendant's conduct.")

In light of the aforementioned evidence regarding these events put forth by Patricot and the clear instruction that in close cases the NYCHRL requires a jury to evaluate the impact of potentially retaliatory conduct, the Court denies Bloomberg's request for summary judgment on Patricot's retaliation claims arising under the NYCHRL.[25]

---

25. Standing alone, Patricot could not have made out a case involving her alleged deprivation of a desk or direct telephone line, the avoidance of eye contact from senior management, and the use of the phrase "publicity stunt" by Bloomberg's spokesperson when discussing the instant action's relation to Mayor Bloomberg. *See Dixon v. Int'l Fed'n of Accountants,* 416 Fed.Appx. 107, 110 n. 1 (2d Cir.2011) (despite broader standard govern-

#### 4. *Summary*

Bloomberg's motion for summary judgment on Patricot's Title VII and NYSHRL discrimination claims with respect to her 2006 demotion and compensation decrease is denied. Bloomberg's motion is granted, however, with respect to the other claims Patricot asserts under Title VII and the NYSHRL. Bloomberg's motion is denied with respect to Patricot's NYCHRL discrimination and retaliation claims.

### B. *Tanys Lancaster*

■ Plaintiff–Intervenor Tanys Lancaster ("Lancaster") brings discrimination and retaliation claims under Title VII and the NYSHRL and the NYCHRL. She filed her EEOC charge on May 9, 2006, and she filed her complaint in the instant action on October 25, 2007. Lancaster cannot invoke the single filing rule to avoid the statute of limitations on certain Title VII claims. *See Holowecki*, 440 F.3d at 565 ("Where the party wishing to piggyback has filed [her] own EEOC charge, [she] is bound by the parameters of [her] own EEOC charge, and cannot subsequently utilize the single filing rule to avoid the statute of limitations." (internal quotation marks omitted)).[26] Thus, any of Lancaster's Title VII claims occurring on or before July 15, 2005, are time-barred.

#### 1. *Background*

Bloomberg hired Lancaster in September 1994 to work in its London office, and she transferred to Bloomberg's New York City office in March 2000. (Bloomberg 56.1 ¶ 35.) In August or September 2001, Lancaster "took on some responsibility for the Algorithmics project" (a strategic alliance with Algorithmics, Inc., a company that develops risk management software ("Algorithmics")) in addition to her primary role as the Manager of Trading Systems Sales Specialists; and as of December 2002, she was managing the project and maintained responsibility for business development. (*See* Bloomberg 56.1 ¶ 36; Pl.-Interv'rs 56.1 ¶ 36.) In September 2003, during Lancaster's last review prior to her pregnancy, she received 475 EECs

---

ing NYCHRL claims, retaliation claim fails as a matter of law where plaintiff can produce no admissible evidence of a causal connection between her protected activity and any adverse action).

**26.** Moreover, even if claimants who have previously filed charges could invoke the rule, Lancaster and the other Plaintiff–Intervenors cannot piggyback on Patricot's charge because nothing in Patricot's charge afforded the EEOC and Bloomberg sufficient notice regarding the broad scope of the grievance aside from a blanket assertion at the end of her charge that Patricot "believes that other women in similar situations have also been demoted." (*See* Golden Decl. Ex. 7, at 5–7.) Other than this broad statement, Patricot's charge alerts the EEOC only to isolated claims of discrimination specific to Patricot's personal experiences at Bloomberg. And nothing in those claims involved an adverse action that could have been sufficiently widespread to put Bloomberg on notice that an entire class of protected individuals had been affected. Bloomberg is a vast organization, and a charge alleging isolated incidents specific to one employee does not offer sufficient indicia that other employees, particularly in other departments, may have similar experiences. Because Patricot's allegations purport to complain of isolated incidents involving only her, they do not provide a sufficient basis to conclude that the EEOC could have conciliated grievances on behalf of the other individual Plaintiff–Intervenors. *See Tolliver v. Xerox Corp.*, 918 F.2d 1052, 1058–59 (2d Cir. 1990) (discussing single filing rule in case alleging age discrimination with respect to company-wide reduction in force). To find otherwise where the claimants do not work in a unit of modest size and they have not tied their complaints to a core event or policy decision would mean that any claimant could trigger the single filing rule simply by alleging that others may have experienced a similar kind of discrimination.

and was considered a "high-level female employee." (Pl.-Interv'rs 56.1 ¶ 75.F)

In August 2004, Bloomberg approved Lancaster's request for paid medical leave for in vitro fertilization from August 24, 2004, through September 7, 2004. (Bloomberg 56.1 ¶ 37.) In September 2004, Lancaster informed Kenneth Cooper ("Cooper"), the head of Bloomberg's Global Trading Systems, that she was pregnant. (*Id.* ¶ 38.) Cooper congratulated her and wished her well. (*Id.*)

Around this time, Cooper decided to streamline his direct reports, and Bloomberg determined that Algorithmics was better aligned under the "buy-side" portfolio managed by Brenton Karmen ("Karmen"), a former peer of Lancaster's.[27] (*Id.* ¶ 39; Pl.-Interv'rs 56.1 ¶ 39.) In October 2004, Cooper met with Lancaster to discuss her compensation for the 2004–2005 evaluation cycle and informed Lancaster of the changes to the reporting structure and Algorithmics, the reasons for it, and that she would begin reporting to Karmen. (Bloomberg 56.1 ¶¶ 40–41.) The record reflects that, at least initially, approximately five of Cooper's direct reports (both male and female) were made to report to people other than him. (Reply 56.1 ¶ 39.) Lancaster further admits that no manager ever told her she was being demoted and that at no point did she ever tell Cooper that she felt the change in reporting structure was a demotion. (*See* Dreiband Decl. Ex. 126, at 442–43 (Cooper Dep.); Ex. 129, at 292–94 (Lancaster Dep.).) Additionally, although Lancaster no longer had direct responsibility for two employees following the change in reporting structure, those two employees remained available to her when she needed them, and her responsibilities in general did not change. (*See* Silberstein Decl. Ex. 70, at 97–98 (Lancaster Dep.); Bloomberg 56.1 ¶ 45.) Finally, while the number of EECs Lancaster received went from 475 to 315, her total intended compensation increased by more than $45,000. (Bloomberg 56.1 ¶ 43; Pl.-Interv'rs 56.1 ¶ 43.)

In November 2004, Lancaster requested to work seven hours per day, instead of the customary ten, per her doctor's recommendation. (Bloomberg 56.1 ¶ 46.) Bloomberg granted her request for reduced hours and another request for intermittent leave and was "quite good" about accommodating her petitions for a modified work schedule during her pregnancy. (*Id.*) In February 2005, Lancaster requested disability leave, effective March 4, 2005, for medical issues associated with her pregnancy. (*Id.* ¶ 47.) Bloomberg approved her request and provided her paid disability leave for the next eight weeks through May 2, 2005. (*Id.*) Lancaster gave birth in May 2005, and was on maternity leave until August 23, 2005. (*Id.* ¶ 48.)

While Lancaster was still on maternity leave, Karmen told her that he did not think that the Algorithmics project needed a full-time manager, and Lancaster replied

---

27. Although Lancaster disputes the wisdom of this decision, she fails to dispute that such a determination was made and that it played a role in the reorganization process. (Pl.-Interv'rs 56.1 ¶ 40 ("While Lancaster admits that she met with Cooper in 2004 to discuss her compensation, she disputes that Algo[rithmics] was better aligned with the 'buy-side' trading system.").) Lancaster appears to suggest that realignment with buy-side was mere pretext but offers only conclusory statements and evidence that Algorithmics "did not solely benefit the 'buy-side' of the business." (*Id.* ¶ 39.) Bloomberg does not claim that Algorithmics only could have been a buy-side product or that it had no sell-side applications; rather, Bloomberg claims that a business decision was made that Algorithmics fit best on the buy-side, a fact that Lancaster fails to contest. (*Compare id., with* Reply 56.1 ¶ 39.)

that she was open to working on something new when she returned from leave. (*Id.* ¶ 49.) Also while on leave, Lancaster began to explore job opportunities outside of Bloomberg. (*Id.* ¶ 50.)[28] In or around July 2005, Lancaster further told Karmen that she would need to work a flexible schedule from "shortly after" 8:00 A.M. to 4:45 P.M. when she returned to Bloomberg. (*Id.* ¶ 51.) Karmen had no issue with her working that schedule. (*Id.*) Finally, the record shows that Karmen and Lancaster discussed two roles for Lancaster upon her return from leave, but Lancaster contends that one of these roles was a clear demotion and the other was outside of her expertise. (*See id.* ¶ 52; Pl.-Interv'rs ¶ 52.)

Around the same time, Lancaster began to speak with Patrick Eldridge ("Eldridge"), Bloomberg's then Global Manager of Trading System Customer Care and another prior peer of Lancaster's, about working on his team. (*Id.* ¶ 53.) Lancaster told him she needed to work flexible hours, and he was "fine" with her proposed schedule. (*Id.*) According to Lancaster's testimony, she told Eldridge that she wanted to report to him, he agreed and stated that he wanted her to manage two people. (Reply 56.1 ¶ 57.) The parties dispute whether Lancaster was told or even led to believe that she would report directly to Eldridge.

In or around August 2005, Lancaster interviewed with Jeff Cohen ("Cohen"), a former Bloomberg employee who was head of sales at Advisen, a Bloomberg competitor. (*Id.* ¶ 55.) Following her interview, Lancaster continued to communicate with

Cohen about working for Advisen, and on or around August 15, 2005, she met with Advisen's CEO and founder to discuss the role that Advisen envisioned for her. (*Id.*)

Lancaster returned to Bloomberg on August 23, 2005, and continued to report to Karmen because her request to transfer to Eldridge's group remained pending. (*Id.* ¶ 56.) She met with Eldridge's manager Nicole Comello ("Comello") in early September 2005 to discuss her future at Bloomberg. (*Id.* ¶ 57.) Comello never told Lancaster, however, that she would report directly to Eldridge if her transfer were to be approved. (Bloomberg 56.1 ¶ 57.)

On September 16, 2005, Lancaster received a formal job offer from Advisen. (*Id.* ¶ 58.) On September 19, 2005, Lancaster sent an email to Cohen indicating that she "would be delighted to accept the offer" if Advisen would agree to provide twenty days of vacation. (*Id.*) Assuming that Advisen agreed to provide the vacation days, Lancaster "anticipate[d] joining Advisen in mid-October 2005." (*Id.*) Within hours, Cohen sent Lancaster a revised offer letter that included the additional vacation time. (*Id.* ¶ 59.)

Either the same day or the day after Lancaster indicated to Cohen that she would join Advisen if it met her terms and Cohen subsequently responded with a revised offer including the additional terms, Lancaster learned that her transfer to Eldridge's team had been approved but that she would not report directly to Eldridge; instead, she would report to a person who at some point used to report to Lancaster.

---

**28.** Lancaster asserts that she began to explore other employment options "[a]fter learning from Karmen that Defendant had no job for her upon her return from leave." (Pl.-Interv'rs 56.1 ¶ 50.) But Lancaster contends in her Rule 56.1 Statement that she did not discuss her return with Karmen until July

2005, and the record shows that the lunch Lancaster had with a friend that both sides agreed prompted Lancaster's exploration of another opportunity occurred on or about June 16, 2005. (*Compare id.* ¶¶ 49–50, *with* Bloomberg 56.1 ¶ 50.)

(*Id.* ¶ 60; Pl.-Interv'rs ¶ 60.) Lancaster asserts that this reporting structure would have negatively impacted her responsibilities and capped her future earnings. (Pl.-Interv'rs ¶ 61.)

As a result of this news, Lancaster e-mailed a member of HR on September 20, 2005, because she was concerned that her new role could be a demotion and could negatively affect her career growth at Bloomberg and her future earnings potential. (Bloomberg 56.1 ¶ 62.) This individual was on leave, though, and did not respond the same day. (*Id.*) Then, on September 21, 2005, Lancaster sent an email to another Bloomberg HR representative. (*Id.* ¶ 63.) Lancaster met with this representative later that same day and expressed her concerns about her new role. (*Id.*)

Also on September 21, 2005, Lancaster met with Karmen to discuss her performance review and compensation for the September 2005 to September 2006 evaluation cycle. (*Id.* ¶ 64.) The review was critical, stating that Lancaster was doing a poor job managing the Algorithmics project. (*Id.* ¶ 64.) Lancaster testified that she disagreed with Karmen about the Algorithmics project and, thus, some of his criticisms. (*See* Silberstein Decl. Ex. 70, at 136, 235, 237–39, 272–74, 276 (Lancaster Dep.).) Nevertheless, Lancaster admitted that the project was not as successful as she would have liked. (*See* Golden Decl. Ex. 25, at 239–40, 280 (Lancaster Dep.).) Additionally, the evidence shows that there also had been customer complaints and dissatisfaction about Algorithmics, and Bloomberg had to discontinue the product Lancaster had originally managed. (*See id.* Ex. 29, at 158, 196, 301, 329–31, 338.) In the end, Lancaster only received 150 EECs, and her total intended compensation decreased more than $38,000. (Bloomberg 56.1 ¶ 68.)

The same day, Lancaster signed the offer letter from Advisen that she had received on September 19th, as well as a confidentiality agreement; she returned both documents to Advisen on September 22, 2005. (*Id.* ¶ 70.) Lancaster resigned from Bloomberg on October 3, 2005. (*Id.* ¶ 73.) During her exit interview, she did not explicitly allege discrimination or mistreatment on the basis of pregnancy, gender, or her status. (*Id.* ¶ 74.)

## 2. *Analysis of Claims under Title VII and NYSHRL*

### a. *Discrimination*

The parties are in agreement that Lancaster is a member of a protected class. As such, in order to make out a prima facie case of discriminatory treatment, Lancaster must show that she was qualified for the position, she suffered an adverse employment action, and the adverse action occurred under circumstances giving rise to an inference of discriminatory intent. Lancaster alleges a series of events that she claims to be adverse and motivated by her becoming pregnant. For the reasons explained above, Lancaster's Title VII claims with respect to any of the alleged actions occurring prior to July 15, 2005, are time-barred.

### i. *2004 Change in Reporting Structure*

██ The Court holds that Lancaster cannot make out the causal element with respect to this alleged adverse action in order to establish a prima facie case of discrimination. Although temporal proximity can give rise to an inference of discrimination under certain circumstances, the timing of the events Lancaster alleges is not suspicious enough alone to create such an inference. Not only had two months passed since Lancaster announced her pregnancy, but Bloomberg had recently granted Lancaster a paid leave of absence for in vitro fertilization treatments.

(Bloomberg 56.1 ¶ 42.) This latter evidence tends to indicate that Bloomberg was trying to accommodate Lancaster. *See Rinsler v. Sony Pictures Entm't, Inc.*, No. 02 Civ. 4096(SAS), 2003 WL 22015434, at *6 & n. 25 (S.D.N.Y. Aug. 25, 2003) (citing evidence of defendant's attempts to accommodate plaintiff and noting that in cases in which temporal proximity had been found to raise an inference of pregnancy discrimination only one month had elapsed between plaintiff's announcement and adverse action). Additionally, the causal inference is further negated by the fact that Bloomberg included men in the streamlining of which Lancaster complains and increased Lancaster's total intended compensation by more than $45,000 in October 2004. (Bloomberg 56.1 ¶¶ 37, 42–43; Reply 56.1 ¶¶ 37, 42–43.)

Even if Lancaster has made out a prima facie case regarding her claim arising out of the change in her reporting structure that resulted in her reporting to a prior peer beginning in October 2004, however, summary judgment remains appropriate for Bloomberg on this claim. Upon such a showing, the Court applies the *McDonnell Douglas* analysis to determine whether her claim survives summary judgment.[29]

■ Bloomberg sets forth a legitimate, non-discriminatory reason for said change: "It wanted to streamline Cooper's direct reports to reduce the number of managers reporting directly to Cooper, and "Bloomberg viewed the Algorithmics project, for which Lancaster was responsible, as better aligned under Karmen's 'buy side' portfolio." (Bloomberg Br., at 37.) It further supports this reason by putting forth evidence that the restructuring impacted several men, at least one of whom was a member of the Trading Systems group in which Lancaster worked. (Bloomberg 56.1 ¶ 39; Reply 56.1 ¶ 39.) Such a reason represents a legitimate business rationale sufficient to find that Bloomberg has met its burden at this stage, *see Olle v. Columbia Univ.*, 332 F.Supp.2d 599, 616–17 (S.D.N.Y.2004), and the burden shifts back to Lancaster to show by a preponderance of the evidence that said reason amounts to pretext for discrimination.

Although Lancaster cannot show that Cooper's direct reports did not decrease, her claim is that she was the only person from the Trading Systems group reporting to Cooper affected by the "streamlining." (*See* Pl.-Interv'rs Br., at 40–41.) To support her assertion that she was the sole person in Trading Systems affected and that Bloomberg's stated reason amounts to pretext, Lancaster cites one piece of evidence: a document entitled "Ken Cooper Reports as Reflected in PeopleSoft," (Silberstein Decl. Ex. 71, Ex. A ("Cooper's PeopleSoft Data")). (*See* Pl.-Interv'rs Br., at 40–41.) This one document, however, is insufficient to carry Lancaster's burden to show by a preponderance of the evidence that Bloomberg's stated reason is pretext.

Although the provided PeopleSoft data reflects that Cooper remained the supervisor of the male member of the Trading Systems group that Bloomberg claims was affected by the restructuring, (*see* Cooper's PeopleSoft Data; Dreiband Decl. Ex.

---

**29.** The Court holds that what Lancaster claims is a "smoking gun" does not classify as evidence sufficient to trigger a *Price Waterhouse* analysis. Under *Price Waterhouse*, the evidence must be such that it *directly reflects* the alleged discriminatory attitude. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 60–61 (2d Cir.1997). Rather than reflecting such an attitude, the evidence Lancaster cites as a smoking gun tends to question the legitimacy of Bloomberg's non-discriminatory reason for the change and, therefore, is properly viewed in the context of whether Lancaster can meet her burden with respect to showing that said reasons amount to pretext.

128), other evidence in the record demonstrates that Cooper did not continue to supervise this individual. First, even though the PeopleSoft data directly related to this individual reflects Cooper as his supervisor from April 9, 2003, until August 23, 2005, the data states that an "Approver/Supervisor Change" related to this employee occurred on or about October 26, 2004. This latter contention is supported by Cooper's deposition testimony in which he testified that this specific individual stopped reporting to him in October 2004, (*see* Dreiband Decl. Ex. 126, at 450–51, 456–57), and is further buttressed by Lancaster's own deposition testimony that this male employee stopped reporting to Cooper and began reporting to a female employee sometime in 2004, (*see* Dreiband Decl. Ex. 129, at 118, 125.) Finally, as noted above, the evidence shows that multiple men were impacted by the streamlining of Cooper's reports, and Bloomberg previously had attempted to accommodate Lancaster by granting her paid leave for in vitro fertilization. In the face of such evidence, Lancaster's document essentially is a "smoking cap gun" because it alone cannot amount to a preponderance of the evidence that Bloomberg's stated reason for this allegedly adverse action constitutes pretext.

### ii. *2004 Compensation Award*

Lancaster claims that she suffered a discriminatory compensation award in October 2004 because her salary remained constant at $130,000 and the total number of EECs she received decreased from 475 to 315. But even though the total number of EECs she received decreased, the total intended or estimated value of her EECs increased by more than $45,000. Therefore, her total intended compensation increased by the same amount.

As this Court has previously found, a change in the raw number of EECs from year-to-year does not offer a reliable metric for employee compensation, and the appropriate measure is an employee's intended compensation for a given year. This is particularly relevant in a year such as 2004 where the evidence demonstrates that Bloomberg instituted an across-the-board reduction in the number of EECs given to employees and top managers due to its expectation that each EEC would be worth more than an EEC awarded the previous year. (Bloomberg 56.1 ¶ 44.) While Lancaster attempts to demonstrate that her 2004 award was adverse because a female colleague of hers received a reduction of 17.5 percent in EECs compared to Lancasters's 33.6 percent reduction, she offers no evidence regarding this employee's total intended compensation as compared to her own or that Lancaster performed at the same level as this colleague. She also does not offer any evidence that other managers received a decrease in EECs less than her own. Her reliance on *Abdu–Brisson*, 239 F.3d at 467–68, is misplaced because the PDA expressly requires that she show that "other persons not so affected [by pregnancy] but similar in their ability or inability to work" received better treatment. 42 U.S.C. § 2000e(k). Regardless, Lancaster does not even assert that there are no similarly situated employees requiring the Court to look to other circumstances for an inference of discrimination. *See Abdu–Brisson,* 239 F.3d at 467–68.

### iii. *2005 Position Change, Performance Review, and Compensation Decrease*

Lancaster claims that she suffered a discriminatory adverse employment action when, after receiving approval for a transfer she requested to work on Eldridge's Trading System Customer Care team upon returning from leave in

2005, she learned that she would be re-porting to one of Eldridge's subordinates (who used to work for her) as opposed to Eldridge directly. Lancaster alleges that, even though this reporting structure did not change her role or duties, this consti-tuted a demotion because it allegedly would have capped her pay below someone who used to work for her. For this con-tention, she relies on speculation and a compensation award that had been deter-mined prior to this event. (*See* Bloom-berg 56.1 ¶ 69; Reply 56.1 ¶ 69). And because she took a new job immediately thereafter (a job for which she had been interviewing and negotiating contempora-neously to this transfer), the record lacks actual evidence regarding the fortitude of Lancaster's predictions. Without more, she cannot prove that a position she volun-tarily accepted amounted to an adverse employment action simply because there was potential for a former subordinate to ensure that he would earn more compen-sation than she, where no evidence indi-cates that her responsibilities or future earnings would be curtailed. This is par-ticularly so since her decision to join El-dridge's team provided the potential for her to manage her own group under El-dridge down the road. (*See* Silberstein Decl. Ex. 86). Additionally, Lancaster's need to find a new role at Bloomberg following her maternity leave stemmed in part from the poor performance of the Algorithmics project and it no longer needing a full-time manager. Neverthe-less, the record shows that while Lancas-ter may not have been pleased with all of the new roles for one reason or another, Bloomberg discussed at least three job opportunities with her to assume upon her return. Therefore, because Lancaster cannot show that assignment to Eldridge's team amounts to an adverse employment action and that discriminatory intent can be inferred from it, she has failed to make out a prima facie case that her taking a position on Eldridge's team constituted unlawful discrimination.

■ Lancaster further contends that her 2005 performance review and compen-sation decrease were the product of unlaw-ful discrimination. With respect to her performance review, assuming that Lan-caster can establish a prima facie case, she fails to rebut Bloomberg's legitimate, non-discriminatory reasons—"namely that Lancaster was not growing the Algorithm-ics project" and that it was actually "doing poorly" and prompting "customer com-plaints and dissatisfaction." (*See* Bloom-berg Br., at 39.)

Lancaster attempts to combat this justi-fication by pointing to prior positive per-formance reviews and her continued enjoy-ment of a high numerical rating. But the law is clear that a claimant cannot merely point to prior favorable evaluations to sat-isfy her burden at the pretext stage. *See, e.g., Viola v. Philips Med. Sys. of N. Am.,* 42 F.3d 712, 717–18 (2d Cir.1994). The Court finds that this is particularly so as here where the claimant does not actually refute any of the content of the review of which she complains, the prior favorable review foresaw at least some problems with the claimant's performance, (*see* Sil-berstein Decl. Ex. 74, at TL0000665), the employer ultimately discontinued the prod-uct prompting the negative review, (*see* Bloomberg 56.1 ¶ 65), and the claimant herself admitted that the product was not meeting her own expectations.

Similarly, Lancaster cannot show that she suffered a discriminatory compensa-tion decrease in 2005. First, Lancaster does not identify any similarly-situated comparators to support her compensation claim. Second, as established, Lancaster cannot show that Bloomberg was unjusti-fied in its review of the Algorithmics pro-

ject-a rationale that Bloomberg states also informed its decision to decrease her compensation, (*see* Bloomberg Br., at 40), as was its right. Additionally, the statement that Bloomberg does not consider leaves of absence when determining an employee's compensation overlooks the fact that an employee who is on leave for most of a year is unlikely to achieve the same success she has in previous years, and thus failures to meet expectations may have tougher consequences. Simply pointing out that Bloomberg had not decreased her high numerical rating does not overcome evidence Bloomberg has proffered showing that Lancaster's compensation decrease was not discriminatory. It follows that summary judgment on these claims is granted in favor of Bloomberg.

### b. *Retaliation*

██ According to the Plaintiff–Intervenors' Brief, claimants survive summary judgment if the legal entity was on notice that the plaintiff had engaged in a protected activity. But Plaintiff–Intervenors, in relying upon a citation to the "Background" section of *Gordon v. New York City Board of Education*, 232 F.3d 111, 113–14 (2d Cir.2000), seem not have read all of the case upon which they rely. Indeed, *Gordon* makes clear that even where general corporate knowledge may satisfy the second prima facie prong of a retaliation claim (employer's knowledge), the lack of evidence indicating knowledge of partic- ular individual agents can doom a plaintiff's ability to show the fourth element (causation). *See id.* at 117; *see also Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 147–48 (2d Cir.2010) (explaining that where plaintiff cannot show direct knowledge causal element is satisfied where circumstances evidence knowledge of protected activity or agent is acting explicitly or implicitly upon orders or encouragement of superior who has knowledge).

Lancaster alleges that her 2005 performance review and compensation, of which she was notified on September 21, 2005, were retaliation for her complaints to HR on September 20 and 21, 2005. But Lancaster does not offer any evidence to controvert Karmen's deposition testimony that he did not know that Lancaster complained to HR until she told him during the September 21st meeting. (*See* Pl.-Interv'rs 56.1 ¶ 69.) Even assuming Lancaster's messages to HR could be construed as complaints about discrimination, when Lancaster fails to offer any circumstantial evidence that would shed doubt upon Karmen's testimony and when the inference of a causal connection is belied further by Bloomberg's evidence that the actions Lancaster claims constitute retaliation were decided long before she complained to HR, (*see* Bloomberg 56.1 ¶ 69; Reply 56.1 ¶ 69), the Court holds that Lancaster cannot make out a prima facie retaliation case.[30]

---

**30.** Assuming *arguendo* that Lancaster has made out a prima facie case, the Court holds that she has not proffered sufficient evidence that a jury could find by a preponderance of the evidence that Bloomberg's stated justification for the alleged adverse actions constitutes pretext for retaliation. As this Court has already held, Lancaster cannot show that her 2005 performance review or compensation were discriminatory. Thus, insofar as Lancaster's only stated evidence to support her claim of pretext is the contents of the performance review, the degree by which her compensation was decreased, and the temporal proximity of her complaints to HR and her notification of these actions, summary judgment is appropriate for Bloomberg on these claims. "At the pretext stage, mere temporal proximity is insufficient, standing alone, to withstand summary judgment 'where the defendant proffers a legitimate reason for the plaintiff's discharge with evidentiary support therefor.'" *Bagley v. J.P. Morgan Chase & Co.*, No. 10 Civ. 1492(PGG), 2012 WL 2866266, at *11 (S.D.N.Y. July 12, 2012) (quoting *Galimore v. City Univ. of N.Y. Bronx*

#### c. *Hostile Work Environment*

Lancaster offers no basis for concluding that an objective person in her position would find disputes about reporting relationships and compensation tantamount to a workplace "permeated with discriminatory intimidation, ridicule, and insult." *Harris*, 510 U.S. at 21, 114 S.Ct. 367. Indeed, a claimant must show "more than a few isolated incidents of [discriminatory] enmity." *Snell*, 782 F.2d at 1103. Merely pointing the Court to her own affidavit attesting to subjective psychological harm and offering conclusory statements that a reasonable fact finder could reach such a result does not entitle a plaintiff to having such a hostile work environment claim heard by a jury. *Cooper v. John D. Brush & Co.*, 242 F.Supp.2d 261, 270–71 (W.D.N.Y.2003); *see also Williams v. Cnty. of Westchester*, 171 F.3d 98, 100 (2d Cir.1999).

#### d. *Constructive Discharge*

Lancaster generally summarizes her above-discussed claims to assert that she was the victim of constructive discharge. But aside from recounting her own negative experiences, Lancaster offers no evidence linking these events together or any reason for believing that Bloomberg deliberately took such actions to make her working conditions so intolerable that she was forced into an involuntary resignation. Moreover, the record indicates that Lancaster voluntarily resigned from Bloomberg because another company offered her more flexibility. As such, summary judgment is granted on these claims in favor of Bloomberg.

### 3. *Analysis of Claims under NYCHRL*

#### a. *Discrimination*

A plaintiff does not reach a jury under the NYCHRL merely by establishing a prima facie case. Assuming for the sake of analysis that Lancaster has established a prima facie case under the NYCHRL, Bloomberg is entitled to show that the adverse actions occurred for non-discriminatory reasons. Lancaster then must show by direct or circumstantial evidence that Bloomberg's proffered reason might be pretextual.

Lancaster, however, has not put forth direct or circumstantial evidence tending to cast doubt upon Bloomberg's non-discriminatory stated reason.

In determining whether the reason for an adverse action was pretextual, it is not for the Court to decide whether the complaints against plaintiff were truthful or fair, as long as they were made in good faith. The mere fact that plaintiff may disagree with [her] employer's actions or think that [her] behavior was justified does not raise an inference of pretext. A challenge ... to the *correctness* of an employer's decision does not, without more, give rise to the inference that the adverse action was due to [pregnancy] discrimination. Nor can plaintiff establish pretext by rationalizing his errors or by blaming others.

*Melman*, 98 A.D.3d at 121, 946 N.Y.S.2d 27 (citations, brackets, and internal quotation marks omitted). Lancaster principally relies upon her own subjective beliefs that she was treated unfairly in order to argue that Bloomberg's stated reasons were pretextual. And where she does proffer shreds of evidence, they do not meet the more substantial burden that Lancaster faces at the pretext stage. *See id.* at 124, 946 N.Y.S.2d 27 ("[T]he initial 'de minimis prima facie showing' required of a plaintiff ... should not be conflated with the 'frequently ... onerous' showing required to defeat a well supported sum-

*Cnty. Coll.*, 641 F.Supp.2d 269, 289 (S.D.N.Y. 2009)).

mary judgment motion." (quoting *Bennett*, 92 A.D.3d at 38, 936 N.Y.S.2d 112.)).

Lancaster directs the Court to a few portions of the record that she claims demonstrate inconsistencies in Bloomberg's proffered reasons. With respect to Lancaster's claim that the 2004 change in reporting structure amounted to discrimination, Lancaster claims that her interpretation of the record that she was the only person from her group reporting to Cooper affected by the streamlining despite Bloomberg's claim otherwise undercuts Bloomberg's non-discriminatory stated reason and entitles her to reach a jury. While the NYCHRL is broader, Lancaster's argument remains unavailing in light of the broader record. Indeed, this argument of Lancaster's is undermined by her own testimony that Ross stopped reporting to Cooper sometime in 2004. Additionally, the fact that Cooper testified that Ross stopped reporting to him in October 2004, that the document upon which Lancaster relies reflects some kind of "Approver/ Supervisor" change in October 2004, and that multiple men were impacted by the streamlining of Cooper's reports weighs against viewing this evidence as the kind of circumstantial evidence that, under the NYCHRL, tends to illuminate inconsistencies in a defendant's stated reasons, raising issues best resolved by a jury.

Additionally, nothing about Bloomberg's not proffering a comparator chart for Lancaster amounts to admissible circumstantial evidence that Lancaster's 2004 compensation was discriminatory. The burden is on Lancaster to put forth such evidence, not Bloomberg. Moreover, Lancaster claims that EECs correlate with how well an employee performed, but she does not offer any evidence that she performed at the same level as comparators she identifies thereby entitling her to the same rate

of decrease in her EECs. Rather than developing this factual record, Lancaster rests on her conclusory allegations, and such is insufficient at this stage under the NYCHRL where her burden is not *de minimis* and the undisputed evidence demonstrates that Lancaster was awarded a more than $45,000 increase in total intended EEC compensation that translated into the same in total intended compensation.

Next, Lancaster claims that her 2005 compensation award and the confusion surrounding her return from maternity leave amounts to a violation of the NYCHRL. With respect to her compensation, she offers no evidence other than her self-serving excuses as to why her performance review that was critical of her performance with Algorithmics was not in good faith. Not only had the project failed to meet Bloomberg's expectations, Lancaster admits that it failed to meet her own, too. Moreover, Lancaster requests that the Court aggregate the various events alleged in the complaint to find that they add up to unlawful discrimination. But viewing Lancaster's compensation in the aggregate shows that her 2005 total intended EEC compensation was greater than the 2003 total intended EEC compensation upon which she relies as the appropriate personal comparator for her previous compensation claim. (*See* Silberstein Decl. Ex. 78.) Thus, in the aggregate, whereas Lancaster's 2005 performance review came on the heels of Lancaster's below expectations performance on the Algorithmics project and whereas her total intended compensation remained above her 2003 total intended compensation (when she claims that she received a positive performance review), Lancaster's proffered analysis of the evidence is insufficient to show that Bloomberg's reason for her 2005 compensation award was pretextual.

Similarly, following the poor performance of the Algorithmics project, Bloomberg decided that it no longer needed a full-time manager for Algorithmics. Nevertheless, Bloomberg worked to find Lancaster a new position upon her return from maternity leave. The fact that she was required to report to someone other than Eldridge does not show pretext where nothing in the record shows that she was promised otherwise and nothing in the record indicates that her responsibilities were altered at all.

Finally, Lancaster states that Bloomberg's stated reasons are pretextual, or at least inconsistent, because her overall rating remained a "2," indicating that Bloomberg considered her a top-performer yet decreased her compensation and authority. But Lancaster offers no evidence that Bloomberg decreases compensation and alters reporting structures when an employee's numerical rating decreases. Where employees are rated on a scale of one-to-six, nothing in the record implies that an employee could fail to perform the same as she did the previous year yet still not surpass Bloomberg's expectations, generally.

■ In light of these considerations, the Court holds that a jury could not find that Lancaster was discriminated against in contravention to the NYCHRL. Thus, the Court finds that Lancaster's discrimination claim under the NYCHRL fails. Where the claimant has not proffered any direct or circumstantial evidence tending to rebut a defendant's stated reason, the Court need not undertake both the *McDonnell Douglas* and mixed-motive analyses, and summary judgment is appropriate in the defendant's favor. *Id.* at 127–28, 946 N.Y.S.2d 27. The Court further finds, though, that because the circumstantial evidence Lancaster proffers only tends to support the required showing for a prima facie case, she cannot demonstrate through such evidence that discriminatory motive played any role in those actions that Lancaster claims were unlawful under the NYCHRL.

#### b. *Retaliation*

Lancaster cannot sustain a retaliation claim under the NYCHRL. Simply stating that the NYCHRL encompasses a broader standard does not absolve Lancaster from putting forth evidence tending to show a causal connection between her action opposing Bloomberg's alleged discrimination and the alleged adverse actions. Perhaps if Lancaster offered any evidence tending to provoke reason to doubt Karmen's testimony that he did not know of her complaints or Bloomberg's evidence that decisions regarding Lancaster's performance review and compensation were completed prior to her complaints, her claims might survive under the NYCHRL. Even under a mixed-motives analysis under the NYCHRL, Lancaster has not offered any evidence other than temporal proximity to suggest any retaliatory animus on the part of Bloomberg. Insofar as there is no other evidence tending to indicate that Karmen had actual or implied knowledge of Lancaster's complaints and there is evidence indicating that the decisions to take such action pre-date Lancaster's complaints, no reasonable jury could conclude that the relevant decision-maker was motivated even in part by a desire to retaliate.

#### 4. *Summary*

Bloomberg's motion for summary judgment is granted with respect to all claims brought by Lancaster under Title VII and the NYSHRL and the NYCHRL.

### C. *Janet Loures*

Plaintiff–Intervenor Janet Loures ("Loures") alleges discrimination and re-

taliation claims under Title VII and the NYSHRL and the NYCHRL. She filed a discrimination charge with the EEOC on October 27, 2006, and a retaliation charge on May 31, 2008. For the reasons explained relative to Lancaster's claims, Loures also cannot invoke the single filing rule to avoid the statute of limitations on certain Title VII claims. Thus, any of Loures's Title VII discrimination claims occurring before December 31, 2005, are time-barred; any of Loures's Title VII retaliation claims occurring before August 5, 2007, are time-barred.

### 1. *Background*

Loures began working for Bloomberg in September 1989 as a quality control analyst. (Bloomberg 56.1 ¶ 76.) Since 1997, she has been a resident of the State of New Jersey and principally worked in Bloomberg's Princeton, New Jersey office. (*Id.* ¶ 77.)

From January through March, 2001, Loures and another employee served as co-managers of Global Data on an interim basis while Stuart Bell was on a management rotation. (*Id.* ¶ 78.) During this time period, Loures became pregnant with her first child, although she did not initially tell anyone about her pregnancy. (Pl.-Interv'rs 56.1 ¶ 78.) According to Loures, however, she suffered from morning sickness in the office, so it is likely that her condition could be surmised. (*Id.*)

In April 2001, Mazzeo was selected to head Global Data in Princeton, and Loures returned principally to her Quality Assurance manager position. (Bloomberg 56.1 ¶ 79.) In October 2001, when Loures was about thirty-six weeks pregnant, Mazzeo announced a reorganization of Global Data and named Loures manager for London Global Data and New/Security Issuance. (*Id.* ¶ 80.) Loures's new position consisted of several subgroups, including Translations, Data License, and New Issuance. (*Id.*) On October 23, 2001, Loures left for maternity leave. (*Id.* ¶ 81.)

Loures returned from maternity leave in February 2002. (*Id.* ¶ 82.) Rather than Loures's returning to supervise London and Asia Global Data, Mazzeo decided that she would continue to manage those groups directly, as she had during Loures's leave, and that Loures would exclusively focus on Translations. (*Id.*) Loures was upset about the loss of direct reports as a result of this decision. (*Id.*) It is undisputed that Loures returned to different responsibilities from those she had when she left.[31]

Mazzeo informed Loures that the process of restructuring Global Data was ongoing, that Loures was a good employee, and that there would be new opportunities for her, though she never made it clear when these would come to fruition. (*Id.* ¶ 83.) In March or April 2003, Mazzeo told Loures that she intended to give Loures responsibility for the Quality Assurance group, and she did so in late April or early May 2003. (*Id.* ¶ 84.) Shortly thereafter, in the middle of May 2003,

---

**31.** Loures asserts that she did not merely have different responsibilities but that she returned to find that her role at Bloomberg had been greatly diminished. However, though Michael Ursitti ("Ursitti") testified that her responsibilities had changed, he stated that Loures "returned to the role of department manager," which was "equivalent" to the position she held prior to leave. (Silberstein Decl. Ex. 19, at 145–46). Similarly, Doreen Szeflinski testified that Loures remained a department manager but "came back to a smaller group" after leave. (Silberstein Decl. Ex. 32, at 87, 117, 121–23.) Both Kevin Iraca and Jennifer Bartashus noted that another employee's responsibilities increased during Loures's leave and that, as a result, Loures had fewer direct reports upon her return. (Silberstein Decl. Ex. 109, at 218; Ex. 110, at 55–56, 58–66.)

Loures informed Mazzeo that she was pregnant for a second time. (*Id.* ¶ 85.)

Loures went on short term disability on September 29, 2003, and she did not return until after her second maternity leave in April 2004. (*Id.* ¶¶ 85–86.) During her absence, a male employee served as interim manager of Quality Assurance, and ultimately, he retained this position when Loures returned from leave as Mazzeo told Loures that she wanted Loures to focus on Translations. (*Id.* ¶ 86.) This again left Loures with fewer direct reports, (Pl.-Interv'rs 56.1 ¶ 86), though Mazzeo reasoned to Loures that Loures had not lost anything because Quality Assurance might not be around much longer, (Bloomberg 56.1 ¶ 86).[32]

More than a year later, in the summer of 2005, Loures volunteered to take over a specific project, but Mazzeo did not select her. (*Id.* ¶ 87.) Loures states that she was humiliated by this. (*Id.*) Then, in September 2005, several managers met and discussed restructuring manager responsibilities due to the departure of a manager, and Loures claims she was slated to take over Profiles and Bloomberg Law. (*Id.* ¶ 88.) Ultimately, however, Mazzeo informed Loures and the other managers that Loures would not assume these responsibilities and had been removed from the restructuring plans. (*Id.*) This caused Loures to feel humiliated yet again. (*Id.*)[33]

In November 2005, Loures attended a Global Leadership Forum in New York City. (Pl.-Interv'rs 56.1 ¶ 89.) As part of this process, she received a "360 Personal Feedback Report," which included feedback from her direct reports, one or two of her peers, and from her supervisor, Mazzeo, that Loures viewed as negative. (Bloomberg 56.1 ¶ 89.) In fact, Loures's direct reports were more critical of her than Mazzeo was. (*See id.* ¶¶ 89–90.)

Loures claims that in December 2005, Mazzeo told Loures that she thought Loures's talent was in process, not management. (*Id.* ¶ 93.) Loures was moved to the Process Analysis team in January 2006. (*Id.*) In June 2006, the Process Analysis team was disbanded, and Loures was transferred to Profiles. (*Id.* ¶ 94.)

Loures filed an EEOC discrimination charge on October 27, 2006, after which she claims that employees in Bloomberg's R & D department retaliated against her by failing to act promptly on, or by excessively scrutinizing, her programming requests. (*Id.* ¶ 95.) She specifically claims that John Palang of the R & D department was hostile to her, made her job more difficult by making her do certain functions manually, ignored her, and told her, "You don't care about this." (*Id.* ¶ 98.) Loures complained to Bloomberg in May 2008 about Palang's treatment of her, which she believed was retaliation for her participation in this action. (*Id.* ¶ 99.) After investigating, HR informed Loures that although Palang's conduct was inappropriate, it was not retaliatory. (*Id.*)

Additionally, according to Loures, Bloomberg moved an employee allegedly known to be hostile next to Loures even after that employee had become enraged during a meeting in which Loures's name was mentioned. (Pl.-Interv'rs 56.1 ¶ 103.) Loures, however, was allowed to move desks the same day. (*Id.*; Reply 56.1 ¶ 103.)

---

32. It appears that Quality Assurance existed at least as late as December 2009. (Pl.-Interv'rs 56.1 ¶ 86.)

33. Loures admits, though, that she did not lose any responsibilities as a result of this particular action. (*See* Golden Decl. Ex. 43, at 185–88 (Loures Dep.).)

Finally, after intervening in this action on her own behalf, according to press reports noting Loures's participating in this action, Bloomberg spokesperson Judith Czelusniak accused certain Plaintiff–Intervenors of participating in a "publicity stunt" and "dragging the mayors [sic] name into their battle in their lawsuit against the company to settle." (Bloomberg 56.1 ¶ 31.)

Loures remains employed at Bloomberg, though she states that she has been kept in a position that is not commensurate with her experience. (Pl.-Interv'rs 56.1 ¶ 105.)

### 2. *Jurisdiction under State and City Statutes*

■ Before proceeding to the substance of Loures's claims, the Court must resolve whether Loures—a resident of New Jersey who works out of Bloomberg's Princeton office—can invoke two of the statutes under which she seeks relief: the NYSHRL and NYCHRL. In order for a nonresident to invoke the protections of the NYSHRL and NYCHRL, she must show that the discriminatory act had an impact within the boundaries of the State and City, respectively. *See Hoffman v. Parade Publ'n*, 15 N.Y.3d 285, 907 N.Y.S.2d 145, 933 N.E.2d 744, 745 (2010).

Loures relies on a single citation to *Regan v. Benchmark*, No. 11 Civ. 4511(CM), 2012 WL 692056 (S.D.N.Y. Mar. 1, 2012), addressing a motion to dismiss as support for her contention that she can assert claims under the State and City statutes. But pleading impact within the State and City in a complaint is different from providing sufficient evidence at summary judgment to show that the challenged actions in this case had a sufficient impact to sustain claims under the NYSHRL and NYCHRL.

Loures concedes that, at all relevant times, she lived in New Jersey and worked almost exclusively out of Bloomberg's Princeton office. She claims, however, that she "often worked with Defendant's employees in New York City, which required her, on several occasions, to visit and work out of Defendant's" New York office. (*See* Pl.-Interv'rs Br., at 50.) She also states that some of her clients are based in New York City, and because Global Data is centrally managed from there, she is entitled to protection under these statutes. (*Id.*) Finally, she notes that she attended a Global Leadership Forum in New York City, during which she received a feedback report upon which Bloomberg relied in connection with her 2006 "demotion."

■ But pointing to a few occasions in which a claimant performed some work in New York and evidence that certain adverse actions were executed from New York is insufficient to show that the alleged discriminatory events had an impact in New York. For starters, the facts that Global Data is managed in New York and that decisions affecting Loures may have been made and executed from that office do not grant Loures jurisdiction on their own because these statutes are intended to protect those who work *in* the State and City. *See Hoffman*, 907 N.Y.S.2d 145, 933 N.E.2d at 747. Additionally, both the New York Court of Appeals and the Court of Appeals for the Second Circuit have held that the impact requirement is not satisfied simply by pointing to frequent communication with a managing office in New York City and meetings there regarding local projects. *See id.; Fried v. LVI Servs., Inc.*, 500 Fed.Appx. 39, 42 (2d Cir. 2012).[34] Finally, Loures offers no indicia

---

34. Loures's own accounting of her time in the New York office reflects that, of the total number of days she worked, she only was in the New York office during six percent of

of how many of her clients are based in New York or how much her work affects these clients in New York as opposed to elsewhere other than conclusory statements that she services clients based in New York. Because Loures has not offered any evidence tending to show more than a tangential relationship between New York and the actions of which she complains, the Court holds that Loures has failed to show that she is entitled to pursue the claims she brings in this action under the NYSHRL and the NYCHRL, and thus, those claims are dismissed.

### 3. *Title VII Claims*

Because Loures cannot invoke the single filing rule in order to pursue Title VII claims occurring more than 300 days before the date on which she filed her own EEOC charge, summary judgment is appropriate in favor of Bloomberg on any such claims occurring before December 31, 2005. Loures asserts, however, that even if she cannot invoke the single filing rule, all of her claims are timely pursuant to the continuing violation doctrine under Title VII. (*See* Pl.-Interv'rs Br., at 49.) Loures's claims, however, do not present one of the rare cases in which the exception should be applied.

As the Court noted *supra*, the doctrine clearly does not apply to "[d]iscrete acts such as termination, failure to promote,

[or] denial of transfer." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 114, 122 S.Ct. 2061. And although Loures claims that she did not consider certain earlier acts as discriminatory until later, she offers no rationale for finding that those earlier acts are not separate, discrete, unlawful acts but, instead, are part of to "a series of separate acts that collectively constitute one unlawful act." *See Shomo v. City of N.Y.*, 579 F.3d 176, 181 (2d Cir.2009). Indeed, simply alleging that prior acts are related to acts alleged in timely filed charges is insufficient to invoke the doctrine. *Nat'l R.R. Passenger Corp.*, 536 U.S. at 113, 122 S.Ct. 2061. Therefore, Loures cannot pursue discrimination claims based on acts occurring before December 31, 2005, and the Court proceeds to analyze Loures's timely filed claims.[35]

### a. *Discrimination*

■ Loures cannot make out a prima facie case of discrimination based on any of the events occurring after December 31, 2005. Assuming Loures is a member of a protected class, she has offered no evidence tending to show an inference of discrimination with respect to any timely filed events. Rather, at the time she was moved out of management in Global Data, it had been more than two years since she gave birth and approximately twenty-two months since she returned from her sec-

---

them in 2002, three percent in 2003, nine percent in 2004, and two percent in 2005. A more accurate accounting, however, shows that Loures only spent 4.7 percent of her time in New York in 2002, 2.7 percent in 2003, 5.1 percent in 2004, and 2.2 percent in 2005. (*Compare* Pl.-Interv'rs 56.1 ¶ 77, *with* Reply 56.1 ¶ 77.)

**35.** Loures is correct to point out that time-barred events can constitute evidence relevant to timely filed claims. But "[t]he mere existence of other alleged retaliatory conduct does not automatically render a retaliation claim plausible. Rather, '[w]hen ... an em-

ployee's allegations of retaliation extend beyond the limitations period, the circumstances surrounding the claim will determine precisely what consideration is owed to the time-barred conduct.'" *Robles v. Cox & Co.*, 841 F.Supp.2d 615, 629 (S.D.N.Y.2012). Furthermore, the Court retains discretion as to whether such evidence should be admitted, *see Nat'l R.R. Passenger Corp.*, 536 U.S. at 112, 122 S.Ct. 2061; *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1211 (2d Cir.1993), and the Court only will consider such evidence where the claimant has tied it to a timely claim.

ond maternity leave. Loures asserts that "a triable issue of fact exists as to whether Loures'[s] maternity leave ending in April 2004 remained in Defendant's 'thoughts and actions' with respect to the adverse employment actions taken against her . . . in December 2005/January 2006." (Pl.-Interv'rs Br., at 52.) Loures offers no evidence or case law in support of this conclusory statement, except to state later that "[a]n invidious discriminatory purpose may often be inferred from the totality of the relevant factors and all evidence of discrimination must be considered as a whole." She makes no clear effort to tie potential evidence of time-barred claims to her timely claims, particularly as it relates to showing a causal link in her nearly two years since returning from maternity leave. As Judge Wood concluded in a case cited by Plaintiff–Intervenors:

> [The claimant] essentially wants the Court to infer from her protected status and an adverse employment action, with [little] else, that she suffered a Title VII violation. This is not enough—she must adduce evidence that raises a question of fact as to whether the employment action was based on impermissible discrimination. The Court cannot infer discrimination based on the first and third elements of a prima facie case alone.

*Infante v. Ambac Fin. Grp.*, No. 03 Civ. 8880(KMW), 2006 WL 44172, at *7 (S.D.N.Y. Jan. 5, 2006). Because a nearly two year gap does not constitute sufficiently close temporal proximity to establish the causal element of a prima facie case, summary judgment is appropriate in favor of Bloomberg on all discrimination claims.

### b. *Retaliation*

Loures lists a litany of allegedly adverse employment actions taken after she engaged in protected activity and then summarily concludes they "were causally con-nected" to Loures's engaging in protected activity. (*See* Pl.-Interv'rs Br., at 57.) She makes no effort to explain how any of the alleged actions, many of which are time-barred, constitute a materially adverse employment action that would reasonably deter someone from engaging in protected activity, much less why they amount to anything more than hostility or petty slights. And she does not cite to any evidence in support of her conclusion that the events are causally connected to her protected activities. For example, Loures asserts via her Rule 56.1 Statement that Bloomberg purposefully did not address her requests in an attempt to create a pretext for performance issues; however, she cites no evidence tending to show that the head of R & D knew about her pregnancies, her leaves, or her EEOC charge or that he was acting upon the encouragement of someone with such knowledge or that other employees of R & D were so doing. (*See* Pl.-Interv'rs Br., at 57; Pl.-Interv'rs 56.1 ¶ 95.)

Additionally, for the same reasons as discussed in relation to Patricot's claims, Loures cannot maintain a claim based on Bloomberg's statements to the press concerning the press conference in which she voluntarily participated. Based on these considerations, it follows that summary judgment is granted in favor of Bloomberg on all of Loures's retaliation claims.

### c. *Hostile Work Environment*

Loures offers no basis for concluding that an objective person in her position would find that she worked in a workplace "permeated with discriminatory intimidation, ridicule, and insult." *Harris*, 510 U.S. at 21, 114 S.Ct. 367. Indeed, a claimant must show "more than a few isolated incidents of [discriminatory] enmity." *Snell*, 782 F.2d at 1103. Merely pointing the Court to her own affidavit attesting to

subjective psychological harm and offering conclusory statements that a reasonable fact finder could reach such a result does not entitle a plaintiff to having such a hostile work environment claim heard by a jury. *Cooper*, 242 F.Supp.2d at 270–71; *see also Williams*, 171 F.3d at 100. Moreover, aside from Mazzeo's alleged involvement in certain interactions, Loures offers no evidence to demonstrate that an objective person would view the untimely events as part of a severe and pervasive pattern culminating in the events underlying her timely-filed claims. As such, summary judgment is appropriate in favor of Bloomberg on Loures's hostile work environment claims.

### 3. *Summary*

Bloomberg's motion for summary judgment is granted with respect to all claims brought by Loures under Title VII, the NYSHRL, and the NYCHRL.

### D. *Monica Prestia*

Plaintiff–Intervenor Monica Prestia ("Prestia") alleges discrimination and retaliation claims under Title VII and the NYSHRL and the NYCHRL. She filed her charge with the EEOC on June 16, 2006. (Bloomberg 56.1 ¶ 149.) For the reasons explained *supra*, Prestia cannot invoke the single filing rule to avoid the statute of limitations on certain Title VII claims. Thus, Prestia's Title VII claims are timely if the challenged events occurred on or after August 20, 2005.

Prestia had also asserted claims alleging violation of the Family and Medical Leave Act, intentional infliction of emotional distress, and negligent hiring and supervision. She has since abandoned these claims. (*See* Pl.-Interv'rs Br., at 1 n. 2.) Thus, summary judgment is granted at the outset in favor of Bloomberg on these latter claims.

### 1. *Background*

Bloomberg hired Prestia in December 1997 as an Account Executive. (Bloomberg 56.1 ¶ 115.) She became pregnant in February 2005 and announced her pregnancy in May 2005. (*Id.*) Her immediate supervisor, Frank Vulpi ("Vulpi") said he was happy for her. (*Id.*)

Beginning in November 2004, Bloomberg required all advertising salespeople to input notes regarding prospective sales into the Prospect System (the "PROS" system). (*Id.* ¶ 116.) In March or April 2005, Carroll Kaschak ("Kaschak") (the manager to whom Vulpi reported) met with Prestia and expressed displeasure with how Prestia input notes into the system. (*Id.* ¶ 117.)

Prestia began experiencing medical problems related to her pregnancy in May 2005. (*Id.* ¶ 118.) On or before May 23, 2005, Prestia met with an HR representative and indicated that she would need to take intermittent leave one to two days per week beginning May 23, 2005, and continuing until the birth of her child and that her workload must be shortened or accommodated to fit shorter work days because she could not work five days a week from 8:00 A.M. to 6:00 P.M. (the normal workday at Bloomberg). (*Id.* ¶¶ 119–120.) Prestia agreed to call Bloomberg or otherwise notify Vulpi on days when she would be absent. (*Id.*; Pl.-Interv'rs 56.1 ¶ 155.) Bloomberg HR approved the leave request. (Bloomberg 56.1 ¶ 119.)

Prestia understood that she was allowed to work from 9:00 A.M. until 5:00 P.M. only on days she was not feeling well. (*Id.* ¶ 120.) She began taking shorter work days beginning in June or early July 2005. (*See id.* ¶ 121; Pl.-Interv'rs 56.1 ¶ 156; Roth Decl. Ex. A, at 94 (Prestia Dep.).) By early July, Prestia had been diagnosed with edema and preeclampsia, and she sought leave from and was granted it by

Stacey Follon ("Follon") in HR. (*See* Pl.-Interv'rs 56.1 ¶ 156; Reply 56.1 ¶ 121.) Also in June or early July, Kaschak noticed that Prestia and another employee on Vulpi's team were arriving late and reminded Vulpi that they were required to be at work on time. (Bloomberg 56.1 ¶ 121.) According to Prestia, Vulpi told Prestia that Kaschak was calling him daily to ask why she was arriving late, prompting him to question Prestia daily. (Pl.-Interv'rs 56.1 ¶ 121.)

The record shows that Kaschak similarly scrutinized the schedule of other employees, as well; nothing in the record demonstrates whether any of these other employees had approved schedule changes like Prestia did. (*See* Bloomberg 56.1 ¶ 122; Pl.-Interv'rs 56.1 ¶ 157; Reply 56.1 ¶ 122.) Kaschak and Vulpi, however, were not informed of Prestia's leave request as a result of these recent diagnoses or of HR's approval of said request. (*See* Pl.-Interv'rs 56.1 ¶ 156; Reply 56.1 ¶ 121.) On August 12, 2005, Prestia e-mailed Follon to express her concern that her supervisors were not aware of the specifics of her medical note and that, as a result, she was under unwanted stress. (Bloomberg 56.1 ¶ 124.) On August 15, 2005, Prestia met with Follon and told her that she was upset because Vulpi had spoken to her on several occasions about coming in late. (*Id.* ¶ 125.) Follon said that Kaschak and Vulpi had not been informed about Prestia's schedule change because her medical issues were confidential. (*Id.*) Neither Vulpi nor Kaschak was present during this meeting with Follon. (*Id.* ¶ 126.)

On August 23, 2005, Prestia's doctor placed her on complete bed rest beginning September 2, 2005, and said that she could return to work "after delivery." (*Id.* ¶ 127.) Prestia began paid maternity leave on September 1, 2005, gave birth in No-vember 2005, and returned from leave on February 21, 2006. (*Id.*)

While Prestia was on leave, Bloomberg moved the entire sales team to a new floor. (*Id.* ¶ 128.) Prestia's desk was moved, and when she returned from leave, her coworkers were sitting behind her. (*Id.*) According to Prestia, she was the only person with her back to the group. (Pl.-Interv'rs 56.1 ¶ 163.)

Shortly after Prestia returned from leave, Trevor Fellows, a Bloomberg manager to whom Prestia did not report at the time, said to her, "Monica, hey, what's this, your third kid?" as he walked by her desk. (Bloomberg 56.1 ¶ 131.) Prestia indicates that this was stated in a condescending manner. (Pl.-Interv'rs 56.1 ¶ 166.)

Prestia further complains that upon returning from leave Kaschak ignored her, failed to ring a bell acknowledging any of her three sales (contrary to custom at Bloomberg after each sale), and did not introduce her to one or two new employees even though she introduced them to all other employees on the floor. (Bloomberg 56.1 ¶ 129; Pl.-Interv'rs 56.1 ¶ 164.) At some later time, Prestia complained to HR that the bell had not been rung in recognition of her sales; HR investigated and concluded that Prestia did not receive the desired bell ringing because she failed to make sales or made sales when Kaschak was not in the office to ring the bell. (Bloomberg 56.1 ¶ 130.) Prestia disputes this conclusion and states that each time she made one of the three sales she sent an email to Kaschak and visually confirmed that Kaschak was in the office each time she sent such an email. (Pl.-Interv'rs 56.1 ¶ 165.) Additionally, Kaschak recalls that she did not introduce one or two new employees to Prestia because Prestia was on the phone while she was making intro-

duction. (*Bloomberg* 56.1 ¶ 130; Golden Decl. Ex. 54, at 296–97 (Kaschak Dep.).) [36]

On or before March 13, 2006, Kaschak came across a potentially falsified PROS note that Prestia had entered concerning Rallye Motors. (*Bloomberg* 56.1 ¶ 132.) Kaschak called Priya Varindani ("Varindani"), Prestia's HR representative, and explained that Prestia's note indicated that Prestia had met with Martin Hall during her recent visit to Rallye Motors, even though an earlier note from a different salesperson indicated that this individual no longer worked for Rallye Motors. (*Id.*) Kaschak met with Prestia on March 13, 2006, discussed Prestia's visit to Rallye Motors, and asked her to "clean ... up" a number of her PROS notes. (*Id.* ¶ 133.) Kaschak then called Varindani after meeting with Prestia. (*Id.*) Prestia testified that Kaschak instigated the meeting by yelling to Prestia to meet her in one of the private conference rooms. (Roth Decl. Ex. A, at 116 (Prestia Dep.).) Prestia claims Vulpi, as her immediate supervisor, normally would have been present in such a meeting but that Kaschak "didn't want [him] to defend [Prestia]." (*Id.* at 48–49, 130.)

The next day, Kaschak, Prestia, and Varindani met together. (*Bloomberg* 56.1 ¶ 134.) During the meeting, Kaschak directly asked Prestia whether she went to Rallye Motors and, if so, with whom she met. (*Id.*) Prestia told them that she dropped off a media kit with the receptionist. (*Id.*) According to Prestia, Kaschak interrogated her in this meeting in an abrasive and confrontational manner, and the meeting ended by Prestia's putting them on notice that she was going to contact an attorney. (Pl.-Interv'rs 56.1 ¶ 169.)

On March 16, 2006, Prestia's then-attorney sent a letter to Bloomberg indicating that Prestia had retained her with respect to "matters that arose during [Prestia's] pregnancy." (*Bloomberg* 56.1 ¶ 135.) This was the first time she complained about alleged discrimination. (*Id.*) Kaschak was first informed that Prestia had formally complained on April 24, 2006. (*Id.* ¶ 136.)

On or around March 24, 2006, Prestia met with Vulpi and Kaschak and received a written evaluation of her performance from December 2004 to December 2005. (*Id.*) Prestia was the lowest-ranked salesperson reporting to Vulpi in 2005. (*Id.*) Prestia disagreed with the ratings that she received. (*Id.*)

On April 3, 2006, Kate Wheatley ("Wheatley"), a Bloomberg HR representative, informed Prestia that she investigated Prestia's concerns about her performance review and was confident that Prestia would not have any further issues. (*Id.* ¶ 140.) Prestia continued to disagree with her evaluation and faxed a written rebuttal. (*Id.*) Subsequently, Wheatley concluded that Prestia's performance evaluation accurately reflected Vulpi's assessment of her performance and was consis-

---

**36.** Prestia asserts in her Rule 56.1 Statement that "[t]he fact that Prestia was on the phone was solely alleged by Kaschak[ ] and refuted by Prestia in her deposition" and that "this did not simply occur once." (Pl.-Interv'rs 56.1 ¶ 165.) These matter-of-fact statements, however, simply are not supported by the cited material. With respect to the former, nothing in the cited pages "refutes" Kaschak's version. All Prestia says is that Kaschak "actually came right over within my row and stopped right before the person who was sitting right next to me." (Roth Decl. Ex. A, at 153 (Prestia Dep.).) The Court is at a loss for how a statement that does not even reference whether Prestia was on the phone refutes Bloomberg's statement. Regarding the latter, Prestia's own testimony is that "there *might* have been one other person," and beyond that, she recalls no other information about this second new employee. (*Id.* at 153–56.)

tent with past performance rating. (*Id.* ¶ 141.)

In April or May 2006, Prestia met with Vulpi to receive information regarding her compensation. (*Id.* ¶ 142.) Although Bloomberg awarded Prestia ten EECs (five fewer than the prior year), her salary remained the same, and her total intended compensation increased by a little more than two hundred dollars. (*Id.* ¶¶ 142–43.) [37]

Prestia stopped working in Bloomberg's offices in June 2006, and resigned in May 2008. (*Id.* ¶¶ 146–48.)

### 2. *Analysis of Title VII and NYSHRL Claims*

Because Prestia cannot invoke the single filing rule in order to pursue Title VII claims occurring more than 300 days before the date on which she filed her own EEOC charge, summary judgment is appropriate in favor of Bloomberg on any Title VII claims occurring before August 20, 2005. Prestia asserts, however, that even if she cannot invoke the single filing rule, all of her claims are timely pursuant to the continuing violation doctrine. (*See* Pl.-Interv'rs Br., at 49.) Prestia's claims, however, do not present one of the rare cases in which the exception should be applied.

As the Court noted *supra,* the doctrine clearly does not apply to "[d]iscrete acts such as termination, failure to promote, [or] denial of transfer." *Nat'l R.R. Passenger Corp.,* 536 U.S. at 114, 122 S.Ct. 2061. Nowhere does Prestia explain how

the acts she complains of constitute "a series of separate acts that collectively constitute one unlawful act." *See Shomo,* 579 F.3d at 181. Simply alleging that prior acts occurred does not show that they are related to acts alleged in timely filed charges and is insufficient to invoke the doctrine. *Nat'l R.R. Passenger Corp.,* 536 U.S. at 113, 122 S.Ct. 2061. Therefore, Prestia cannot pursue Title VII discrimination claims based on acts occurring before August 20, 2005.

#### a. *Discrimination*

In her Brief, Prestia proffers a list of "adverse actions" purportedly prohibited by the law yet devoid any legal argument as to why almost all of them are not patently unactionable and as to why those that might be actionable are in this case. (*See* Pl.-Interv'rs Br., at 73.) After applying the law to the facts, the Court finds that summary judgment is appropriate in favor of Bloomberg on Prestia's discrimination claims for the following reasons.

#### i. *Non–Compensation Claims*

First, Prestia's allegations of excessive monitoring do not give rise to an adverse employment action. With respect to her allegations involving the scrutiny of her hours, excessive monitoring of the type alleged by Prestia does not constitute an adverse employment action in the absence of unfavorable consequences rising to a level greater than embarrassment and anxiety. *See Ifill v. United Parcel Serv.,* No. 04 Civ. 5963(LTS), 2008 WL 2796599, at *6 (S.D.N.Y. July 17, 2008). Even if

**37.** This was not the first time Prestia experienced a decrease in the number of EECs awarded to her. In December 2003, Prestia had been awarded eighty-five EECs with an intended value of $26,625; but in or around December 2004, she was awarded fifteen EECs with an intended value of $7,200, resulting in a decrease of nearly $20,000 in her total intended compensation. (*Id.* ¶ 144.)

Additionally, decreases in her total intended compensation were not unprecedented, either. In December 2001, Prestia's total intended compensation decreased by almost $7,000 compared to the previous year, and it decreased again more than $3,000 the following year. (Golden Decl. Ex. 58 (Prestia PeopleSoft data).)

Prestia made such a showing, she has not proffered evidence of causation as necessary to establish a prima facie case. As Prestia admits, neither of her supervisors was aware that HR had approved her flexible schedule due to her edema and preeclampsia, and thus, no inference of discrimination arises. This is particularly true insofar as Prestia offers no rationale for concluding that HR did not inform her supervisors for the purpose of discriminating against her. Finally, Prestia does not dispute that other employees' hours were scrutinized, aside from claiming that she was the only person who received such scrutiny despite approval from HR. Such an argument is meritless in light of the just-noted findings.[38] To the extent that Prestia complains that she was excessively scrutinized for two days approximately eight months later with respect to her PROS notes, the Court rejects that contention as well because, as explained below, Prestia cannot show such scrutiny was unlawful.

■ Second, Prestia complains of a number of perceived slights after her return from maternity leave, but she does not explain how any of these altered her conditions of employment. Of these, Trevor Fellows's asking her, "What's this, your third kid?" is precisely the kind of stray remark that "often tak[e]s place at work and that all employees experience," *Burlington N.*, 548 U.S. at 68, 126 S.Ct. 2405 (Courts must "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."), and obviously does not amount to an adverse employment action where the individual making the comment had no authority over Prestia at the time. Next, the Court finds that Prestia has not demonstrated that the movement of her desk amounts to an adverse employment action because she has not offered any evidence indicating how this affected the terms of her employment since she was still placed with her team as a general matter. *See Cunningham v. N.Y. State Dep't of Labor*, No. 1:05–CV–1127–DNH–RFT, 2010 WL 1781465, at *6 (N.D.N.Y. Apr. 30, 2010) ("[P]laintiff's complaints about his new office [location] fall squarely within the class of trivial harms that the *Burlington* Court held Title VII was not intended to protect against.") Additionally, this action does not create an inference of discrimination because it arose out of the entire sales team moving to a new floor while she was out on maternity leave. Likewise, Kaschak's failure to ring a bell to recognize Prestia's sales does not amount to an adverse action, particularly insofar as the only effect this lack of public recognition during a two-week span seemed to have was to, at most, "embarrass" Prestia. *Miksic v. TD Ameritrade Holding Corp.*, No. 12 Civ. 4446(AJN), 2013 WL 1803956, at *3 (S.D.N.Y. Mar. 7, 2013) ("Actions that cause a plaintiff 'embarrassment or anxiety' are insufficient to qualify as an adverse action because such intangible consequences are not materially adverse alterations of employment conditions. (sec-

---

**38.** Prestia asserts that such scrutiny caused her to become severely depressed. (*See* Pl.-Interv'rs 56.1 ¶ 156.) But Prestia admits that she was not diagnosed with depression until May 2006, and nothing in her cited testimony speaks with any precision to when in 2005 such symptoms began. (*See* Roth Decl. Ex. A, at 310–14 (Prestia Dep.).) The only medical evidence in the recorded related to one of Prestia's claims that unwanted stress was further complicating her pregnancy and affecting her ability to work involves her need to take maternity leave early. Yet, that document only states that Prestia would need to be on bed rest due to edema and preeclampsia and makes no mention of stress. (Golden Decl. Ex. 57.)

ond set of internal quotation marks omitted)). For the same reasons, the one or two times Prestia was not introduced to a new employee also are not actionable as adverse actions.[39]

■ Third, Prestia cannot establish a prima facie case with respect to Kaschak's response to discovering that Prestia may have falsified PROS entries. As an initial matter, yelling at an employee regarding a potentially falsified report does not amount to an adverse action. *See Sekyere v. City of N.Y.*, No. 05 Civ. 7192(BSJ), 2009 WL 773311, at *3 (S.D.N.Y. Mar. 18, 2009) (finding delay in giving employee e-mail address, decision to move her seat, and alleged yelling and screaming did not amount to materially adverse changes). Even so, such does not give rise to an inference of discrimination because the record is clear that the PROS reports appear as though they could have been falsified and that this was not the first time Prestia had encountered some kind of trouble with the PROS system, and upon such a discovery any employer likely would question its employee about the contents of other reports, as well. Aside from this occurring a few weeks after she returned from leave, Prestia cannot point to any evidence other than her blanket statements that *she* had never witnessed anyone else receive such scrutiny to establish an inference of discrimination. Assuming *arguendo* that she has established a prima facie case, Prestia would be further barred from pursuing this claim because she cannot show that Kaschak's concerns about Prestia's reports amount to pretext. Prestia makes a relatively incoherent argument regarding Kaschak's not going to HR after discovering that Prestia may have lied. But the record is clear that Kaschak did involve HR on March 13th and March 14th; to the extent she did not go back to HR after reflecting later upon potential inconsistencies in Prestia's explanations, no reasonable jury would conclude that such a decision after the fact proves pretext.

Finally, Prestia cannot show that her 2005 performance review was discriminatory. Not only can she not show that the circumstances of the review give rise to an inference of discrimination, but her papers do not point the Court to a single piece of evidence demonstrating that Bloomberg's nondiscriminatory reason for the review— that she did not meet performance goals even when prorated to account for her leave—amounts to pretext. Prestia tries to argue through her Rule 56.1 Statement that comments in three areas of her review do not align with the numerical ratings. She does not challenge the comments and ratings in areas that are more negative. Prestia, though, does not point the Court to any reviews of other employees with similar language but different ratings. And on their face, the comments about which Prestia complains appear to be in line with the corresponding rating Prestia received based on Bloomberg's metric. For example, Prestia complains that she received a "4" in "Product and Market Knowledge/Self Development." (*See* Pl.-Intervr's Br., at 75.) In that category, the review states at the outset that "Monica's product knowledge was in line with the staff." (Roth Decl. Ex. F, at BLP–0002293.) Bloomberg's definition of "4" is that an employee's "Performance meets expectations." (*Id.* at BLP–0002292.) Absent some evidence that Bloomberg's expectations of employees were that an employee would not be in line with other

---

39. For argument's sake, even if this latter "mistreatment" was an adverse action, Prestia could not rebut as pretext Bloomberg's stated reason that she was on the phone on these occasions because her cited testimony does not directly refute this explanation.

staff, the Court is at a loss for how being "in line with the staff" does not correspond with "meets expectations." Because Prestia cannot make out a prima facie case regarding this event and, even if she could, she has not identified any admissible evidence tending to rebut Bloomberg's non-discriminatory justification, Prestia cannot maintain her discrimination claim based on this event.

### ii. *Compensation Claims*

Summary judgment is appropriate in favor of Bloomberg on Prestia's discriminatory compensation claims, as well. The relevant metric for compensation claims in this action is an employee's total intended compensation. Thus, particularly in the absence of any similarly situated comparators for the Court to consider, Prestia cannot show that her compensation increase in 2006 amounts to an adverse employment action. Finally, even if this could be considered an adverse employment action it does not give rise to discrimination because Prestia's total intended compensation decreased multiple years prior to her pregnancy, and her 2006 decrease was informed by Prestia's performance in 2005, which failed to meet expectations. Consequently, summary judgment on Prestia's discriminatory compensation claim is granted in favor of Bloomberg.

### b. *Retaliation*

Prestia claims that her 2005 performance review was unlawful retaliation. However, even assuming that Prestia has established a prima facie case, summary judgment is granted on this claim in favor of Bloomberg because Prestia cannot show that Bloomberg's non-discriminatory reason was pretextual.

Bloomberg explains that Prestia received a negative performance review because she did not meet performance goals even when prorated to account for her leave. This is a legitimate, non-discriminatory reason, and the burden shifts to Prestia to show that it was pretextual. Prestia, though, does not cite any specific evidence for the proposition that this was such.

First, Prestia cites no authority for why involving HR in a potentially adverse employment action is evidence of pretext. To the extent the Court credits Prestia as having put Kaschak on notice that Bloomberg may face legal action during the March 14, 2006, meeting, an employer is likely to involve HR in decisions going forward involving an employee threatening to sue it. Second, for reasons already stated, Prestia has not proffered evidence that the contents of the review were unwarranted. Third, even if drafts of Prestia's evaluation did not properly account for her leave, Prestia's final evaluation did prorate her revenue target to account for her leave. Finally, the record shows that Wheatley, an HR representative, concluded that Prestia's 2005 review reflected Vulpi's assessment of her performance and was in line with previous performance ratings.[40] (*See* Golden Decl. Ex. 59, at 217–18, 440–41 (Wheatley Dep.).) As such, no reasonable jury could find that Prestia's personal belief that others unjustly influenced the contents and conclusions of her performance review and the temporal proximity of when she received her review and when she engaged in protected activity overcome the evidence offered by Bloomberg to show that Bloomberg's non-discriminatory justification for Prestia's negative review was pretext for retaliation.

---

**40.** To the extent Prestia contends that such ratings were unprecedented, she does not direct the Court to any of her previous performance ratings or the ratings of similarly situated employees.

### c. *Hostile Work Environment and Constructive Discharge*

■ As the Court has observed, Prestia has not made a showing that Kaschak or anyone in HR harbored a bias against pregnant women. "Title VII prohibits discrimination; it is not a shield against harsh treatment at the work place. Personal animosity is not the equivalent of [pregnancy] discrimination [and] [t]he plaintiff cannot turn a personal feud into a [pregnancy] discrimination case." *Doherty v. Nederlander Producing Co.*, No. 04 Civ. 3324(LTS), 2006 WL 2239421, at *5 (S.D.N.Y. Aug. 4, 2006). Additionally, an employer's failure to investigate an employee's complaint cannot "contribute[ ] to or constitute[ ] a hostile work environment." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 724 (2d Cir. 2010). Finally, Prestia offers no evidence or legal argument to conclude that Prestia's complaints meet the objective arm of the hostile work environment standard. Consequently, Prestia's hostile work environment claim fails.

Based on the same course of events, Prestia claims that she was constructive discharged. "Where an alleged constructive discharge stems from an alleged hostile work environment, a plaintiff must show working conditions so intolerable that a reasonable person would have felt compelled to resign. This standard is higher than the standard for establishing a hostile work environment." *Id.* at 725. Because Prestia failed to establish a hostile work environment, her claim of constructive discharge also fails. *Id.*

### 3. *Analysis of NYCHRL Claims*

#### a. *Discrimination*

Assuming for the sake of analysis that Prestia has established a prima facie case under the NYCHRL, Bloomberg is entitled to show that the adverse actions occurred for non-discriminatory reasons. Prestia then must show by direct or circumstantial evidence that Bloomberg's proffered reason might be pretextual. Prestia, however, has not put forth direct or circumstantial evidence tending to cast doubt upon Bloomberg's non-discriminatory stated reason.

As the Court noted *supra*,

[i]n determining whether the reason for an adverse action was pretextual, it is not for the Court to decide whether the complaints against plaintiff were truthful or fair, as long as they were made in good faith. The mere fact that plaintiff may disagree with [her] employer's actions or think that [her] behavior was justified does not raise an inference of pretext. A challenge ... to the *correctness* of an employer's decision does not, without more, give rise to the inference that the adverse action was due to [pregnancy] discrimination. Nor can plaintiff establish pretext by rationalizing [her] errors or by blaming others.

*Melman*, 98 A.D.3d at 121, 946 N.Y.S.2d 27 (citations, brackets, and internal quotation marks omitted).

By and large, Prestia relies upon her own subjective beliefs that she was treated unfairly in order to argue that Bloomberg's stated reason was pretextual. And her argument attempting to demonstrate inconsistencies with respect to Bloomberg's explanations for the PROS notes incident is poorly fleshed out and is belied by the fact that Kaschak did involve HR extensively when dealing with Prestia. Finally, Prestia does not cite any evidence indicating that the context in which her maternity leave may have been mentioned in the review reflects a discriminatory animus; and as a general matter, it would be odd, indeed, if a performance review did not note why an employee was absent for a third of the year.

Such "evidence" is plainly insufficient to carry the burden of showing pretext. *See id.* at 124, 946 N.Y.S.2d 27 ("[T]he initial 'de minimis prima facie showing' required of a plaintiff ... should not be conflated with the 'frequently ... onerous' showing required to defeat a well supported summary judgment motion." (quoting *Bennett,* 92 A.D.3d at 38, 936 N.Y.S.2d 112.)). Thus, the Court finds that Prestia's discrimination claim under the NYCHRL fails for the same reason the First Department held that the plaintiff's claims failed as a matter of law in *Melman.* Where the claimant has not proffered any direct or circumstantial evidence tending to rebut a defendant's stated reason, the Court need not undertake both the *McDonnell Douglas* and mixed-motive analyses, and summary judgment is appropriate in the defendant's favor. *Id.* at 127–28, 946 N.Y.S.2d 27.

### b. *Retaliation*

Given the broader standard under the NYCHRL, Prestia's threat to sue during the March 14, 2006, meeting and her following up on that notice by having her then-attorney send a letter to Bloomberg put the relevant Bloomberg decision-makers on notice that she was engaging in protected activity. Additionally, under the NYCHRL, the nature of the clash between Kaschak and Prestia, the fact that Kaschak was involved in the review process at all, and the temporal proximity of Prestia's complaint and the production of the review suffice under the NYCHRL to establish a prima facie case of retaliation.

Nevertheless, Prestia's retaliation claim under the NYCHRL fails, too. As noted, Bloomberg has set forth legitimate, lawful reasons for Prestia's negative performance review, and Prestia has not offered any evidence tending to draw those reasons into doubt. Even under a mixed-motive theory, Prestia has not offered any evi-

dence, such as other employees' experiences with the review process, demonstrating that it is unusual for Kaschak to be involved in the review process at least to some degree. It seems natural that Vulpi would discuss the reviews of his subordinates, particularly poorly performing subordinates, with Kaschak—his supervisor. Kaschak's testimony regarding Prestia's review merely confirms that she discussed it with Vulpi and states that Vulpi, himself, drafted the narrative, (*see* Silberstein Decl. Ex. D, at 272–73 (Kaschak Dep.)); and Prestia's own subjective *belief* that Kaschak "really influenced the review," (*see* Pl.-Interv'rs 56.1 ¶ 172), does not operate to show otherwise. Prestia also does not offer any evidence contradicting Wheatley's conclusion that the review represented Vulpi's views on Prestia's performance. Finally, as examined above, Prestia does not offer any evidence other than to assert it was a down year for the proposition that her performance ratings do not correspond with the comments or her actual performance. It follows that since Prestia has not offered any direct evidence or circumstantial evidence to rebut Bloomberg's non-retaliatory explanation or even to indicate that a mixed-motive may have played a role in her performance review.

### 4. *Summary*

Bloomberg's motion for summary judgment is granted with respect to all claims asserted by Prestia.

### E. *Maria Mandalakis*

Plaintiff–Intervenor Maria Mandalakis ("Mandalakis") alleges discrimination and retaliation claims under Title VII and the NYSHRL and the NYCHRL. She filed her charge with the EEOC on or around January 30, 2008. (Bloomberg 56.1 ¶ 175.) For the reasons explained relative to the other Plaintiff–Intervenors, Mandalakis cannot invoke the single filing rule to avoid

the statute of limitations on certain Title VII claims. Thus, her Title VII claims are timely if the challenged events occurred on or after April 5, 2007.

Mandalakis had also asserted claims alleging violation of the Family and Medical Leave Act, intentional infliction of emotional distress, and negligent hiring and supervision. She has since abandoned these claims. (*See* Pl.-Interv'rs Br., at 1 n. 2.) Thus, summary judgment is granted at the outset in favor of Bloomberg on these claims.

### 1. *Background*

Since July 1998, Mandalakis has worked as a Broadcast Specialist for Bloomberg Radio Sales in Bloomberg's New York office. (Bloomberg 56.1 ¶ 150.) She became pregnant with her first child in February 2003, and took maternity leave from September 22, 2003, until February 16, 2004.[41] (*Id.* ¶¶ 153, 155.)

Mandalakis returned from maternity leave to the position of Broadcast Specialist. (*Id.* ¶ 156.) Mandalakis claims that when she returned, her accounts were "in a complete state of disarray" because "[n]obody watched [her] account list, [and] nobody followed up with [her] clients." (Pl.-Interv'rs 56.1 ¶ 191.) Bloomberg asserts that Mandalakis's accounts were assigned a backup, Jackie Amatetti ("Amatetti") ("a top biller with excellent follow up skills"), and further attributes the state of Mandalakis's accounts to the lack of a close enough working relationship and good communication plan between Mandalakis and Amatetti. (*See* Dreiband Decl. Ex. 149, at BLP–0001292.) Mandalakis further asserts through her own deposition that this was unusual because it was customary at Bloomberg for coworkers to watch another's accounts when someone took leave. (*See* Pl.-Interv'rs 56.1 ¶ 191.) She identifies in her deposition the names of and certain circumstances involving coworkers who she claims had their accounts watched when taking leave. (*Id.*) As a result, Mandalakis states that she complained to her supervisor and to HR to no avail. (*See id.*)

Mandalakis's total intended compensation for 2004 was $140,534. (Bloomberg 56.1 ¶ 157.) On September 9, 2004, she requested and received paid leave to care for her husband from October 6, 2004, until October 14, 2004. (*Id.* ¶ 159.)

Mandalakis became pregnant with her second child in December 2004. (*Id.* ¶ 160.) Mandalakis requested, and Bloomberg approved, intermittent leave beginning in January 2005 and continuing until she went on maternity leave due to medical complications. (*Id.* ¶ 161.) According to Mandalakis, around this time in January and after she had been out intermittently, Vulpi told Mandalakis that her second-level supervisor, Dave Decina ("Decina"), would be calling her to talk about her sales calls quota, and she then told Vulpi that she was pregnant and had missed work due to certain complications. (*See* Roth Decl. Ex. B, at 201–02 (Mandalakis Dep.); Pl.-Interv'rs 56.1 ¶ 195.) After Vulpi told Mandalakis that she was pregnant, he congratulated her. (Bloomberg 56.1 ¶ 160.) Mandalakis claims that she was then contacted by Decina who expressed concern about her sales calls quota, informed her that the requirement to make 120 calls over three months had changed to forty calls each month, and that her job was in jeopardy if she did not meet the deadline going forward and make-up the calls she had missed. (Pl.-Interv'rs 56.1 ¶ 195.) Mandalakis further states that during this conversation she told Decina that she was

---

41. On January 11, 2004, Mandalakis requested-and Bloomberg approved-an additional month of unpaid leave in addition to her three-months paid leave. (*Id.* ¶ 155.)

taking intermittent leave and was occasionally out on bed rest due to complications in her pregnancy. (*Id.*) According to Mandalakis, Decina told Mandalakis that Lex Fenwick (Bloomberg's CEO) would not care that her complications were affecting her ability to meet her quota and that such a perception regarding Fenwick subsequently was verified by Vulpi. (*See id.*) Mandalakis further states that she attempted to receive permission to work a reduced schedule (less than ten hours a day) but never received formal permission from HR because HR rejected multiple notes Mandalakis provided from her doctor because it was unsatisfied with the notes' verbiage. (*Id.*)

Mandalakis went into pre-term labor on June 26, 2005,[42] and took maternity leave from that date until December 24, 2005. (Bloomberg 56.1 ¶ 162.) Mandalakis complains that at some point after she had been granted maternity leave until she gave birth, Follon (an HR representative) contacted her on behalf of Kaschak to ask when she would be returning to work and to inform her that Kaschak wanted her back at work. (Pl.-Interv'rs 56.1 ¶ 197; Intervenor Complaint [dkt. no. 48] ("Mandalakis Complaint") ¶ 23.)

For 2005, Mandalakis received $137,228 in total intended compensation. (*Id.* ¶ 163.) During her leave, a coworker was assigned to watch her accounts, but he left Bloomberg while she was still on leave. (Roth Ex. B, at 190 (Mandalakis Dep.).) Mandalakis claims that her accounts suf-

fered during her absence because they were not properly watched and that accounts that needed to be renewed were left unattended. (Pl.-Interv'rs 56.1 ¶¶ 198–99.) In doing so, her proffered testimony identifies that certain clients' advertisements did not air as scheduled and that coworkers transferred the billing for her accounts into their names. (*Id.*) Mandalakis again returned from leave to the position of Broadcast Specialist. (Bloomberg 56.1 ¶ 164.) She claims that her complaints to her supervisors about her coworkers' handling of her accounts went unpunished. (Pl.-Interv'rs 56.1 ¶¶ 198–99.)

Mandalakis claims that Kaschak ignored her for two days by not looking up as Mandalakis walked by Kaschak's desk and by not saying anything about the baby when Mandalakis returned.[43] (*Id.* ¶ 165.) According to Mandalakis, the ice was broken when she waved at Kaschak when she was on the phone on her third day back. (*Id.*) Mandalakis asserts that Kaschak continued to treat her in a hostile manner, however. For example, Mandalakis asserts that Kaschak called her into a conference room on more than one occasion and screamed at her about the status of her PROS notes. (Pl.-Interv'rs 56.1 ¶ 200.)

In March 2006, Mandalakis received her July 2005 written performance evaluation from Vulpi and Kaschak. (Bloomberg 56.1 ¶ 167.) Mandalakis alleges that Kaschak included "scathing" comments in her re-

---

**42.** Mandalakis's deposition references hearsay from her doctors, who she claims associated some of her pregnancy complications and pre-term labor to the work environment at Bloomberg. (*See* Pl.-Interv'rs 56.1 ¶ 196–97.) Not only are these statements inadmissible hearsay, but Bloomberg has provided sworn declarations from the doctors identified by Mandalakis contradicting Mandalakis's assertions. In these declarations, both doctors state under oath that they either have

no record or recollection of linking Mandalakis's complications with the work environment at Bloomberg or that they did not offer such a diagnosis. (*See* Dreiband Decl. Ex. 152 ¶¶ 6–9 (Patrick Decl.); Dreiband Decl. Ex. 153 ¶¶ 2–4 (Holland Decl.).)

**43.** It is undisputed that Kaschak never made any comments to Mandalakis about her maternity leave or her pregnancies. (*Id.* ¶ 166.)

view while Mandalakis was on maternity leave. (*Id.*) She further characterizes the section of her review entitled "Communication/Negotiating" as "scathing" because, while it says positive things about her, it ultimately gives her a "5" rating based on her low billing. (*Id.*) Mandalakis alleges that in March 2006, during the review meeting, Kaschak said that Mandalakis's performance had changed and that she was the "Energizer Bunny" now. (*Id.* ¶ 169.) In July 2006, Mandalakis's total intended compensation was $141,669. (*Id.* ¶ 170.)

On January 2, 2007, Mandalakis requested, and Bloomberg granted, intermittent leave to care for her son. (*Id.* ¶ 171.) Her total intended compensation for the period of July 2007 to July 2008 was $151,291. (*Id.* ¶ 172.) In September 2007, Mandalakis claims that Vulpi took over an account called JLMedia when an account representative left the Radio Sales Team. (*Id.* ¶ 173.) She further alleges that Vulpi used it to funnel orders to other people on the team. (*Id.*) On December 7, 2007, Mandalakis again requested and received intermittent leave to care for her son. (*Id.* ¶ 174.) She filed her EEOC charge on or around January 30, 2008. (*Id.* ¶ 175.)

Sometime in 2008, Mandalakis met with HR representative Shelby Siegel ("Siegel") to discuss Bloomberg's hours in light of the fact that she had a son with special needs who required therapy. (*Id.* ¶ 176.) Mandalakis also claims she told Siegel that she felt harassed while she was pregnant. (*Id.*) In July 2008, the Bloomberg work system changed such that part-time and flex-time schedules became available; at least one of Mandalakis's supervisors (Fellows), though, did not believe in such a policy and did not want it to apply to ad sales. (Pl.-Interv'rs 56.1 ¶ 212.) On July 25, 2008, Mandalakis received a written review from Vulpi, which stated that she

had been at sixty-five percent of her 2007 billing goal and was in a good position to meet her 2008 goal. (Bloomberg 56.1 ¶ 178.) Additionally, she received a 2.32 percent increase in her total intended compensation compared to the previous year. (*Id.* ¶ 182.) On October 23, 2008, Mandalakis received confirmation from HR that she could work from home one day per week. (*Id.* ¶ 177.) According to Mandalakis, approximately three weeks after she started working from home, Vulpi showed her an e-mail from Fellows asking Vulpi how he was going to monitor Mandalakis working from home. (*Id.* ¶ 181.) In December 2008, Mandalakis received a year-end performance evaluation from Vulpi. (*Id.* ¶ 179.) She admits that at the end of 2008, "her efforts [were] enthusiastic yet she end[ed] the year at the lower third of the team," as stated in this performance evaluation. (*Id.*)

In January 2009, Bloomberg reviewed Mandalakis's work from home arrangements, and she continued to work from home one day per week. (*Id.* ¶ 180.) Mandalakis filed her Complaint [dkt. no. 48] in this action on March 31, 2009. Mandalakis claims that some time after she filed her charge, she faced many forms of retaliation, particularly from Fellows. Mandalakis claims that the day after her name appeared in the *New York Post* in conjunction with this case, she was uninvited from a meeting involving one of her largest accounts. (*Id.*) Mandalakis testified that Fellows told her that he was reducing the size of attendees to just three people avoid a "mob scene" (or "call mob"). (*See* Roth Decl. Ex. B, at 275 (Mandalakis Dep.).) Mandalakis estimated that the original number of attendees would have been at least five, and she does not know who attended the meeting. (*Id.*) Although she is unaware of anyone else who is uninvited, Mandalakis estimated that at least five employees from Bloomberg originally

were going to attend. (*Id.*) Mandalakis asserts that her ad agency subsequently lost that client and Fellows forbid her from calling on this company directly. (*Id.* at 124.) Additionally, Mandalakis states that Vulpi ensured leads were tunneled to employees other than herself. (Pl.-Interv'rs 56.1 ¶ 210.)

She claims that after Vulpi left Bloomberg, employees were informed in July 2009 that certain accounts that would be split fifty-fifty but that the accounts on which she was working would be a "zero split" (meaning that Mandalakis would not receive any of the billing). (*See* Pl.-Interv'rs 56.1 ¶ 210; Roth Decl. Ex. B, at 253, 262–63, 268–70 (Mandalakis Dep.).) She also claims that Vulpi misled her about the true value of an account on which Mandalakis voluntarily gave the billing to another employee because she was under the impression that the billing would be negligible and that when she tried to raise this concern to Fellows, he replied that she was "stupid to believe [Vulpi]" and refused to fix her billing. (*See* Pl.-Interv'rs 56.1 ¶ 210.) Finally, Mandalakis claims that she has been excluded from other meetings and that she was not consulted on a proposal where she had asked to be in on the preparation. (*Id.*)

### 2. *Analysis of Title VII and NYSHRL Claims*

Because Mandalakis cannot invoke the single filing rule in order to pursue Title VII claims occurring more than 300 days before the date on which she filed her own EEOC charge, summary judgment is appropriate in favor of Bloomberg on any Title VII claims occurring before April 5, 2007.

#### a. *Discrimination*

Mandalakis took two maternity leaves, from September 2003 to February 2004 and from June 2005 to December 2005. She also took two additional shorter leaves. Before 2009, her pay was set annually on July 14th. A snapshot of her compensation since 2002 shows the following.

In 2002, before she became pregnant, Mandalakis received a 12.11 percent pay decrease. (Bloomberg 56.1 ¶ 152.) The following year, while pregnant and before she went on leave, her compensation was decreased by another 2.82 percent. (*Id.* ¶ 154.) In July 2004, five months after returning from maternity leave, Mandalakis received a nearly four percent pay increase, followed by a 2.35 percent decrease in 2005 (which was set while she was on her second maternity leave), and a 3.24 percent increase in 2006. (*Id.* ¶¶ 157, 163, 170.) Her total intended compensation increased again in 2007; this time by 6.79 percent. (*Compare id.* ¶ 172, *with* ¶ 170.) The following year in July 2008, her compensation increased by 2.32 percent, but in January 2009, Mandalakis's total intended compensation decreased by 4.8 percent compared to the July 2008 figure. (*Id.* ¶ 182.) The raw numbers show that Mandalakis's worst pay outcome at Bloomberg was in 2002 (before she became pregnant), and her second worst was in 2009 (four years after her last pregnancy). (*See* Golden Decl. Ex. 75 (Mandalakis People-Soft data).)

Additionally, Bloomberg has provided a comparator chart illustrating how these fluctuations compared to individuals within the same job group with similar performance ratings. (*See* Golden Decl. Ex. 77.) As Bloomberg points out in its opening brief, in 2003, Mandalakis was rated a seven on a scale of zero to nine with nine being the first and received a 2.82 percent pay decrease; although there were no other individuals in her job group with the same rating, the data shows that the two individuals who were rated an eight received 11.58 percent and 5.13 percent pay

decreases, respectively, and made about $35,000 less per year than Mandalakis and that the individual rated a six received an 8.20 percent decrease and made approximately $20,000 less than Mandalakis. (Bloomberg 56.1 ¶ 154.) Similarly, in 2004, Mandalakis was rated a five on a scale of one to six with six being the worst and made over $25,000 more than the other individual with the same job title and supervisor who received the same rating. (*Id.* ¶ 158.) Finally, in 2005, although Mandalakis's total intended compensation was less than her comparator, her comparator previously had been her direct supervisor, and Mandalakis's compensation decreased at a lesser percentage than this individual's at this time. (*Id.* ¶ 168.)

Mandalakis, however, does not respond to this evidence by disputing the figures; and she does not make any argument in her brief with respect to linking her compensation from 2007 through 2009 to discrimination. Because of this tacit abandonment of any potential discrimination claims related to these years and because Mandalakis does not put forth any evidence tending to show discrimination with respect to her compensation other than temporal proximity—which is insufficient given how remote in time these compensation decisions are as compared to her second maternity leave—the Court grants summary judgment in favor of Bloomberg insofar as Mandalakis asserts discrimination claims based on her 2007, 2008, and 2009 compensation awards.

■ Mandalakis, instead, asserts that she was a victim of discriminatory compensation because Bloomberg took measures designed to decrease her billing amounts, which in turn negatively affected her annual compensation. (*See* Pl.-Interv'rs Br., at 82–83.) [44] Specifically, she claims that she lost billing because Bloomberg did not assign her departing employees' accounts, Bloomberg did not ensure that her accounts were watched properly while she was on her maternity leaves, she had to split billing with other team members and sometimes received zero billing on certain accounts, other team members transferred her bills into their names, and her supervisors took no action to rectify these issues despite her complaints. (*Id.*)

In abandoning the use of comparators to draw an inference of discrimination, Mandalakis essentially relies upon temporal proximity to explain why the Court should view these alleged acts as pregnancy discrimination. (*See* Pl.-Interv'rs Br., at 86 (asserting broadly that "Mandalakis had a flourishing career at Bloomberg, until her pregnancy leaves" and that "[i]t is clear from both testimony and exhibits that Defendant's actions did not begin until Mandalakis announced her pregnancy.").) In other words, Mandalakis would like the Court to ignore her compensation pattern between the years immediately preceding and following her pregnancies and rely on her account of why certain events occurred as she alleges and affected her billing. Mandalakis, who relies almost exclusively on citations to her own deposition to dispute Bloomberg's proffered facts,[45] cannot

---

**44.** Although any remaining compensation claims are time-barred under Title VII because the relevant events did not occur within 300 day of the filing of her EEOC complaint, the statute of limitations is tolled under the NYSHRL and NYCHRL between the time a plaintiff files an EEOC charge and receives a right to sue letter from the Commission. Thus, the Court continues its analysis.

**45.** The exceptions are in paragraphs 189, 198, 199, and 200 of the Plaintiff–Intervenors' Rule 56.1 Statement and have no relevance to issues of discriminatory or retaliatory causation or pretext. Aside from paragraph 200, in which she cites to testimony from Kaschak's and Prestia's depositions to date when Bloomberg implemented the PROS system, the other citations to evidence other than her

rely on her own conclusory statements that Bloomberg decision-makers intended to discriminate against her to satisfy her burden of establishing an inference of discrimination. While she refers to other employees who she claims had their accounts monitored while on leave, she offers no details indicating the length of those leaves or how to compare measures those employees took to ensure the individuals watching their accounts could do so properly as against the measures taken by herself. Additionally, while she claims other pregnant women were treated poorly around the same time, she does not cite anything other than her own deposition to support her claims that other women were discriminated against on account of their pregnancies. (*See id.* ¶ 196.) She does not even address Bloomberg's explanation for the status of her accounts upon her return—that she did not develop a good working and communication plan with the individual assigned to watch her accounts—but relies upon her claim that she asked an *HR* representative to make sure her accounts were watched properly to support her claim that her accounts were not watched properly for discriminatory reasons.[46] Without more, in light of her compensation history and below-expectations performance ratings, her supervisors' alleged refusal to remedy her complaints do not tend to imply anything more than a poor working relationship between the relevant individuals, something Title VII and the NYSHRL do not protect against. *See, e.g., Doherty,* 2006 WL 2239421, at *5 ("Title VII prohibits discrimination; it is not a shield against harsh treatment at the work

place. Personal animosity is not the equivalent of [pregnancy] discrimination [and] [t]he plaintiff cannot turn a personal feud into a [pregnancy] discrimination case.").

■ Even if Mandalakis could establish a prima facie case, the above review plainly reflects that she cannot rebut Bloomberg's explanation that Mandalakis's billing is part of a larger pattern and was affected by her own performance shortcomings. Additionally, with respect to Mandalakis's complaints about whether she received full pay during her maternity leave, not only do Bloomberg's attempts to solve the problem belie any inference of discrimination, but Mandalakis has not identified any evidence tending to rebut Bloomberg's explanation that a pay shortfall occurred as a result of bureaucratic confusion. As such, summary judgment is granted in favor of Bloomberg on all of Mandalakis's discriminatory compensation claims.

### ii. *Non–Compensation Claims*

Mandalakis also claims pregnancy discrimination as a result of certain non-compensation actions. Many of these claims mirror the actions she alleges as explanations for her deficient billing figures that resulted in allegedly adverse compensation actions, (*see* Pl.-Interv'rs Br., at 84–85), and for the reasons discussed *supra,* summary judgment is appropriate on those claims in favor of Bloomberg.

■ As for the other events Mandalakis asserts constitute pregnancy discrimina-

---

own deposition are all for the proposition that compensation can be adversely affected by lower billing and worse evaluations. (*See* Pl.-Interv'rs 56.1 ¶¶ 189, 198, 199, 200.)

**46.** The evidence shows that Bloomberg officially did assign employees to watch her accounts while on leave. The Court finds it

strange that Mandalakis would rely upon an HR representative not just to ensure that such an assignment had been made but to understand the intricacies of Mandalakis's accounts and monitor the degree to which those accounts were being watched.

tion, summary judgment is appropriate in favor of Bloomberg on those claims, as well. For starters, even Mandalakis's own cited testimony does not support the conclusion that what Mandalakis describes as her supervisor's refusal to give her an account of a client she knew well amounted to an adverse employment action. The cited testimony states that her supervisor told her that *he* was not giving it to her but that she could go ask the individual to whom the account had been assigned if she would give it to Mandalakis; Mandalakis then did so and received the account. (*See* Roth Decl. Ex. B, at 121 (Mandalakis Dep.).) Next, she cites no evidence other than her testimony and recollection to support her claim that she was the only employee forced to give up all of her billing on certain accounts, and, without more, Mandalakis cannot show that this decision was motivated by discrimination. The Court also finds that Bloomberg's inquiries about her leave status and about whether she would be willing to do a performance review over the phone while on leave do not amount to adverse employment actions because an employer can inquire about an employee's leave status and Mandalakis offers no evidence of how either of these inquiries actually changed the terms of her employment. Similarly, Mandalakis cannot maintain a discrimination claim based on the fact that her supervisors expressed concern regarding how to monitor an employee working from home, particularly insofar as Mandalakis offers no evidence tending to show that such concerns were prompted by discriminatory animus as opposed to their general concerns over Bloomberg's new more flexible work options. It goes without saying that an employee working from home presents more obstacles to supervision than an employee working within an office in front of her supervisors. Moreover, Mandalakis cannot make out a claims based on Kaschak's

pulling Mandalakis into a room and yelling at her about Mandalakis's PROS notes because, as the Court has noted repeatedly, such an incident of yelling does not constitute to an adverse employment action; even so, Mandalakis offers no evidence other than her own assertions within her deposition testimony to support her claim that such incidents were directed at pregnant employees only.

 Finally, Mandalakis claims that she was discriminated against because, while taking intermittent leave for pregnancy complications, a deadline for sales calls was changed from requiring employees to make 120 calls over the course of three months to making forty calls each month for three months. Mandalakis, though, does not claim that this change was intended to affect only her; rather, her complaint is that her supervisors did not grant an exception for her to this change on account of her informing them that she was experiencing pregnancy-related complications. Although, the parties agree that Mandalakis began taking intermittent leave in January 2005, the record is unclear as to when she formally requested and Bloomberg formally approved such leave. The only document either party references with respect to this period of intermittent leave is Mandalakis's family medical leave request form that grants intermittent leave effective as of January 5, 2005, which Mandalakis confirms that she did not sign and submit until February 23, 2005. (Dreiband Decl. Ex. 138, at 442 (Mandalakis Dep.).) The Court finds that Decina and Vulpi's alleged statements that Bloomberg's CEO would not care about Mandalakis's complications when running a report showing the status of her group's sales calls only shows that those supervisors believed that Bloomberg leadership expected all employees to meet their deadlines. Mandalakis admittedly did not tell

either Decina or Vulpi about her pregnancy or her complications before they raised these concerns with her, and nothing in the record shows that either of these supervisors was aware that Mandalakis had been taking a form of medical leave; thus, the Court finds that the alleged reprimand regarding the status of her sales calls does not amount to an adverse employment action giving rise to an inference of pregnancy discrimination merely because of a stray remark speculating about the attitude of Bloomberg's CEO.

In light of the foregoing considerations, the Court grants Bloomberg's motion for summary judgment on all of Mandalakis's discrimination claims alleged as arising under Title VII and the NYSHRL.

### b. Retaliation

#### i. Retaliation Claims "Asserted" Subsequent to Mandalakis's Filing of Her Complaint

 It is well-established that a plaintiff must plead her claims in her complaint. Fed.R.Civ.P. 8(a)(2); *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998). After discovery has commenced, a party must amend her complaint in accordance with Federal Rule of Civil Procedure 15(a) to assert a new claim. And under the circumstances here, the Court sees no reason to create an exception to this basic requirement.

Mandalakis asserts that the only relevant inquiry on this issue is whether Bloomberg had notice of the claims she now asserts and that Bloomberg was provided notice because she filed an EEOC charge related to these claims during the course of the instant action. In support of

this proposition, Mandalakis merely cites a different portion of a case relied upon by Bloomberg for its argument that any unpleaded claims should not be considered.[47] (*See* Pl.-Interv'rs Br., at 80 (discussing *Youssef v. F.B.I.*, 541 F.Supp.2d 121, 160–64 (D.D.C.2008)).) The Court is unpersuaded by Mandalakis's arguments.

According to Mandalakis, the District Court for the District of Columbia held in *Youssef* that a party need not amend her complaint so long as she has filed a charge with the EEOC because the filing of such puts the defendant on notice of any new claims within the charge. (*See id.*) This reading of *Youssef*, however, is too broad.

In *Youssef*, the court considered a claim that was not referenced in the plaintiff's complaint but did so because the defendant had notice of this claim from the outset because it was included in the plaintiff's original EEOC charge *and* because the defendant proceeded to include the claim in its own motion for summary judgment. *See Youssef*, 541 F.Supp.2d at 141. Furthermore, the court stated that while it "would ordinarily require [the plaintiff] to amend his … Complaint to add [the relevant] a claim …, the Court's dismissal of this claim on summary judgment obviates the need for such an amendment." *Id.* at n. 23. Thereafter, the Court expressly declined to consider additional claims that the plaintiff identified during discovery because he did not seek leave to amend his complaint to include them. *Id.* at 160–64. With respect to these latter claims, the Court noted that the defendant did not discuss these potential claims other than to note that the plaintiff had not included them in his complaint. *Id.*

---

47. Bloomberg does not proceed to discuss the merits of any of the claims it identifies as not pleaded in Mandalakis's Complaint and restricts its discussion of any such claims to a legal argument that the Court should not consider any retaliation claims that Mandalakis now asserts but that have yet to be added formally to her Complaint. (*See* Bloomberg Br., at 73–74; Reply Br., at 36–37.)

Here, Mandalakis does not even attempt to explain her failure to seek leave to amend her complaint to include the allegations contained in the subsequent EEOC charge or her failure to stay her portion of the instant action pending the outcome of her EEOC proceedings related to these claims. In the absence of such a basic effort to fulfill her pleading obligations, the Court will not assume that Bloomberg was on notice that Mandalakis would continue to prosecute those claims in this action, and thus, the Court grants Bloomberg's motion for summary judgment on these claims. *See Woods v. Dunlop Tire Corp.*, 972 F.2d 36, 41 (2d Cir.1992) (holding that claimant seeking to raise post-complaint allegations must stay her federal lawsuit pending outcome of administrative proceedings and then amend her federal complaint or seek right to sue letter and then amend her complaint to add post-complaint allegations).

### ii. *Retaliation Claims Pleaded in Mandalakis's Complaint*

With respect to Mandalakis's properly pleaded retaliation claims, the Court holds that she cannot establish a prima facie case of retaliation under Title VII or the NYSHRL. As the Court has noted repeatedly throughout this opinion, being yelled at, misled, publicly reprimanded, and condescended to generally represent examples of "petty slights, minor annoyances, and simple lack of good manners" that may be covered by an employer's own civility code but are not actionable via Title VII and the NYSHRL. *Burlington N.*, 548 U.S. at 68, 126 S.Ct. 2405.

Regardless, though, aside from vague allegations that Bloomberg's allegedly retaliatory acts occurred sometime after she engaged in protected activity, Mandalakis offers no evidence tending to show that any of the individuals she claims retaliated against her was aware that she had engaged in protected activity. While Mandalakis may be correct in noting that the second element of a claim is satisfied by her showing that she alerted HR, her inability even to offer any circumstantial evidence tending to show that any of the individuals she complains mistreated her knew that she had complained about discrimination or was encouraged to mistreat her by someone with such knowledge bears on her ability to establish the causal connection required to make out a prima facie case. In light of all the circumstances, the Court holds that a jury could not find that Mandalakis's vague temporal proximity references suffice to establish a prima facie case on her remaining retaliation claims, and summary judgment is granted in favor of Bloomberg.

### c. *Hostile Work Environment*

Summary judgment is appropriate in favor of Bloomberg on Mandalakis's hostile work environment claim. As noted with respect to the aforementioned claims, Mandalakis fails to draw a causal link between the isolated events of which she complains and her pregnancy. Moreover, with respect to her hostile work environment claim, she fails to demonstrate that an objective person would find her experiences so severe and pervasive that the terms and conditions of her employment were thereby altered. Additionally, no reasonable person would conclude that Bloomberg subjected her to unreasonable hours or conditions of employment without any evidence that Bloomberg allowed any other employees to work less than a ten-hour day between 2001 and 2008. Moreover, Bloomberg granted Mandalakis multiple periods of leave to deal with pregnancy and familial issues, undercutting any notion that Bloomberg's actions were severe or pervasive. Additionally, any reasonable employer would employ some level of scrutiny of doctor's notes to ensure that

employees were being granted leave in accordance with their terms of employment. Mandalakis only offers one other comparator in this regard, fellow Plaintiff–Intervenor Prestia. In doing so, though, the Court finds that such a comparator, if anything, undercuts any inference that this was a discriminatory decision. Finally, as noted with respect to Prestia's claims, Mandalakis's assertions with respect to Bloomberg's alleged failure to remedy her complaints cannot, itself, add to the severity of the conditions she alleges.

Finally, the Court notes that aside from her own, non-medical opinion regarding the effects of Bloomberg's treatment of her, she relies on inadmissible hearsay which happens to be contradicted by sworn declarations from her doctors that have been proffered by Bloomberg. For these reasons, the Court grants summary judgment in favor of Bloomberg on Mandalakis's hostile work environment claim.

### 3. Analysis of NYCHRL Claims

#### a. Discrimination

As the Court has alluded to throughout this opinion, a plaintiff does not reach a jury under the NYCHRL simply because she filed a complaint; she must show that she was treated less well *because of* her protected status. Mandalakis offers no evidence to sustain such a showing. But even assuming that she has, she must show by direct or circumstantial evidence that Bloomberg's proffered reasons might be pretextual.

Mandalakis, however, has not put forth direct or circumstantial evidence tending to cast doubt upon Bloomberg's non-discriminatory stated reasons that any actions Mandalakis claims were motivated by discrimination are explained, instead, by her own deficient performance, as reflected in her compensation history and

reviews. Mandalakis responds to Bloomberg's motion by referencing only her own deposition in support of her claim that Bloomberg acted unlawfully. She does not direct the Court to any evidence other than vague accusations of temporal proximity to overcome Bloomberg's evidence of legitimate, nondiscriminatory explanations. Perhaps her strongest piece of evidence under the NYCHRL is her claim that her supervisors believed that Bloomberg's CEO would not care about her pregnancy complications when reviewing whether she had met her sales calls quota. But such evidence, alone, does not show that Mandalakis was treated "less well" than others. Rather, on its face, it shows that all employees were expected to maintain a certain level of performance. And to the extent such a comment could reflect an anti-pregnancy bias, such is belied by Bloomberg's subsequently granting Mandalakis intermittent leave on account of her complications.

The Court, therefore, holds that, even assuming the presence of a prima facie case, Mandalakis cannot meet her burden at the pretext stage under either the mixed-motive or *McDonnell Douglas* standard. *See Melman*, 98 A.D.3d at 124, 946 N.Y.S.2d 27 ("[T]he initial de minimis prima facie showing' required of a plaintiff ... should not be conflated with the 'frequently ... onerous' showing required to defeat a well supported summary judgment motion." (quoting *Bennett*, 92 A.D.3d at 38, 936 N.Y.S.2d 112.)). Thus, the Court grants summary judgment in favor of Bloomberg on Mandalakis's NYCHRL discrimination claim.

#### b. Retaliation [48]

As the Court noted in its analysis above, aside from vague allegations that Bloom-

---

**48.** Mandalakis does not argue that a different procedural analysis applies under the

berg's allegedly retaliatory acts occurred sometime after she engaged in protected activity, Mandalakis offers no evidence tending to show that any of the individuals she claims retaliated against her was aware that she had engaged in protected activity. Her inability to offer any circumstantial evidence tending to show that any of the individuals she complains mistreated her knew that she had complained about discrimination or was encouraged to mistreat her by someone with such knowledge is relevant to whether Mandalakis can show that she was treated less well because she engaged in protected activity. Moreover, Mandalakis offers no evidence to support her claim that she only suffered from reduced billings because her coworkers discriminated against her for becoming pregnant and retaliated against her upon her engaging in protected activity. Rather, Bloomberg has proffered uncontroverted evidence that Mandalakis encountered negative performance ratings and compensation awards in years in which she was not pregnant, which undercuts Mandalakis vague temporal accusations. Therefore, in light of all the circumstances, the Court holds that a jury could not find that Mandalakis's vague temporal proximity references suffice to sustain a retaliation claim under the NYCHRL, and summary judgment is granted in favor of Bloomberg. *See Dixon,* 416 Fed.Appx. at 110 n. 1.

### 4. *Summary*

The Court grants Bloomberg's motion for summary judgment on all claims asserted by Mandalakis.

### F. *Marina Kushnir*

Plaintiff–Intervenor Marina Kushnir ("Kushnir") alleges discrimination and retaliation claims under Title VII and the NYSHRL and the NYCHRL. She filed a discrimination charge with the EEOC on November 9, 2007. For the reasons explained relative to Lancaster's claims, Kushnir also cannot invoke the single filing rule to avoid the statute of limitations on certain Title VII claims. Thus, any of Kushnir's Title VII discrimination claims occurring before January 13, 2007, are time-barred.

### 1. *Background*

Kushnir began working for Bloomberg as a software engineer in the Data License group in August 2000. (Bloomberg 56.1 ¶ 185.) In August 2005, she began her first maternity leave while employed at Bloomberg and gave birth in September 2005. (*Id.* ¶ 186; Pl.-Interv'rs 56.1 ¶ 186.)

Derek Lo ("Lo"), Kushnir's direct supervisor, and Michael Devaney ("Devaney"), Kushnir's department manager, delivered Kushnir's 2005 performance evaluation by phone that same August. (Bloomberg 56.1 ¶ 187.) During the call, Lo and Devaney informed Kushnir that her total intended compensation that year was set at $103,252. (*Id.* ¶ 188.) They further told her that she had been awarded twenty-four EECs (down from forty-five in 2004) and that the reduction from the prior year was because of market conditions. (*Id.* ¶ 188; Pl.-Interv'rs 56.1 ¶ 188; Golden Decl. Ex. 94, at 102 (Kushnir Dep.).)

Upon Kushnir's return from leave in January 2006, Lo assigned her to troubleshooting projects on existing applications. (Bloomberg 56.1 ¶ 189.) Although Kushnir viewed such assignments as less prestigious than working on new projects, she states that focusing on the existing systems was where she was most needed and the best fit for her given her seniority and

NYCHRL with respect to a party's general pleading requirement. Thus, for the reasons discussed *supra,* the Court will not consider unpleaded claims of retaliation that Mandalakis now pursues as violations of the NYCHRL.

experience. (Golden Decl. Ex. 94, at 99, 107–08. (Kushnir Dep.).) Kushnir's June 2006 performance evaluation noted that

> Marina is a valuable member of the ... team. She continues to produce quality work that meets deadlines and effort estimates.... She works on the majority of DRQS requests relating to the Per Security infrastructure, and is extremely proficient at troubleshooting issues.... In the next year, we would like Marina to improve her development speed, set more aggressive milestone targets, and show more initiative to take on new projects and learn more about Data License systems. With her level of experience, we expect her to be able to tackle projects more independently, both in the research and development phases. We are also looking for Marina to complete her developmental objectives carried over from the past year.

(Golden Decl. Ex. 98.) Thereafter, in August 2006, she was awarded twenty EECs and her total intended compensation was set at $104,696. (Bloomberg 56.1 ¶ 191.)

In early March 2007, Lo began drafting a development plan that identified areas of Kushnir's performance needing improvement. (Id. ¶ 192.) Lo presented Kushnir with the development plan on May 15, 2007, and expressed his concerns about her performance. (Id.) Lo testified that he presented development plans to all of his direct reports. (Dreiband Decl. Ex. 157, at 185 (Lo Dep.).) With respect to Kushnir, Lo informed Kushnir that Bloomberg's performance standards had increased company-wide, and as a result, Lo told Kushnir that she need to be more proactive, take ownership of her projects,

and show more initiative. (Bloomberg 56.1 ¶¶ 193, 195; Golden Decl. Ex. 94, at 137 (Kushnir Dep.); Golden Decl. Ex. 97, at 86–87 (Lo Dep.).) Under the new performance standards, the skills needed to be a senior software engineer at Bloomberg included the ability to program in the C++ computer programming language-skills that Kushnir lacked. (Bloomberg 56.1 ¶ 193.) According to Kushnir, when she was hired at Bloomberg, being able to program in C++ was not a requirement for senior software developers. (Pl.-Interv'rs 56.1 ¶ 193.) Nevertheless, she admits that Bloomberg previously had set learning C++ as an objective for her as early as August 2004. (Bloomberg 56.1 ¶¶ 194, 207.)

On June 15, 2007, Kushnir notified Lo and the other members of the Data License group that she was pregnant. (Id. ¶ 196; Golden Decl. Ex. 94, at 475–76 (Kushnir Dep.).)[49] Sometime during the summer of 2007, Kushnir had entered at least some Fridays and Mondays as vacation days, but Kushnir asserts that Lo told her that he preferred that she take a two-week block of vacation instead of scattering her vacation days throughout a two-month period. (Bloomberg 56.1 ¶ 197; Pl.-Interv'rs ¶ 197; Reply 56.1 ¶ 197.) Although Kushnir states that some of these days were scheduled in order accommodate doctor's appointments and that she told Lo this, Kushnir asserts that Lo told her that she should "re-think" the way that she utilized her time off. (Pl.-Interv'rs 56.1 ¶ 197.) Nevertheless, Kushnir did reschedule her vacation days and testified that she was able to reschedule her doctor's appointments. (Bloomberg 56.1 ¶ 197; Dreiband Decl. Ex. 158, at 135

---

**49.** Kushnir asserts that she informed a representative in Bloomberg's HR department in April 2007 that she was pregnant. (Pl.-Interv'rs 56.1 ¶ 192.) She does not know whether this information was communicated by HR to anyone at Bloomberg. (Id.) Lo testified that he was not aware Kushnir was pregnant when he began drafting the development plan in March 2007. (Reply 56.1 ¶ 196.)

(Kushnir Dep.).) According to Kushnir's testimony, Lo told her that he was making the request because it would make it easier for him to manage his project. (Golden Decl. Ex. 94, at 130 (Kushnir Dep.).) Lo testified that he was opposed to the manner in which Kushnir had scheduled her vacation days because there was a project due at the end of the summer and the team needed to provide coverage throughout the summer for certain products and bug fixes; he further stated that neither Kushnir nor anyone in HR ever told him that Kushnir had scheduled any of those days to accommodate doctor's appointments. (Golden Decl. Ex. 97, at 110–14 (Lo Dep.).)

On August 29, 2007, Kushnir met with other managers and Lo to receive her annual performance review and a written performance plan. (Bloomberg 56.1 ¶ 199.) The latter included deadlines for completing certain objectives. (Id.) Kushnir testified that although she had concerns about some of the "due dates," she never discussed her concerns with Lo or anyone else. (Golden Decl. Ex. 94, at 181–82.) As part of this review, Lo told Kushnir that she was not meeting Bloomberg's standards, needed to be more proactive, needed to take more initiative, and expressed his growing concern with her productivity, ability to multi-task, and difficulty working with the code. (Bloomberg 56.1 ¶ 200.) At this meeting, Kushnir also received her compensation for August 2007 through August 2008. (Id. ¶ 199.) She was informed by Melissa Horowitz ("Horowitz"), an HR representative who attended this meeting, that she received no EECs because her performance did not meet company standards but that she could earn EECs in subsequent years if her performance improved. (Id. ¶ 202.) According to Lo, company policy at the time was that an employee who was put on a performance plan was ineligible to receive EECs. (Reply 56.1 ¶ 202.) As a result, Kushnir's total intended compensation decreased by approximately fourteen percent. (Pl.-Interv'rs 56.1 ¶ 202.)

Kushnir began her second maternity leave on September 5, 2007, and gave birth in December 2007. (Bloomberg 56.1 ¶ 203; Pl.-Interv'rs 56.1 ¶ 203.) She returned from her second maternity leave on or about April 4, 2008. (Pl.-Interv'rs 56.1 ¶ 203.) On November 13, 2007, while on leave, Kushnir filed a charge of discrimination with the EEOC. (Bloomberg 56.1 ¶ 204.) [50] The next day, she began seeing psychologist Jeanne Nesselroth. (Id. ¶ 205.)

After she returned from maternity leave in April 2008, Lo reminded Kushnir that she needed to learn C++ because the majority of new projects in her group would be written in C++. (Id. ¶ 206.) By this time, all new hires into the Data License group were required to know C++, and at least one senior application builder who joined the group at the same time as Kushnir learned it while employed at Bloomberg. (Id. ¶ 208.)

On April 8, 2008, a few days after Kushnir returned from leave, Lo assigned her several urgent projects and requested that she complete one by the end of the day on April 9, 2008. (Id. ¶ 211.) Kushnir asserts that she was assigned a disproportionate amount of work upon her return. (Pl.-Interv'rs 56.1 ¶ 211.) Kushnir further alleges that she informed Lo on April 8th that she needed to leave by 5:00 P.M. because she had a doctor's appointment

---

50. Neither party cites any evidence in the record indicating with any certainty when Lo and Bloomberg senior management became aware that Kushnir had filed an EEOC charge.

and that Lo responded that Kushnir should finish the ticket on time and decide what is more "important." (Bloomberg 56.1 ¶ 211.) Because Kushnir did not complete the project before she left on April 9th, another employee had to release the fix Kushnir had been working on. (*Id.*) According to Kushnir, the project was not so urgent that she could not have finalized it herself the next morning, which she says she informed Lo that she would do. (Pl.-Interv'rs 56.1 ¶ 211.) Kushnir further alleges that after Lo assigned these tasks, he placed her under enormous pressure and checked in on her several times throughout the day,[51] including right before and soon after she used a lactation room even though she had listed that block of time on her calendar. (*Id.*)

Lo conducted regularly scheduled one-on-one meetings with his reports and would ask them about their short- and long-term goals. (Bloomberg 56.1 ¶ 212.) Kushnir asserts that she was informed during one of these meetings about a new rule regarding "enhancement assignments" that applied only to her group. (Pl.-Interv'rs 56.1 ¶ 212.) Lo testified that this new rule was communicated to and applied to all of the employees in Kushnir's group. (Dreiband Decl. Ex. 157, at 183–84 (Lo Dep.).)

On May 20, 2008, Kushnir filed a charge of retaliation with the EEOC. (Bloomberg 56.1 ¶ 215.) In June 2008, Catherine Hui ("Hui") became Kushnir's direct supervisor. (*Id.* ¶ 216.)

In August 2008, Hui, Avi Hayes (Hui's manager), and Christina Bisconti ("Bisconti") (an HR representative) met with Kushnir to provide her annual performance review covering August 2007 through August 2008. (*Id.* ¶ 217.) This time,

Kushnir's performance ratings were primarily "4s" and "5s," which correspond to "[p]erformance meets expectations in some but not all respects for the roles" and "[p]erformance must improve to meet minimal expectations for the role." (*Id.*) Hayes told Kushnir that her performance was "bad" and needed to improve, and Bisconti reiterated that Kushnir was not meeting her manager's expectations. (*Id.*) Based on an e-mail exchange Kushnir had with a coworker, Kushnir suspects that someone shared the contents of her performance review with that coworker. (Pl.-Interv'rs 56.1 ¶ 217.) Kushnir states that she raised this concern with an HR representative but never heard back with respect to this issue. (*Id.*)

In September 2008, Vijay Shah ("Shah") became Kushnir's direct supervisor and Hui became Shah's manager. (Bloomberg 56.1 ¶ 218.) On or about November 10, 2008, Shah presented Kushnir with a development plan containing deadlines for various projects. (*Id.* ¶ 219.) Kushnir then met with Hui, Shah, and Bisconti on December 23, 2008, to receive her performance review. (*Id.* ¶ 220.) Her ratings ranged from "3s" to "5s" on a 1–to–6 scale with "1" representing the best performance and "6" representing the worst performance. (*Id.*) Thus, her numerical ratings reflected that in most areas her performance either "must improve to meet minimal expectations" or at best "[met] expectations in some but not all respects." (*Id.*) Her review further noted that she failed to meet certain target dates required by her November 10, 2008, development plan. (*Id.* ¶ 221.) It also noted that the Data License group was writing new code using C++, RDE, BAS, and

---

51. Lo testified that his custom was to check in on his subordinates numerous times a day if they were assigned an urgent task and he had not heard from them. (Golden Decl. Ex. 97, at 171 (Lo Dep.).)

COMBD2 languages and that Kushnir needed to "get up to speed in these areas." (*Id.*; Golden Decl. Ex. 106, at BLP-0486884.) Kushnir was presented with another written performance plan and informed that she needed to improve her productivity, increase her sense of ownership, and take less time working on tickets. (Bloomberg 56.1 ¶ 221.) While Kushnir admits that her performance failed to improve with increased seniority and, instead, deteriorated, she attributes such performance issues as resulting from the alleged discrimination and retaliation to which she has been subjected. (Golden Decl. Ex. 94, at 588–90.)

Between February 1 and 3, 2009, Kushnir caused two problems that affected many clients, including a code failure (the "World Problem") that affected hundreds of clients. (Bloomberg 56.1 ¶ 222.) Although Kushnir asserts that World Problems occur frequently, (*see* Pl.-Interv'rs 56.1 ¶ 222), Shah, Hui, and Bisconti presented Kushnir with a warning letter on February 12, 2009, and communicated that her performance still was not meeting company standards. (Bloomberg 56.1 ¶ 223.) The warning letter included project deadlines and notified Kushnir that her employment could be subject to termination if her performance did not improve. (*Id.*) Thereafter, Kushnir sent a letter to Shah stating that she believed that she was being set up to fail by Bloomberg and that the alleged performance issues discussed in the February 12th performance plan were pretextual and retaliatory in nature and filed a second charge of retaliation with the EEOC. (Pl.-Interv'rs 56.1 ¶¶ 223, 225.) With respect to the projects described in this warning letter, Kushnir testified that three of the projects were completed on time, one of them was completed one business day late, and one was completed two business days late. (Silber-stein Decl. Ex. 129, at 426, 458–59 (Kushnir Dep.).)

Beginning on April 7, 2009, Kushnir took a two-week vacation. (Pl.-Interv'rs 56.1 ¶ 224.) On April 20, 2009, Kushnir's first day back from vacation, Kushnir met with HR representative Bisconti. (Pl.-Interv'rs 56.1 ¶ 226.) Kushnir testified that during this meeting she told Bisconti that she had received a warning letter in February 2008 and needed feedback on how she had been performing since then and that she believed she was being treated differently. (Dreiband Decl. Ex. 158, at 73–75 (Kushnir Dep.).) That same day, Shah, Paul Mancinelli ("Mancinelli"), and Bisconti met with Kushnir to present her with a second warning letter. (Bloomberg 56.1 ¶ 226.) Shah read the letter aloud, which stated that Kushnir still failed to meet Bloomberg's performance standards. (*Id.*)

The next day, Kushnir, Bisconti, and Shah met to discuss concerns Kushnir raised in the April 20, 2009, meetings. (*Id.* ¶ 227.) Shah detailed the number of days required for each assigned project and told Kushnir that he believed the deadlines were reasonable and could be met. (*Id.*) Among the projects assigned in this letter was a project using C++, which knowledge Kushnir still did not possess. (Pl.-Interv'rs 56.1 ¶ 227.) Kushnir asserts that the deadlines were unreasonable and did not take into account the additional work that she claims Shah routinely disproportionately assigned to her on a day-to-day basis. (*See id.*) During this meeting, Kushnir expressed her belief that she was being set up to fail. (Reply 56.1 ¶ 226; Dreiband Decl. Ex. 158, at 83–84.) Additionally, Bisconti asked Kushnir to provide examples of deadlines that Kushnir believed were reasonable, (Reply 56.1 ¶ 226; Dreiband Decl. Ex. 158, at 83–84.); but, Kushnir never provided such because she believed it "would have been an exercise in

futility," (*see* Pl.-Interv'rs 56.1 ¶ 228). With respect to the assigned project using C++, when Kushnir told Shaw that she would be unable to complete the project by the deadline due to her lack of C++ proficiency, Shaw gave her permission to instead complete the bulk of the project in another programming language. (Bloomberg 56.1 ¶ 230.) Kushnir, however, never completed the project. (*Id.*)

Kushnir filed a third EEOC retaliation charge in April 2009. (Pl.-Interv'rs 56.1 ¶ 232.) Kushnir took disability leave as of approximately August 5, 2009, and has not returned to Bloomberg. (Bloomberg 56.1 ¶ 233.)

### 2. *Analysis of Title VII and NYSHRL Claims*

Because Kushnir cannot invoke the single filing rule in order to pursue Title VII claims occurring more than 300 days before the date on which she filed her own EEOC charge, summary judgment is appropriate in favor of Bloomberg on any Title VII discrimination claims occurring before January 13, 2007.[52]

#### a. *Discrimination*

No reasonable jury could conclude based on the facts presented here that Kushnir was discriminated against because of her pregnancy. For the following reasons, summary judgment is granted in favor of Bloomberg on all discrimination claims alleged by Kushnir.

#### i. *Non–Compensation Claims*

■ Kushnir asserts that in January 2006 she returned to work from her first maternity leave to a less prestigious role because, rather than working on projects with new technologies, she was assigned to troubleshooting projects on existing applications. The Court finds that Kushnir cannot establish that this "change" in responsibilities amounted to an adverse employment action. First, not only does Kushnir admit that this was the best use of her skill set and level of experience, she offers no evidence other than her own subjective assertion that troubleshooting existing applications is less prestigious than working on newer technologies. Such is fatal to a claim relying upon prestige to show that an action is adverse. *See Joseph v. Thompson,* No. A95 CV 4898(DGT)(MDG), 2005 WL 3626778, at *6 (E.D.N.Y. Mar. 23, 2005), *aff'd,* 465 F.3d 87 (2d Cir.2006). Second, the fact that she admits that this was the best use of her skill set and expertise undercuts any inference of discrimination and most certainly prevents her from showing pretext where the only evidence she otherwise offers is temporal proximity.

■ Next, Kushnir asserts that she was discriminated against because she was presented with a development plan in May 2007. First, it is well established that criticism of an employee that is part of training and necessary to allow employees to develop, improve, and avoid discipline, standing alone, is not an adverse employment action. The plan is constructive on its face and elaborates upon the areas of concern that were raised in Kushnir's previous performance review for the purpose of helping Kushnir develop and avoid discipline down the road. (*Compare* Golden Decl. Ex. 100 (May 2007 Development Plan), *with* Golden Decl. Ex. 98 (June 2006 Performance Review).) Kushnir, who does

---

**52.** Although Kushnir's Title VII claims occurring more than 300 days before the date she filed her EEOC charge are time-barred, the statute of limitations is tolled under the NYSHRL between the time a plaintiff files an EEOC charge and receives a right to sue letter from the Commission. Because the NYSHRL is evaluated under the same standards as Title VII, though, the analysis herein discusses allegations that Kushnir is barred from pursuing under Title VII but may pursue under NYSHRL.

not even address the content of the plan, offers no explanation for why such "criticism" is actionable under the law. Moreover, Kushnir cannot even establish an inference of discrimination with respect to this development plan. Kushnir claims that an inference is generated here because she informed an HR representative in April 2007 that she was pregnant. The undisputed evidence, however, shows that Lo, her supervisor, began preparing the plan in March 2007 and that Kushnir did not inform Lo of her pregnancy until June 2007. She offers no evidence tending to show that anyone from HR informed Lo of her pregnancy prior to when she received her development plan, and she offers no evidence other than her own speculation to rebut Lo's direct testimony that he provided development plans to all of his direct reports. Thus, Kushnir cannot establish the causal element of a discrimination claim with respect to this claim, either.

■ Kushnir also asserts that Lo's request that she reschedule her vacation days to be used in a two-week block amounts to discrimination. "In general, the denial of vacation time does not generally rise to the level of an adverse employment action. Moreover, the denial of a single vacation request, without any indication that there was an absolute prohibition against plaintiff taking any vacation time, is not a material adverse employment action." *Chukwuka v. City of N.Y.,* 795 F.Supp.2d 256, 261 (S.D.N.Y.2011). Kushnir does not offer evidence that this requirement applied only to her, and she admits that she was not prevented from using her full allotment of vacation time. Kushnir claims that she had scheduled them on Fridays and Mondays throughout the summer to accommodate doctor's appointment required on account of her pregnancy. While Kushnir claims that she informed Lo of this reasoning and Lo claims that she did not inform him of such, Kushnir admits that she did not miss any doctor's appointments as a result. It follows that Kushnir cannot show any restriction on how she used her vacation time amounts to an adverse action.[53]

■ Kushnir further asserts that Bloomberg's placing her on a performance plan in August 2007 was unlawful discrimination. Because such a move impacted her eligibility to receive EECs, the Court holds that Kushnir can show that this was an adverse action. Assuming, though, that Kushnir can establish an inference of discrimination, Bloomberg has proffered a legitimate, non-discriminatory reason for this action: Kushnir needed to be more proactive and to take more initiative, and Bloomberg harbored growing concerns with Kushnir's productivity, ability to work on more than one project at a time, and her difficulty working with code. (*See* Bloomberg Br., at 82; Reply Br., at 40.) Thus, the burden shifts back to Kushnir to prove pretext by a preponderance of the evidence; something she has not done.

The record shows that Bloomberg's performance standards increased companywide in late 2006 and early 2007, and implemented a requirement that senior

---

53. Even if Kushnir established a prima facie case on this claim, Bloomberg proffers a legitimate, non-discriminatory reason for such a preference-that such scheduling aided Lo's ability to assign work because there was a project due at the end of the summer and the team needed to provide coverage throughout the summer for certain products and bug fixes. Kushnir's mere lack of awareness of a big project does not mean that there was not one, and she proffers no evidence to contradict Lo's testimony on this point. Lo's reason was that there was a project *and* he needed to ensure proper coverage otherwise. It is quite conceivable that certain employees would be assigned to providing more general coverage while others worked on more consuming projects.

software engineers know C++. Kushnir claims that after focusing her attention on projects that did not require proficiency with C++, Bloomberg only began to complain about her lack of C++ knowledge because she became pregnant. (*See* Pl.-Interv'rs Br., at 64.) But the undisputed evidence demonstrates that Kushnir was informed that of a growing emphasis within Bloomberg on C++ as late as August 2004, and her performance reviews set her learning C++ as an objective each year. Simply working primarily on "older technology" or even becoming pregnant does not absolve an employee from learning the requisite skills to adapt in an evolving workplace. Moreover, an employer is not required to provide classes to employees lacking such skills, much less to provide them during the workday.[54] As the Court has noted previously in this action, the law does not mandate a work-life balance. The record here is clear that even though Bloomberg may not have offered its own intensive course in C++, it offered to pay the cost of a

course if Kushnir took it at a local college. (Golden Decl. Ex. 94, at 232–35 (Kushnir Dep.); Reply 56.1 ¶ 194.) Although such an option would have presented difficulties for any mother who has recently returned from maternity leave, such does not amount to proof of unlawful pregnancy discrimination. Because Kushnir cannot meet her burden at the pretext stage, she cannot survive summary judgment on this claim.

ii. *Compensation Claims*

Kushnir cannot establish that that her August 2005 compensation award was an adverse employment action. In an effort to establish a prima facie case, she relies upon comparator data that is selectively chosen and inherently flawed.[55] Additionally, Kushnir offers no evidence that Bloomberg's salaries were intended to be consistent department-wide and no evidence indicating that Bloomberg's compensation decisions are made based solely on an individual's overall performance rating.[56] Moreover, the Court notes that Kushnir's brief does not even broach the

---

**54.** The record shows that Bloomberg gave Kushnir a chance to take a C++ class in 2005 and provided her with access to a tutorial. (*See* Bloomberg 56.1 ¶ 194.)

**55.** Kushnir offers no explanation for why she chooses the three comparators that she did for that year, and she relies on a blatantly inaccurate recalculation for each employee's "intended EEC compensation" even though the accurate calculation is reflected plainly on the proffered charts. (*Compare* Pl.-Interv'rs 56.1 ¶ 188 & n. 6, *with* Silberstein Exs. 134–37.) Kushnir further asserts without citing any evidence for support that a comparator who received a similar decrease in EECs as she was pregnant, as well. (*See* Pl.-Interv'rs 56.1 ¶ 188.) The comparator chart proffered by Bloomberg, however, demonstrates that this individual went on leave eleven months after her 2005 EECs were reduced at a similar rate as Kushnir's, indicating that Kushnir is incorrect in asserting that this individual was pregnant at the relevant time. (*See* Golden Decl. Ex. 96.)

**56.** The Court notes that 2005 was not the first year Kushnir's EECs were cut. Indeed, in 2004, she received fifteen fewer EECs than she did in 2003. Although her total intended EEC compensation increased by more than $8,500 in 2004 despite the decrease in EECs, this comparison highlights the flaws in the Plaintiff–Intervenors' reliance upon the number of EECs awarded. Additionally, to the extent that Kushnir relies upon the number of EECs awarded as compared to the previous year as a gauge for her performance, this also undercuts her claim that she had no reason to believe that her performance was on a downward trajectory. After all, based on Kushnir's proffered equation for calculating differences between years in total intended EEC compensation, Kushnir's 2004 award of fifteen fewer EECs translates into a nearly $7,000 decrease in her total intended EEC compensation as compared against her 2003 award.

subject of why the Court should conclude that Bloomberg's stated reason for her 2005 decrease in EECs (market conditions) amounts to pretext. The Court, therefore, finds that summary judgment is appropriate in favor of Bloomberg on Kushnir's claim that her 2005 compensation was discriminatory.

With respect to Kushnir's claim that her 2006 reduction in EECs amounts to discriminatory compensation, the Court finds that she has not established a prima facie case. First, she does not dispute that after returning from maternity leave, she received an overall raise in total intended compensation—the most relevant metric for such a claim. Second, even though the other employee with the same rating and same supervisor discussed by the parties received a compensation increase at a more significant rate than Kushnir, it is undisputed that Kushnir's total intended compensation was still nearly $15,000 more per year than this comparator. (*See* Golden Decl. Ex. 96.) Regardless, Bloomberg justifies its decision to cut her 2006 EECs because of her poor performance in certain areas. On their face, Kushnir's 2005 and 2006 performance reviews reflect an increased concern about Kushnir's performance in 2006 as compared to 2005, indicating that her performance was worse than the previous year despite the same numeric rating. Additionally, the fact that Kushnir's total intended compensation increased after returning from pregnancy further belies an inference of discrimination or claim of pretext. Thus, Kushnir has not proffered sufficient evidence to survive summary judgment with respect to her 2006 discriminatory compensation claim.

Summary judgment is also appropriate on Kushnir's claim that her 2007 compensation award was discriminatory. As the Court has already held, Kushnir cannot show on the record here that Bloomberg's decision to put her on a performance plan was unlawful discrimination. In 2007, Kushnir's annual salary stayed the same but she received zero EECs. Bloomberg has proffered evidence that company, if not departmental, policy was that employees on a performance plan were ineligible to receive EECs. Kushnir argues that this is pretext for two reasons. First, she claims that when Mayor Bloomberg previously ran the company, all employees were eligible to receive EECs and that receiving zero EECs would have been impossible because that employee would have been fired. But company policy under a former CEO who had been separated from the company for approximately six years is not proof that such policy remained in place in 2007. Second, Kushnir asserts that a male colleague of Kushnir's rating also decreased from four to five but that he was awarded the same number of EECs as he had been the previous year. But Kushnir offers no evidence indicating that this employee's "5" rating means that he also was on a performance plan, and the record shows that this same employee subsequently was placed on a performance plan and thereafter received zero EECs before eventually being terminated. (*See* Silberstein Decl. Ex. 136; Dreiband Decl. Ex. 159, at 99–100.) Thus, even if Kushnir could establish a prima facie case with respect to her 2007 compensation award, she has not proffered sufficient evidence upon which a jury could find that Bloomberg's legitimate, non-discriminatory reason was pretextual.

Finally, the Court notes that Kushnir offers no evidence with respect to any of these compensation awards tending to show that her performance actually improved from year-to-year or that she developed the skills Bloomberg set as objectives for her to learn. In light of all these considerations, the Court holds that sum-

mary judgment is granted in favor of Bloomberg on all of Kushnir's discriminatory compensation claims.

### b. *Retaliation*[57]

After Kushnir filed her EEOC discrimination charge in November 2007, she continued to receive negative performance reviews and received written warnings about her failure to meet company standards. Specifically, Kushnir claims that:

- upon her return from her second maternity leave in April 2008 (she was on leave when she filed her charge), she was assigned a disproportionate and excessive workload, did not receive the same flexibility in receiving assistance from coworkers or in receiving extensions on deadlines as other coworkers, was subjected to excessive scrutiny and monitoring, was given the cold shoulder by her supervisors, and was told that she needed to decide whether her work or her family was more important after informing her supervisor that she needed to leave on time for a doctor's appointment;

- in 2008, a colleague was allegedly told of the contents of her performance review and that her complaints to HR with respect to this issue went unanswered;

- she received a negative annual review and zero EECs in August 2008 and a negative end-of-year review in December 2008; and

- she was placed on a series of development plans, performance plans, and written warnings throughout 2008 and 2009.

(*See* Pl.-Interv'rs Br., at 67.) Kushnir asserts that these acts constitute unlawful retaliation.

Aside from Kushnir's compensation-related claim, none of these actions alone is an actionable adverse employment action under Title VII or the NYSHRL. In essence, though, Kushnir's allegations, even taken together, amount to her complaining that Bloomberg continued the same course of conduct that prompted her to file a discrimination charge with the EEOC in the first place. The natural progression of Bloomberg's conduct towards Kushnir would have been continued scrutiny of her projects to ensure that her performance was improving, and to the extent Bloomberg believed that it was not, one would expect Bloomberg to follow a similar path as here with respect to the issuance of the performance plans, compensation, and warning letters of which Kushnir complains. In such a situation, the Court in-

---

**57.** In its opening brief, Bloomberg argues that summary judgment is appropriate on all of the allegedly unlawful events occurring after Kushnir filed her EEOC discrimination charge whether analyzed as discrimination or retaliation claims. (*See* Bloomberg Br., at 82–88.) In her response, however, Kushnir does not offer any argument that the events that she claims to be unlawful and that occurred after she filed her EEOC charge should survive summary judgment as discrimination claims. Therefore, to the extent that her complaint could have been interpreted as asserting discrimination claims based on these events, the Court interprets Kushnir as having abandoned any potential argument to that effect and as having clarified that her complaint alleges retaliation claims based on the events occurring after she filed her EEOC charge. It follows that to the extent that Kushnir's claim could have been construed as alleging discrimination claims based on the alleged adverse actions taken against Kushnir after she filed said charge, summary judgment would be appropriate in favor of Bloomberg on any such claims. Nevertheless, summary judgment would be appropriate for such discrimination claims for the same reasons summary judgment is appropriate when evaluating these allegations as retaliation claims: Kushnir has not proffered evidence tending to show causation; and even if she has, she has not proffered evidence sufficient for a jury to find pretext.

fers little causal connection between Kushnir's protected activity (which aside from her EEOC charge amounts to continuing to file complaints after each allegedly adverse action) and Bloomberg's continued course of challenged conduct. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001); *Melman*, 98 A.D.3d at 129, 946 N.Y.S.2d 27.

A conclusion that the events alleged here lack a causal connection to a retaliatory motive is buttressed by the following observations. First, Kushnir offers no evidence tending to show that her performance ever improved or that she made any attempt to learn the skills Bloomberg required upon elevating its companywide standards.

Second, Kushnir cites no evidence that the decision-makers who allegedly retaliated against her upon her return from maternity leave in April 2008 had any knowledge that she had filed an EEOC charge while she was on leave. As the Court has noted, the absence of even circumstantial evidence tending to imply knowledge by these individuals undercuts an inference of a retaliatory motive.

Third, aside from her own subjective assertions, Kushnir does not offer any evidence tending to belie the testimony of Lo, an individual charged with actually assigning work to Kushnir and her team, that workload is never distributed evenly by number of projects and that it is not unusual for half of a certain type of ticket (DRQS tickets, specifically) to be assigned to one software engineer. (Golden Decl. Ex. 97, at 190 (Lo Dep.).) In fact, it is clear from the record that different tickets require different lengths of time to complete; thus, it is only natural that tickets would not be assigned numerically evenly across the team in such a way.

Fourth, Kushnir does not even offer a standard by which to evaluate her complaint that the assigned deadlines were unreasonable. Just as she did not offer to Bloomberg her own views on what would have been reasonable deadlines when asked to do so, Kushnir fails to offer the Court any metric for seeing her complaint as anything more than a conclusory allegation. Furthermore, Kushnir repeatedly cites the same one or two documents for the proposition that another co-worker was granted a deadline extension whereas her extension requests were rebuffed repeatedly. Kushnir does not offer any evidence outside of her own conclusory allegations, though, with respect to the context in which these referenced extensions were granted.

Fifth, Kushnir's reliance upon temporal proximity to support the causal element is undercut repeatedly by her continued failure to meet company standards. For example, Kushnir admits that she failed to meet the requested deadlines on two of the projects assigned in the first warning letter.

Sixth, aside from offering excuses for her failure to learn C++, Kushnir offers no rationale for concluding that Bloomberg's warning letters should have continued to ignore her failure to develop a skill that it had requested she begin developing at least five years prior to the issuance of said letters. Moreover, Bloomberg offered to let Kushnir complete the bulk of this project in a language in which she was proficient; yet, she did not.

Finally, Kushnir's claim that Bloomberg's elevated performance standards "seemingly only applied to [her]," (Pl.-Interv'rs Br., at 68), amounts to rank speculation. Lo testified that he personally told Kushnir that the standards applied to everyone, and Kushnir does not offer any evidence tending to show that these issues

were better discussed at group-wide meetings as opposed to the weekly one-on-one meetings with Lo or any other evidence tending to contradict Lo.

Had Kushnir been able to establish a prima facie case, these observations would have applied with even more force in the face of her weightier burden at the pretext stage and demonstrate clearly that she cannot survive summary judgment in light of Bloomberg's legitimate, non-retaliatory reason: that Kushnir continued to perform below expectations. Consequently, summary judgment is granted on these claims in favor of Bloomberg.

### c. *Hostile Work Environment*

With respect to the adverse actions that Kushnir asserts severely and pervasively permeated her experience at Bloomberg from the moment she took her first maternity leave, the Court has found repeatedly that the events Kushnir alleges to be adverse do not give rise to an inference of a discriminatory or retaliatory animus. "To prevail on a claim of hostile work environment based on [ ] discrimination [or retaliation], the plaintiff must establish that the abuse was based on her [protected status.]" *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir.2010). Kushnir has not proffered evidence that such a motive underlay what she claims to be a severe and pervasive pattern of abuse.

Additionally, Kushnir's claim fails because she has not shown that a reasonable jury could conclude that a reasonable person would find her experiences so severe and pervasive that the terms and conditions of her employment were thereby altered. She neither offers a standard by which to view her claims in such a light nor case law holding such against an analo-gous set of facts. Thus, summary judgment is appropriate in favor of Bloomberg on this claim, too.

### 3. *Analysis of NYCHRL Claims* [58]

To sustain her discrimination and retaliation claims under the NYCHRL, Kushnir must be able to show that she was treated less well because of her protected status or because she engaged in protected activity, respectively. Even assuming that Kushnir has made out a prima facie case under the NYCHRL's especially *de minimis* standard, she still must show by direct or circumstantial evidence that Bloomberg's proffered reasons might be pretextual.

In an effort to get her case to a jury, Kushnir relies principally on her own speculation that she was singled out. She does not direct the Court to any inconsistencies in Bloomberg's stated non-discriminatory reasons to survive summary judgment, even under the NYCHRL. Bloomberg's non-discriminatory stated reasons are that any actions Kushnir claims were motivated by discrimination are explained, instead, by her own deficient performance, as reflected in her compensation history and reviews. Tellingly, Kushnir offers no evidence, direct or circumstantial, that her performance improved, much less remained consistent, once she was presented with a development plan highlighting areas in which she needed to improve. The evidence Kushnir does rely upon is plainly insufficient to carry her substantial burden of pretext. First, Kushnir asserts that her May 2007 development plan failed to identify a single project that needed improvement. In a sense, Kushnir is accurate that the plan does not identify a "single" project that needed improvement; instead,

---

**58.** Because the Court interprets Kushnir's NYCHRL claims broadly, her discrimination and retaliation claims under the NYCHRL tend to rely on certain overlapping citations to the record, and the same lack of evidence defeats both claims under the NYCHRL, the following analysis applies to Kushnir's ability to show pretext as to both NYCHRL claims.

the document identifies at least seven projects that illustrate a need for improvement. (*See* Golden Decl. Ex. 100.) Moreover, the preparation of this plan predates Kushnir's informing HR that she was pregnant, and it was presented to Kushnir by her supervisor before she told her supervisor that she was pregnant. Finally, the constructive criticisms within the plan echo and build out of the criticisms found in her 2006 performance review.

Additionally, Kushnir complains that she was burdened with unreasonable deadlines and disproportionate work assignments at various times, but she proffers no objective evidence to support such a claim. Nowhere does she state what would have been a reasonable deadline, and thus a jury has no evidence to compare against Bloomberg's proffered evidence showing that Kushnir's supervisor thought the deadlines were reasonable.[59] Furthermore, Kushnir cannot show that Bloomberg's deadlines were unreasonable and pretextual by pointing the Court to a document showing that in the past, for an unstated reason, a coworker was granted a deadline extension but Kushnir, later, was not. Similarly, Kushnir cannot show that she was given a disproportionate amount of work based on her being assigned the majority of a certain kind of ticket because she offers no evidence showing that her colleagues were any less consumed with other projects than she was with the projects assigned to her.

Kushnir cannot rely on one of her supervisors' telling her that she needed to decide between what was more "important"

with respect to finishing a project or going to a doctor's appointment. On its face, such a statement is gender neutral, and Kushnir offers no evidence that this stray remark was directed at her because of her pregnancy or because she engaged in protected activity. Indeed, the record shows that one of her coworkers stayed after she left and released the project at issue. Kushnir's subjective belief that it could have waited until the next day cannot satisfy her burden even under the broader standard of the NYCRL. Similarly, Kushnir cannot rely upon evidence that her supervisor refused to permit her to take *vacation* days because she was pregnant. She offers no evidence that other employees were permitted to take vacation days the way she proposed, and surely even the NYCHRL does not prohibit an employer from asking if one of its employees can reschedule doctor's appointments that might interfere with job performance.

Next, Kushnir does not offer evidence related to compensation sufficient to sustain her burden. Not only does Kushnir not even discuss why Bloomberg's explanations regarding her 2005 and 2006 compensation rewards are pretextual, her comparisons rely upon flawed calculations. Additionally, in the face of a plethora of evidence showing that Kushnir's performance did continue to deteriorate, she offers no evidence that she is the only employee that Bloomberg held to such standards; and she offers no timely evidence tending to rebut Bloomberg's proffered testimony that employees in her department placed on performance plans were ineligible for

---

**59.** With respect to the 2007 performance plan, Bloomberg offers evidence that Lo told Kushnir that some of the deadlines in the plan were not completion dates but meant that the requested changes should begin immediately. Additionally, Lo testified that one of the deadlines was an end-of-year target and those that were actual deadlines were such that he be-

lieved she could meet them prior to going on maternity leave. (*See* Dreiband Decl. Ex. 157, at 131–38 (Lo Dep.).) Nowhere does the law state that an employer is required to lower its performance expectations solely because an employee is about to take maternity leave.

EECs. The record indicates that within approximately a year after Kushnir was placed on a performance plan and awarded zero EECs, the comparator the parties discuss most often was put on a performance plan and awarded zero EECs and eventually terminated.[60]

Finally, particularly with respect to Kushnir's retaliation claims, although Kushnir did an excellent job creating a paper trail of complaints so as to allege retaliation with respect to whatever potentially adverse action occurred next, such temporal proximity does not rebut the clear evidence that Kushnir's performance continued to decline. It should go without saying that even the NYCHRL does not redefine the word "deadline" such that Kushnir can admit missing two deadlines that were set in the February 2009 warning letter yet still maintain that she met expectations. Moreover, she cannot rely on her failure to develop a job skill over the course of five years to assert pretext under the NYCHRL when Bloomberg assigned her a project to be completed by utilizing that skill and still offered to allow her to complete the bulk of the project in a manner consistent with her own knowledge.

Because no jury could find that Kushnir has met her burden at the pretext stage under either the mixed-motive or *McDonnell Douglas* standard with respect to both Kushnir's discrimination and retaliation claims as asserted under the NYCHRL, summary judgment is appropriate in favor of Bloomberg. *See Melman*, 98 A.D.3d at 124, 946 N.Y.S.2d 27 ("'[T]he initial de minimis prima facie showing' required of a plaintiff ... should not be conflated with the 'frequently ... onerous' showing required to defeat a well supported summary

judgment motion." (quoting *Bennett*, 92 A.D.3d at 38, 936 N.Y.S.2d 112.)).

### 4. *Summary*

Bloomberg's motion for summary judgment on all claims asserted by Kushnir is granted.

## VI. CONCLUSION

Bloomberg's motion for summary judgment on all of the claims asserted by the Plaintiff–Intervenors [dkt. no. 322] is GRANTED in part and DENIED in part. Specifically,

- Bloomberg's motion for summary judgment on Patricot's Title VII and NYSHRL discrimination claims with respect to her 2006 demotion and compensation decrease is denied. Bloomberg's motion is granted, however, with respect to the other claims Patricot asserts under Title VII and the NYSHRL. Bloomberg's motion is denied with respect to Patricot's NYCHRL discrimination and retaliation claims;

- Bloomberg's motion for summary judgment is granted with respect to all claims brought by Lancaster;

- Bloomberg's motion for summary judgment is granted with respect to all claims brought by Loures;

- Bloomberg's motion for summary judgment is granted with respect to all claims asserted by Prestia;

- Bloomberg's motion for summary judgment is granted on all claims asserted by Mandalakis; and

- Bloomberg's motion for summary judgment is granted on all claims asserted by Kushnir.

The Clerk of the Court shall terminate this action with respect to Plaintiff–Inter-

---

**60.** In light of this individual's fate, Kushnir does not even offer evidence that appropriate comparators were given more opportunities to right the ship than she.

venors Lancaster, Loures, Prestia, Mandalakis, and Kushnir. Counsel for Patricot and Bloomberg shall confer and inform the Court by letter no later than September 30, 2013, as to how they propose that this action should proceed.

SO ORDERED.